```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   UNITED STATES OF AMERICA,          )
                                        )
 4               Plaintiff,             )
                                        )
 5               v.                     )   No. 17 CR 00084
                                        )
 6   IVAN REYES AZARTE,                 )   Chicago, Illinois
                                        )   November 8, 2018
 7               Defendant.             )   9:56 a.m.

 8             TRANSCRIPT OF PROCEEDINGS - Sentencing

 9        BEFORE THE HONORABLE HARRY D. LEINENWEBER

10   APPEARANCES:

11   For the Plaintiff:        HON. JOHN R. LAUSCH, JR.
                               United States Attorney
12                             BY:  MS. KATHERINE SAWYER
                                    MR. DEVLIN N. SU
13                             Assistant United States Attorneys
                               219 South Dearborn Street, Suite 500
14                             Chicago, Illinois 60604
                               (312) 353-5300
15
     For the Defendant:        LOPEZ & LOPEZ, LTD.
16                             BY:  MR. JOSEPH R. LOPEZ
                               53 West Jackson Boulevard
17                             Suite 1651
                               Chicago, Illinois 60604
18                             (312) 922-2001
                               josephrlopezlaw@gmail.com
19
     ALSO PRESENT:             MR. JOSE PINA,
20                             MS. KATHLEEN MORRIS, and
                               MS. KATHLEEN O'HANLON,
21                             Official Court Interpreters

22
     Court Reporter:           Judith A. Walsh, CSR, RDR, F/CRR
23                             Official Court Reporter
                               219 South Dearborn Street, Room 2118
24                             Chicago, Illinois 60604
                               (312) 702-8865
25                             judith_walsh@ilnd.uscourts.gov
```

```
 1                          I N D E X
 2   WITNESS                      DX    CX    RDX    RCX
 3   SERGIO VILLARREAL BARRAGAN
 4       By Ms. Sawyer            10           61
 5       By Mr. Lopez                   39
 6   MATTHEW SANDBERG
 7       By Mr. Su                65          141
 8       By Mr. Lopez                  116           143
 9
10
11
12                        E X H I B I T S
13   NUMBER                       MARKED    RECEIVED
14   Government Exhibit
15       Nos. 1 through 12                    80
16
17
18
19
20
21
22
23
24
25
```

1     (Proceedings heard in open court:)

2         THE CLERK:  17 CR 84, United States versus Azarte.

3         MR. LOPEZ:  Judge, the government and I need to

4 discuss just one matter, please.

5         THE COURT:  All right.

6         MS. SAWYER:  Thank you, your Honor.  I apologize.

7 Katherine Sawyer and Devlin Su on behalf of the United States.

8         MR. LOPEZ:  Joseph Lopez for the defendant, your

9 Honor.

10         THE COURT:  All right.  We're here for sentencing?

11         MR. LOPEZ:  Yes.

12         THE COURT:  All right.  I have received a presentence

13 report prepared by Ms. Kwong dated July 19th of this year.  I

14 have received her sentencing recommendation.  I have received

15 the defendant's objections, presentence investigative report,

16 and position paper.  I have received defendant's certificates

17 in support of his position paper and character letters.  I

18 believe there were 47 letters in both Spanish and English that

19 were sent to me.  And I have received the government's

20 sentencing memorandum.

21         Anything else I should have?  This morning, I've been

22 presented with government exhibits, also, and a list of names

23 that may come up.  That's about all I have.  Is there anything

24 else I should have?

25         MR. LOPEZ:  No.  I think that's it, Judge, other than

1    the witnesses' testimony.

2              THE COURT:  Right.  And so, Mr. Lopez, have you read

3    the presentence report?

4              MR. LOPEZ:  I have.

5              THE COURT:  Have you discussed it with your client?

6              MR. LOPEZ:  I have.

7              THE COURT:  Mr. -- does he go by Reyes or both names?

8    How does he wish to be addressed?

9              MR. LOPEZ:  Reyes Azarte.

10             THE COURT:  Reyes Azarte?

11             MR. LOPEZ:  Yes, please.

12             THE COURT:  All right.  Have you read this report?

13             THE DEFENDANT (through the interpreter):  Yes.

14             THE COURT:  Have you had it translated for you?

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  All right.  The defendant had -- I think

17   there were two written objections that we need to go through.

18   And that starts on Page 5.  The first one -- oh, wait a

19   minute.  Excuse me.  On Page 4, the government presumes that

20   Reyes Azarte is Ayalla.  And as I understand it, he denies it

21   and wishes to have Paragraph 8 -- Paragraph 28 on Page 8

22   removed.  Is that correct?

23             MR. LOPEZ:  Yes.

24             THE COURT:  And plus the three points.

25             MR. LOPEZ:  Yes.

1        THE COURT:  All right.  I think that part -- that

2  will be discussed during the testimony, I guess.  Is that

3  correct?

4        MR. LOPEZ:  Yes.

5        THE COURT:  So, I mean, I will not be in a position

6  to rule on that as of yet.  The other objection was -- what

7  did I do with it?  Paragraph 37 on Page -- 8, was it?  On 9,

8  the nonrelevant conduct regarding Confidential Source 3, and

9  the defendant denies that that is accurate.  Is that correct?

10       MR. LOPEZ:  Correct.

11       THE COURT:  And that will also, I assume, become an

12  issue for later decision.

13       MS. SAWYER:  I think that's correct, your Honor.

14  Just to elaborate briefly on both of those, with respect to

15  Paragraph 28 and the specific offense characteristics that

16  both the government has applied and Probation has applied, I

17  think that the Court has bases upon which to apply that

18  enhancement regardless of the finding, regardless of whether

19  or not the Court wants to find that the defendant was Ayalla.

20  I think that there is a factual basis upon which that --

21       THE COURT:  I think that's probably accurate based

22  upon the type of -- as I understand the nolo contendere as to

23  the indictment.  So anyway --

24       MS. SAWYER:  I'm happy to address that in terms of

25  argument.  I have some case law.

1          THE COURT:  Yes.  I think we'll do that later.

2          So but there's no objection to the base offense level

3    of 14; is that correct?

4          MR. LOPEZ:  No, Judge.

5          THE COURT:  And a two-level role -- let's see.

6    Position of trust, any objection to that?

7          MR. LOPEZ:  No, Judge.

8          THE COURT:  All right.  Then the other issue is, the

9    government is taking the position that there's no acceptance

10   of responsibility; is that correct?

11         MS. SAWYER:  That's correct, your Honor.

12         THE COURT:  All right.  So that issue will be later

13   determined at the conclusion of the case.  There's no

14   objection to the criminal history category I; is that right?

15         MR. LOPEZ:  No, Judge.

16         MS. SAWYER:  No.

17         THE COURT:  No points.

18         All right.  I think that probably resolves at least

19   as far as we can go as to the -- excuse me.  I should say

20   this.  Mr. Lopez, is -- other than your two requests for

21   corrections, is the presentence report accurate?

22         MR. LOPEZ:  Yes.

23         THE COURT:  Is that true, Mr. Reyes Azarte?  The

24   factual material other than the two matters raised by your

25   lawyer is accurate; is that correct?

1      THE DEFENDANT:  Yes, sir.

2      THE COURT:  Is the government satisfied with the

3  report?

4      MS. SAWYER:  Yes, your Honor.

5      THE COURT:  All right.  So we will then proceed.  I

6  guess the government wishes to -- let's see -- wishes to

7  present evidence on the issues of sentencing; is that correct?

8      MS. SAWYER:  Yes, your Honor.

9      THE COURT:  All right.  So are you ready to proceed?

10 Do you want to make opening statements, or just call

11 witnesses?

12     MS. SAWYER:  Your Honor, I can give the Court a brief

13 background as to who you will be hearing from, but I don't

14 think there's any real need to give more formal statements.

15     THE COURT:  All right.  You want to just give a

16 brief --

17     MS. SAWYER:  Yes, your Honor.  The government intends

18 to call two witnesses in order to provide the Court with some

19 background with respect to, first, this defendant's historical

20 connections to the Beltran Leyva organization.  This Court

21 will hear testimony to this effect, but just for context and

22 for reference -- and forgive me if you're already familiar

23 with the history of this -- the Sinaloa Federation was a

24 conglomerate cartel within Mexico.

25     For lack of a better term, sometime around 2008,

1    there was a split between El Chapo, Joaquin Guzman Loera, and

2    Arturo Beltran Leyva. This Court is going to hear largely

3    about Arturo Beltran Leyva who was the head of the Beltran

4    Leyva organization, and that is the cartel that the government

5    is alleging Mr. Reyes has a history with.

6           In that context, we intend to call an individual by

7    the name of Sergio Villarreal Barragan.

8           THE COURT: Okay. Let's see. That's -- you're going

9    to call him. Okay.

10          MS. SAWYER: Yes. Mr. Barragan was affiliated

11    originally with the Sinaloa cartel, and then following the

12    split that I described, aligned himself with the Beltran

13    Leyvas and was a fairly high-ranking member of that

14    organization and, generally speaking, responsible for being --

15    again, for lack of a better term -- an intermediary between

16    the cartel and law enforcement and government contacts within

17    the Mexican government in order to sort of facilitate the

18    movement of drugs on behalf of the organization.

19          And as such, he was well positioned within that

20    organization and had vast familiarity with members of various

21    different police forces, military, and politicians in Mexico

22    who were receiving payments from the Beltrans, and it is in

23    that context that he was familiar with Mr. Reyes. And so that

24    testimony will be offered, your Honor, in support of the

25    government's request for an above-guideline sentence.

1    And in the context and under the purview of 3553(a)

2    and in an effort to provide this Court with a fulsome

3    perspective with respect to the history and characteristics of

4    the defendant as a 3553(a) factor, I think in no way is any of

5    it relevant, obviously, to the -- well, go back from that, the

6    second witness.  And so essentially, that's what

7    Mr. Villarreal's testimony will relate to.

8    We also intend to call Special Agent Matthew Sandberg

9    who was, for all intents and purposes, the case agent in

10   Mexico City for the underlying narcotics investigation out of

11   which this case arose.  He's familiar -- well, he has a

12   longstanding history in the DEA and is familiar with cartel

13   operations.  He was in El Paso and did a lot of work in

14   Juarez.  He was also in Guatemala and then, obviously, in

15   Mexico City.

16   So he's familiar with historical facts.  He's also

17   obviously familiar with the underlying investigation.  And so

18   he will testify regarding the underlying narcotics

19   investigation that gave rise to this and some of the evidence

20   that connects Mr. Reyes to the obstruction to which he has now

21   pled guilty.

22   THE COURT:  All right.  Mr. Lopez, do you wish to

23   make a statement at this time?

24   MR. LOPEZ:  Judge, we'd just ask that you listen to

25   Mr. Villarreal -- Mr. Barragan's testimony, the impeachment

Barragan - direct by Sawyer

10

1   that will come.  It's our position that he's not a reliable

2   witness.  He tells three different versions of the same event.

3   We can also listen to what Agent Sandberg has to say in regard

4   to some of the issues that the government has raised.

5           THE COURT:  All right.  Let's proceed with the

6   witnesses then.

7           MS. SAWYER:  So at this time, your Honor, the

8   government would call Sergio Villarreal Barragan.

9           THE COURT:  All right.  He may come forward.

10      (Pause.)

11          THE COURT:  Right up here.  Raise your -- does he

12  speak English?

13          THE WITNESS:  No, your Honor.

14          THE COURT:  Do we have the --

15          THE CLERK:  He's right there.

16          THE COURT:  Please raise your right hand.

17      (Witness sworn through interpreter.)

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Please take a seat.

20          Ms. Sawyer, you may question the witness.

21          MS. SAWYER:  Thank you, your Honor.

22      SERGIO VILLARREAL BARRAGAN, GOVERNMENT'S WITNESS, SWORN

23                      DIRECT EXAMINATION

24  BY MS. SAWYER:

25  Q.  Good morning.

Barragan - direct by Sawyer

11

1   A.  Good morning.

2   Q.  May I ask you to state and spell your name for the record,

3   please?

4          THE INTERPRETER:  By the interpreter, your Honor:

5   May we get one more piece of equipment, please?

6          THE COURT:  Sure.

7     (Pause.)

8          THE COURT:  All right.  You may proceed.

9          THE WITNESS:  Sergio Villarreal Barragan.  My name is

10  Sergio Barragan.  My fraternal last name is spelled

11  V-i-a-r-e-a-l.

12  BY MS. SAWYER:

13  Q.  And Mr. Villarreal, are you known by any nicknames?

14  A.  El Grande.

15  Q.  And are you currently serving a federal prison sentence

16  here in the United States?

17  A.  That is so.

18  Q.  And did that sentence arise out of federal crimes with

19  which you were charged in the United States in federal court

20  in Houston?

21  A.  That is correct.

22  Q.  And more specifically, did those charges arise of your

23  affiliation between approximately 2006 and 2010 with the

24  Sinaloa Federation and later the Beltran Leyva organization?

25  A.  That is correct.

Barragan - direct by Sawyer

12

1    Q.  And you were already in custody in Mexico in September

2    2010 before those charges were filed in the United States; is

3    that right?

4    A.  That's correct.

5    Q.  And you were extradited to the United States in May 2012?

6    A.  That's correct.

7    Q.  Once in the United States, did you plead guilty in that

8    case in Houston?

9    A.  That's correct.

10   Q.  And was that on April 5th, 2013?

11   A.  That's correct.

12   Q.  All right.  And did you plead guilty to one count of

13   conspiracy to distribute a controlled substance for purposes

14   of unlawful importation?

15   A.  That's correct.

16   Q.  And one count of conspiracy to launder monetary

17   instruments?

18   A.  That's correct.

19   Q.  Now, Mr. Villarreal, were you originally charged with more

20   crimes than just the two that you pled guilty to?

21   A.  That's correct.

22   Q.  As part of that guilty plea, did you agree to cooperate

23   with the United States government?

24   A.  That's correct.

25   Q.  And at the time of that agreement, was your cooperation

Barragan - direct by Sawyer

13

1   totally unrelated to this case?

2   A.   That's correct.

3   Q.   Now, when you pled guilty, was it your understanding that

4   you would receive a benefit based on your cooperation?

5   A.   That's correct.

6   Q.   And did you, in fact, receive a benefit as a result of

7   your cooperation?

8   A.   That's correct.

9   Q.   And what was that?

10  A.   The reduction of my sentence.

11  Q.   And what were you ultimately sentenced to for your

12  offenses?

13  A.   To 120 months.

14  Q.   And to the best of your knowledge, as of today, is it your

15  understanding that depending on how the Bureau of Prisons

16  credits you for the time that you were incarcerated in Mexico

17  that you could be released any time between May 2019 and May

18  2021?

19  A.   That's correct.

20  Q.   And is that regardless of your testimony in this case?

21  A.   That's correct.

22  Q.   Now, as part of your cooperation, did you provide

23  information to prosecutors and agents about your knowledge of

24  narcotics trafficking in Mexico and the United States?

25  A.   That's correct.

Barragan - direct by Sawyer

14

Q.  And did you also provide information about corruption

within the Mexican government and law enforcement?

A.  That's correct.

Q.  Now, at some point around January 2019 -- I'm sorry,

January 19, 2017, did you meet with me and other prosecutors

and agents to talk about an individual who you knew as La

Reina?

A.  That's correct.

Q.  And at that time, were any promises made to you about any

benefit you might receive for the information that you were

providing?

A.  No, none.

Q.  And during that meeting, did agents show you a series of

10 to 12 photographs?

A.  That's correct.

Q.  Now, there's a --

        MS. SAWYER:  May I approach, your Honor?

        THE COURT:  By the way, nobody needs to ask

permission to approach.  Just approach.

        MS. SAWYER:  Thank you.

BY MS. SAWYER:

Q.  There's a binder in front of you, Mr. Villarreal, but I'm

going to hand you a copy of Government Exhibit No. 1.  Do you

recognize that?

A.  That's correct.

Barragan - direct by Sawyer

15

1   Q.   And what is that?

2   A.   La Reina.

3   Q.   And is that the photograph that you were shown in January

4   of 2017?

5   A.   Correct.

6   Q.   And are your initials, in fact, noted at the bottom of

7   that page?

8   A.   That's correct.

9   Q.   Okay.  And specifically, with reference to your testimony

10  today, have I or anyone else promised you any benefit for your

11  testimony today?

12  A.   No, none.

13  Q.   All right.  And indeed, as you sit here today, do you have

14  any idea whether your testimony in this case will change the

15  sentence that's already been imposed?

16  A.   I didn't understand.  I'm sorry.

17  Q.   Do you have any idea whether your testimony today will in

18  any way change the sentence that has already been imposed?

19  A.   No, I have no idea.

20  Q.   And I'd like to ask you a few questions about your

21  background.  Prior to becoming involved in narcotics

22  trafficking, what did you do for a living?

23  A.   I worked for the judicial police for the State of Coahuila

24  and later as a federal judicial policeman in the City of

25  Mexico.

Barragan - direct by Sawyer

16

1    Q.   Okay.  And was it approximately 1993 to 1997 that you

2    worked as a federal police officer?

3    A.   That is correct.

4    Q.   And did your work as a federal police officer bring you

5    into contact with narco traffickers?

6    A.   That is correct.

7    Q.   And at some point while employed as a federal police

8    officer, did you begin working with one trafficker in

9    particular?

10   A.   That's correct.

11   Q.   Who was that?

12   A.   Amado Carrillo Fuentes.

13   Q.   Was he affiliated with a cartel in particular?

14   A.   He was the leader of the Juarez cartel.

15   Q.   And through your relationship with Amado Carrillo Fuentes,

16   did you come to meet someone named Arturo Beltran Leyva?

17   A.   That's correct.

18   Q.   And who was Arturo Beltran Leyva at that time?

19   A.   He was in charge for Amado Carrillo Fuentes in the city of

20   Agua Prieta, Sonora.

21   Q.   And at that time, he was affiliated with the Juarez

22   cartel?

23   A.   That's correct.

24   Q.   Now, at some point around approximately 1997, did you

25   leave the police force?

Barragan - direct by Sawyer

17

1    A.   That's correct.

2    Q.   And where did you go?

3    A.   To Nuevo Laredo, Tamaulipas.

4    Q.   And during that time, did you maintain your relationship

5    with Arturo Beltran Leyva?

6    A.   Telephonic contact.

7    Q.   Now, sometime four to five years later, around 2001 or

8    2002, did you return and begin working directly for Arturo

9    Beltran Leyva?

10   A.   That's correct.

11   Q.   And at that time when you returned and began again working

12   for him, what cartel was Arturo Beltran Leyva affiliated with?

13   A.   To The Federation.

14   Q.   Okay.  And what is The Federation?  What was The

15   Federation?

16   A.   It was a group of narcotics traffickers, all of them, all

17   of them in general from Sinaloa and some from Jalisco.

18   Q.   And at the time that you went to work for Arturo Beltran

19   Leyva, who were the other leaders of the Sinaloa Federation?

20   A.   Joaquin el Chapo Guzman; Ismael Zambada Garcia; El Azul,

21   Esparragoza Moreno; Arturo Beltran Leyva; Hector Beltran

22   Leyva; Alfredo Beltran Leyva; Nacho Coronel; the

23   Valencia brothers; and some others from Jalisco.

24   Q.   And just very briefly, could you explain what happened in

25   approximately 2008 to the relationship between El Chapo and

Barragan - direct by Sawyer

18

1   Arturo Beltran Leyva?

2   A.   Their relationships between them fell apart because El

3   Chapo Guzman betrayed Arturo.

4   Q.   And did that conflict result in essentially the formation

5   of two separate groups:  The Beltran Leyva organization on one

6   hand and the Sinaloa Federation on the other?

7   A.   That's correct.

8   Q.   And was -- would it be fair to say that the relationship

9   between those two groups was violent?

10  A.   That's correct.

11  Q.   And who was in charge at that time of the Sinaloa

12  Federation?

13  A.   Could you repeat the question, please?

14  Q.   Who was in charge at that time of the Sinaloa Federation?

15  A.   El Chapo Guzman on the one hand; on the other hand, Arturo

16  Beltran.

17  Q.   Okay.  And just to clarify, are you saying that El Chapo

18  Guzman was in charge of the Sinaloa Federation and Arturo

19  Beltran Leyva was in charge of his Beltran Leyva organization?

20  A.   That's correct.

21  Q.   And following that split, who of those two did you align

22  yourself with?

23  A.   With Arturo Beltran.

24  Q.   And could you please describe your relationship with

25  Beltran Leyva and your role within his organization?

Barragan - direct by Sawyer

19

1   A.   A very close relationship.  We were God siblings or God

2   brothers --

3            THE INTERPRETER:  Re-rendering.

4            THE WITNESS:  -- and we were very good friends.

5   BY MS. SAWYER:

6   Q.   Did there come a time that you actually lived with Arturo

7   Beltran Leyva?

8   A.   I didn't hear you.  I'm sorry.

9   Q.   Did there come a time that you actually lived with Arturo

10  Beltran Leyva?

11  A.   All the time normally.

12  Q.   And specifically within his organization, what was your

13  role?

14  A.   I worked for Arturo Beltran.  The majority of my work

15  consisted of the corruption of the American -- of the

16  Mexican -- of the Mexican government.  I opened up routes for

17  narcotics trafficking on the Mexican roads and strategies to

18  weaken rival cartels by means of the government.

19  Q.   Okay.  What do you mean by that?  How would by -- how

20  would you weaken rival cartels by means of the government?

21  A.   Providing information to the federal government normally

22  so that the government could do its work and capture rivals

23  from other cartels.

24  Q.   And would that then obviously in turn aid the Beltran

25  Leyva organization?

Barragan - direct by Sawyer

20

1   A.   To grow.

2   Q.   All right.  Now, you've referenced that -- you said that

3   part of your job was to help open routes of narco trafficking.

4   How does corruption within law enforcement aid in opening

5   routes of narco trafficking?

6   A.   By means of corruption, we would insert policemen and

7   military people into the cities, on the roadways at the

8   inspection points so that drugs would not have trouble on

9   their route as they traveled through Mexico.

10  Q.   Okay.  And over the course of the time that you were

11  working for Arturo Beltran Leyva, approximately what kinds of

12  quantities was the organization trafficking?

13  A.   Many, many tons of cocaine.

14  Q.   And when you say "many tons of cocaine," were there

15  occasions where one shipment would contain tons of cocaine?

16  A.   In no shipment would there be normally less than five

17  tons.

18  Q.   Okay.  And based on your knowledge of the operation of the

19  organization, were significant portions of that cocaine

20  transported to the United States?

21  A.   That's correct.

22  Q.   Now, in the context of your role as an intermediary

23  between the Beltran Leyva organization and Mexican law

24  enforcement, did you personally -- were you personally present

25  for meetings between Arturo Beltran Leyva and law enforcement

Barragan - direct by Sawyer

21

1   officials?

2   A.   That's correct, many times.

3   Q.   And in that context, did you come to hear members of the

4   Beltran Leyva organization refer to an individual by the code

5   name La Reina?

6   A.   That's correct.

7   Q.   And who within the Beltran Leyva organization referred to

8   this individual by that nickname?

9   A.   Alberto Pineda Villa, Elias El Borrado, and Arturo Beltran

10  Leyva himself.

11  Q.   Now, is that the same individual who you've already

12  identified there in Government Exhibit No. 1?

13  A.   That's correct.

14  Q.   Now, with respect to this individual you just described,

15  Alberto Pineda Villa, what was his role within the Beltran

16  Leyva organization?

17  A.   He was in charge of taking receipt of the boats and

18  submarines loaded with cocaine on international waters between

19  the coasts of Chiapas and Guerrero and transport these to the

20  beach in either of the aforementioned states.

21  Q.   Now, prior to actually meeting La Reina in person, had you

22  heard members of the Beltran Leyva organization simply refer

23  to that code name?

24  A.   That's correct.

25  Q.   And based on the discussions that you heard, what was your

Barragan - direct by Sawyer

22

1    understanding of who La Reina was?

2    A.   A person who worked for the cartel, the Beltran Leyva

3    cartel, who provided a lot of help to the organization.

4    Q.   Help in what context?

5    A.   With information regarding the cartel itself provided by

6    some authority.

7    Q.   Okay.  And how was it that he would have that information?

8    A.   I pretty much lived with Beltran Leyva the whole time.

9    Q.   I'm sorry.  I asked that poorly.  Not you.  Did you --

10   based on your understanding of those conversations, what was

11   La Reina's job?

12   A.   He worked as a federal policeman in the Mexican

13   government.

14   Q.   Okay.  And at some point, did you come to meet La Reina in

15   person?

16   A.   That's correct.

17   Q.   Could you describe how that happened?

18   A.   The first time it happened, when we went to make a payment

19   along with Alberto Pineda Villa el Borrado.

20   Q.   Let me ask you this.  You said "we."  Who went to make a

21   payment?

22   A.   Alberto Pineda Villa and I.

23   Q.   And what was the payment for?

24   A.   For an operation that had been conducted by the federal

25   police and the PGR.

Barragan - direct by Sawyer

1   Q.   Was that operation against a cartel in particular?

2   A.   That's correct.

3   Q.   What cartel was that?

4   A.   La Familia Michoacana.

5   Q.   And was that cartel an ally or a rival of the Beltran

6   Leyva organization?

7   A.   Rival.

8   Q.   Approximately how much was that payment?

9   A.   Approximately $3 million.

10  Q.   Okay.  Who did you make that payment to?

11  A.   To a federal police high official and to La Reina.

12  Q.   So the two people present to receive that payment were La

13  Reina and another police officer?

14  A.   That's correct.

15  Q.   And the other police officer, was he senior or junior to

16  La Reina at the time?

17  A.   Superior.

18  Q.   And based on your experience working for Arturo Beltran

19  Leyva, was it common for you to pay law enforcement for

20  strikes on rival cartels?

21  A.   That's correct.

22  Q.   And was it common for Arturo Beltran Leyva to give law

23  enforcement information about those cartels so that they could

24  act on it?

25  A.   That's correct.

Barragan - direct by Sawyer

24

1  Q.  And was the reverse also true, that rival cartels would

2  have their own law enforcement loyal to them who would then

3  provide information about the Beltran Leyva organization?

4  A.  That's correct.

5  Q.  And for that reason, is it fair to say that Arturo Beltran

6  Leyva had to be very cautious about who he let into his inner

7  circle?

8          MR. LOPEZ:  Objection.

9  BY THE WITNESS:

10 A.  That's correct.

11         THE COURT:  Overruled.

12 BY MS. SAWYER:

13 Q.  Was that the only meeting that you participated in that La

14 Reina was present for, or were there more?

15 A.  There were more.

16 Q.  And is it fair to say you don't recall the specific dates

17 of each of those meetings?

18 A.  That's correct, I do not remember the dates.

19 Q.  And during any of those meetings, did you ever hear La

20 Reina talk about training that he had received abroad?

21 A.  That's correct.

22 Q.  Do you recall specifically where he said he had trained?

23 A.  That's correct.

24 Q.  What -- where did he say he had trained?

25 A.  In Virginia.

Barragan - direct by Sawyer

1   Q.  And was there another name that he mentioned?

2   A.  That's correct.  Quantico.

3   Q.  Was there a particular United States agency that La Reina

4   talked about having worked with?

5   A.  That's correct.

6   Q.  What is that?

7   A.  The DEA.

8   Q.  Aside from the meetings you were personally present for,

9   do you know whether Arturo Beltran Leyva and Borrado, that is,

10   Alberto Pineda Villa, had direct contact with La Reina?

11   A.  That's correct.

12   Q.  How do you know that?

13   A.  Arturo would tell me about it when I wasn't present.

14   Q.  Now, Mr. Villarreal, did there come a time sometime in

15   2007 or 2008 when Arturo became concerned that there might be

16   an informant within his organization?

17   A.  That's correct.

18   Q.  And what was it that happened that led him to that

19   concern?

20   A.  He was suffering a lot of drug losses on a sea route with

21   speedboats loaded with cocaine that were headed to Mexico.

22   Q.  Okay.  When you say "losses," do you mean seizures or that

23   the drugs were simply lost?

24   A.  Seizure of the drugs by governments.

25   Q.  And due to those multiple seizures along the same maritime

Barragan - direct by Sawyer

26

1   route, what was Arturo Beltran Leyva's concern?

2   A.   That two lines had the same route but only one of those

3   had the losses, the seizures, and that somebody was providing

4   information about it.

5   Q.   And as a result of that concern, did Arturo convene a

6   meeting to discuss the issue?

7   A.   That's correct.

8   Q.   Okay.  And how did that come about?

9   A.   It came about through a meeting with a very high official

10  in the federal police.

11  Q.   Okay.  And did discussions about this issue take place

12  during one meeting or more than one meeting?

13  A.   No, several meetings.

14  Q.   Well, let's start with the first one.  You mentioned that

15  Arturo met with someone from the federal police.  Was it La

16  Reina or someone else?

17  A.   It was someone else.

18  Q.   All right.  And was that person senior to La Reina or

19  junior?

20  A.   Senior.

21  Q.   Who do you recall being present on behalf of the Beltran

22  Leyva organization in that first meeting?

23  A.   "El R," Roberto was there; Arturo Beltran; I was there; La

24  Barbie was there.

25  Q.   All right.  And what was the purpose of that first

Barragan - direct by Sawyer

27

1   meeting?

2   A.   To inform the officer of the federal police the problems

3   that the organization was suffering because of those seizures

4   and to ask for himself to investigate that.

5   Q.   All right.   That federal police representative at the

6   first meeting, what did he -- what did he tell Arturo?

7   A.   That he was going to check the information that he was

8   giving him through contact he had at the Mexican Embassy in

9   Colombia and through contacts he had within the same federal

10   police.

11   Q.   All right.   And was there -- after this meeting, was there

12   a follow-up?   You mentioned there were multiple meetings.   Did

13   another meeting take place?

14   A.   One more.

15   Q.   Were you present at that second meeting?

16   A.   That's correct.

17   Q.   And where did that second meeting take place?

18   A.   In a farm called Mi Ranchito located in the state of

19   Morelos in the municipality of Zapata near the city of

20   Cuernavaca, Morelos.

21   Q.   Now, the high-ranking officer who was at the first

22   meeting, was he present at the second meeting?

23   A.   That's correct.

24   Q.   And was he alone, or were there other police officers?

25   A.   There were other officers.

Barragan - direct by Sawyer

28

1    Q.   Approximately how many?

2    A.   More than four.

3    Q.   All right.  At the -- and who was there from the Beltran

4    Leyvas -- well, let me ask a different question.

5         Was there a discussion at the second meeting between

6    Arturo Beltran Leyva and the police officers about what they

7    had learned with respect to an informant?

8    A.   They started to tell him what had been happening.

9    Q.   Who is "they"?

10   A.   Two very high officials in the federal police, La Reina,

11   and another officer.

12   Q.   So let me just break that down a little bit.  You've

13   now -- so you've described four federal police officers:  One

14   who was at the first meeting, a second high-ranking officer,

15   La Reina, and another individual?

16   A.   That's correct.

17   Q.   And so what happened?  What did those people relay to

18   Arturo about the Colombian informant?

19   A.   They started to tell Arturo Beltran that in the city of

20   Miami, Florida, the DEA had stopped a person of Colombian

21   origin, had released that person for purposes of providing

22   information regarding drug shipments of Arturo Beltran.

23   Q.   And did they provide anything to Arturo Beltran Leyva,

24   anything additional?

25        MR. LOPEZ:  Judge, I object to "they."

Barragan - direct by Sawyer

1    BY THE WITNESS:

2    A.   The two high officials, La Reina who was sitting at the

3    table.

4    BY MS. SAWYER:

5    Q.   What did they do?

6    A.   After narrating everything verbally, they showed him a

7    photograph of the Colombian.

8    Q.   And did members of the Beltran Leyva organization

9    recognize that individual?

10           THE COURT:  Who is "they"?  Mr. Lopez wanted to know,

11   and I do, too.  He said that "they."  The two high officials,

12   is that who we're talking about?

13           THE WITNESS:  Two high officials, La Reina, and the

14   third person -- the fourth person, I don't know that person's

15   name.

16           THE COURT:  Okay.

17   BY MS. SAWYER:

18   Q.   Can you describe how it happened that a photo was provided

19   to Arturo Beltran Leyva?

20   A.   That's correct.  La Reina had a cardboard binder.  He gave

21   it to his immediate superior who in turn gave it to Arturo

22   Beltran, who Arturo Beltran recognized the photograph that he

23   was being shown.

24   Q.   Just to clarify, the two high-ranking officials who you've

25   referred to, would those people have been considered La

Barragan - direct by Sawyer

30

1    Reina's boss at the time?

2    A.   That's correct, the high, the very high official who had

3    met the first time and the person next in charge.

4    Q.   Now, after recognizing the photo of the Colombian

5    individual, what did Arturo Beltran Leyva do?  How did he

6    respond?

7    A.   He became very angry and ordered that he be kidnapped.

8    Q.   That who be kidnapped?

9    A.   The Colombian.  And interrogated.

10   Q.   To your knowledge, did that happen?

11   A.   That's correct.

12   Q.   And based on your knowledge, did the informant admit

13   cooperating with the DEA?

14   A.   That's correct.

15   Q.   And what ultimately happened to that Colombian informant?

16   A.   He was murdered.

17   Q.   And were you present when Arturo gave the order for the

18   informant to be murdered?

19   A.   That's correct.

20        MS. SAWYER:  All right.

21     (Pause.)

22   BY MS. SAWYER:

23   Q.   Now, Mr. Villarreal, prior to January 2017, do you recall

24   that you had already provided information about this

25   particular meeting to investigators other than myself and the

Barragan - direct by Sawyer

31

1  other prosecutor in this case?

2  A.  That's correct.

3  Q.  And did you talk about this meeting on more than one

4  occasion?

5  A.  That's correct.

6  Q.  In approximately 2014 and 2015?

7  A.  That's correct.

8  Q.  Okay.  And on those occasions, you did tell investigators

9  that you had met with La Reina to make payments for the

10 Beltran Leyva organization, correct?

11 A.  That's correct.

12 Q.  But you did not mention La Reina being present at this

13 particular meeting involving the Colombian informant; is that

14 right?

15 A.  That's correct.

16 Q.  And why was that?  Why didn't you mention back in 2014 and

17 '15 that La Reina was at this particular meeting?

18 A.  Because that day, the people that they were asking me

19 about were the very high-ranking officials of the federal

20 police that -- to whom I had referred to in what I said.

21 Q.  And at the time of the meeting about the informant, how

22 did those people rank in relation to La Reina?

23 A.  Very, very high-ranking officials in the office of the

24 secretary for federal public safety.

25 Q.  And when you spoke with me and the other prosecutor and

Barragan - direct by Sawyer

32

1   the agents in January 2017, of all the interviews you've

2   given, was that the first time anyone came to specifically ask

3   you about La Reina?

4   A.  That's correct.

5   Q.  And as you sit here today, is it your recollection that La

6   Reina was present and participated with others in providing

7   information to the Beltrans about the Colombian informant?

8   A.  That's correct.

9   Q.  Now, I'd like to ask you about a few other individuals.

10  During our meeting in January of 2017, did you see a series of

11  photographs of people other than La Reina?

12  A.  That's correct.

13  Q.  All right.  Now, it's in the back of your binder there.

14  It's Government Exhibit No. 12, what I'm also going to hand

15  you -- that I'm also going to hand you.  Do you recognize that

16  person?

17  A.  That's correct.

18  Q.  And what name did you know him by?

19  A.  Jeremiah -- Jeremias.

20  Q.  And did he go by anything else besides Jeremias?

21  A.  Geronimo.

22  Q.  And who was he?

23  A.  His nickname was El Jero.  He is a representative of the

24  organization that Arturo Beltran Leyva had in the Colombian

25  country with different organizations, Colombian organizations,

Barragan - direct by Sawyer

33

1   business partner of Arturo Beltran.

2   Q.   And was -- do you know whether he was Mexican or

3   Columbian?

4   A.   He's Mexican.

5   Q.   Okay.  So Geronimo is a Mexican who worked for the Beltran

6   Leyvas, and you said representative in Colombia.  Just more

7   specifically, in what sense was he Arturo's representative in

8   Colombia?  What did he do?

9   A.   He did drug deals, cocaine to be sent to Mexico and the

10  United States through Arturo Beltran.

11  Q.   So would it be fair to say he was sort of Arturo's liaison

12  to Colombian cocaine suppliers?

13  A.   That's correct.

14  Q.   At some point around September 2009, was the person you've

15  described as Borrado, Alberto Pineda Villa, was he killed?

16  A.   That's correct.

17  Q.   And following his death, did someone from within the

18  Beltran Leyva organization take over his role as an

19  intermediary between the Beltran Leyvas and different federal

20  police officers including La Reina?

21  A.   That's correct.

22  Q.   Who was that?

23  A.   Ismael Coronel Sicairos.

24  Q.   Did he go by any nicknames?

25  A.   That's correct.  El Judio or El Bufalo.

Barragan - direct by Sawyer

34

1   Q.  And just for future purposes, can I ask the interpreter to

2   provide the Court a translation of the nickname "El Judio"?

3   A.  "The Jew."

4            THE COURT:  I know what it is.

5            MS. SAWYER:  Just for the record.

6            THE COURT:  All right.

7   BY MS. SAWYER:

8   Q.  And based on your observations, did Ismael Coronel

9   Sicairos know La Reina?

10  A.  That's correct.

11  Q.  And now in approximately December of 2009, was Arturo

12  Beltran Leyva also killed?

13  A.  That's correct.

14  Q.  And who took over the leadership following -- of the

15  Beltran Leyva organization following Arturo's death?

16  A.  Hector Beltran Leyva.

17  Q.  Around that time, was there an individual who Hector

18  perceived as a threat to the leader -- to his leadership of

19  the Beltran Leyvas?

20  A.  That's correct.

21  Q.  And who was that?

22  A.  Edgar Valdez Villareal, alias La Barbie.

23  Q.  Mr. Villarreal, are you aware of what ultimately happened

24  to La Barbie, to Edgar Valdez?

25  A.  That's correct.  He fought with Hector Beltran, and he

Barragan - direct by Sawyer

35

1    ended up arrested by the federal police.

2    Q.  Was there a particular federal police --

3              THE COURT:  Wait a second.

4              MS. SAWYER:  I'm sorry.

5              THE COURT:  La Barbie was the one that was arrested

6    by the federal police?  Okay.

7              MS. SAWYER:  Yes, your Honor.

8    BY MS. SAWYER:

9    Q.  And Mr. Villarreal, are you aware of whether or not any

10   members of the federal police received payment for their

11   participation in that arrest?

12   A.  That's correct.

13   Q.  Who was that?

14   A.  La Reina.

15   Q.  Was it La Reina's group that conducted the operation that

16   resulted in the arrest of Edgar Valdez?

17   A.  That's correct.

18   Q.  And how much was paid by the Beltran Leyva organization to

19   the federal police including La Reina?

20   A.  Could you please repeat the question for me?

21   Q.  How much did the Beltran Leyva organization pay to the

22   members of the federal police including La Reina?

23   A.  500 -- $500,000.

24   Q.  How do you know that?

25   A.  Because I was with The Judio to make that payment.

Barragan - direct by Sawyer

36

1   Q.  And was there a specific issue that was discussed at the

2   time the payment was made about a dissatisfaction on behalf of

3   the Beltran Leyvas?

4   A.  That's correct.

5   Q.  And what was that?

6   A.  El Judio was complaining to La Reina that the deal that

7   they had made said that they were going to kill La Barbie, and

8   they had arrested him.

9   Q.  And did La Reina give an explanation of why that happened?

10  A.  That's correct.

11  Q.  And what was that?

12  A.  He said that he had shot at La Barbie on one occasion and

13  that La Barbie didn't respond to the aggression and for that

14  reason, they had to arrest him.

15  Q.  Are you familiar with an individual who went by the

16  nickname Macho Prieto?

17  A.  That's correct.

18  Q.  Who was he?

19  A.  It was a lieutenant of Chapo Guzman and Mayo Zambada that

20  was operating in the states of Sonora and Sinaloa.

21  Q.  So in the time period following Arturo Beltran Leyva's

22  death, would Macho Prieto have been an ally of the Beltran

23  Leyvas or a rival?

24  A.  A rival of the Beltran Leyvas.

25  Q.  Now, based on your observations in your time working for

Barragan - direct by Sawyer

37

1    Arturo Beltran Leyva, what kind of relationship would someone

2    have to have with him in order to be able to meet with him in

3    person?

4    A.   Real, real close.

5    Q.   Why is that?

6    A.   Because of fear of betrayal.

7    Q.   Whose fear?

8    A.   From rival cartels.

9    Q.   Who would have been afraid of that?

10    A.   I'm sorry?

11    Q.   You said fear of rival cartels.  Whose fear?

12    A.   Arturo Beltran's being afraid that they would betray him.

13    Q.   Would Arturo Beltran ever have met with someone simply

14    because they were a police officer?

15    A.   No.

16    Q.   Why is that?

17    A.   Because of fear of betrayal.

18    Q.   Mr. Villarreal, based on your experience both on one hand

19    as a police officer and also from working for Arturo Beltran

20    Leyva, is there any legitimate law enforcement reason for a

21    federal police officer to meet in person with Arturo Beltran

22    Leyva or to take money from him?

23            MR. LOPEZ:  Objection, Judge.

24            THE COURT:  Overruled.

25            THE WITNESS:  I'm sorry.  I'm having trouble hearing

Barragan - direct by Sawyer

1  you through the microphone.

2          THE INTERPRETER:  The interpreter will use the

3  microphone closer, your Honor.

4          THE COURT:  All right.

5  BY MS. SAWYER:

6  Q.  Based on your experience both as a police officer and

7  working for Arturo Beltran Leyva, is there a legitimate

8  non-corrupt law enforcement reason that a federal police

9  officer would meet with Arturo Beltran Leyva or take money

10  from him?

11  A.  Yes.  There were a lot of people that took money from

12  Arturo Beltran, hundreds of police officers.

13  Q.  Let me ask my question again.  Is -- well, let me ask

14  this.  Were those people corrupt --

15          THE COURT:  I think that's -- I understand the

16  position historically, at least as laid out, concerning what

17  the Mexican police relationship is as opposed to the DEA, for

18  example.  I don't think you really need to have him answer

19  this.

20  BY MS. SAWYER:

21  Q.  And Mr. Villarreal, were there law enforcement -- were

22  there police officers who were paid by intermediaries on

23  behalf of the Beltran Leyva organization but who never met

24  Arturo in person?

25  A.  A lot.  The majority of them pretty much didn't know him.

Barragan - cross by Lopez

39

1   Q.   The majority of the police officers never met Arturo in

2   person, is that what you're saying?

3   A.   That's correct.

4          MS. SAWYER:   I have no further questions, your Honor.

5          THE COURT:   Cross-examine?

6          MR. LOPEZ:   Yes.

7       (Pause.)

8                        CROSS-EXAMINATION

9   BY MR. LOPEZ:

10  Q.   Good morning, Mr. Barragan.

11  A.   Good morning, sir.

12  Q.   Sir, you were a federal -- or the Coahuila judicial police

13  force in 1990; is that right?

14  A.   That's correct, sir.

15  Q.   And then eventually you went to the federal police; is

16  that correct?

17  A.   That's correct, sir.

18  Q.   And the federal police you worked for at that time was led

19  by the office of the Attorney General of Mexico; is that

20  right?

21  A.   That's correct, sir.

22  Q.   And at that time, you were stationed at Nuevo Laredo on

23  the border; is that correct?

24  A.   No, sir.

25  Q.   Were you ever stationed in Nuevo Laredo?

Barragan - cross by Lopez

40

1   A.  Not working as a federal policeman.

2   Q.  How about when you were working for the judicial police

3  force?

4   A.  No.  Coahuila is another state, sir.

5   Q.  But you did eventually make your way to Reynosa,

6  Tamaulipas, correct?

7   A.  No, sir.

8   Q.  You never were in Reynosa, Tamaulipas?

9   A.  No, sir.

10   Q.  Do you know a group called the Juarez cartel?

11   A.  That's correct, sir.

12   Q.  And did you work for the Juarez cartel for a period of

13  time?

14   A.  That's correct, sir.

15   Q.  In what years did you work for the Juarez cartel?

16   A.  Approximately from 1993 to 1997.

17   Q.  And what were your duties for the Juarez cartel at that

18  time, Mr. Barragan?

19   A.  I worked as a federal -- a judicial policeman, and I

20  cooperated with Amado Carrillo in bringing down planes loaded

21  with cocaine.

22   Q.  Was that -- Amado Carrillo, was he the head of the Juarez

23  cartel?

24   A.  That's correct.

25   Q.  Was he also nicknamed "King of the Skies"?

Barragan - cross by Lopez

41

1   A.   The "Lord of the Skies," yes.

2   Q.   And that was because he used airplanes to bring cocaine

3   into Mexico?

4   A.   That's correct, sir.

5   Q.   Okay.  And would you assist in getting those planes on to

6   the ground?

7   A.   That's correct, sir.

8   Q.   So you worked for him for approximately four years; is

9   that correct, sir?

10  A.   That's correct, sir.

11  Q.   And at the same time, you worked for the federal police,

12  correct?

13  A.   That's correct, sir.

14  Q.   After 1997, did you then move over to the Gulf cartel?

15  A.   No, sir.

16  Q.   What about, did you ever work for the Gulf cartel?

17  A.   No, sir.

18  Q.   Did you go from the Juarez cartel to the Federation?

19  A.   That's correct, sir.

20  Q.   In what year did you begin working with the Federation?

21  A.   Approximately in 2001.

22  Q.   So from 1997 to 2001, were you still on the federal police

23  force?

24  A.   Not anymore, sir.

25  Q.   When did you leave the federal police force?

Barragan - cross by Lopez

42

1    A.   Approximately in 1997.

2    Q.   So between 1997 and 2001, who did you work for?

3    A.   I ran some businesses in Nuevo Laredo, Tamaulipas.

4    Q.   What type of businesses were those?

5    A.   It was a car sales business, and one was a food sales

6    business.

7    Q.   And that was in Mexico, correct?

8    A.   In Nuevo Laredo, Tamaulipas, yes, sir.

9    Q.   And in 2001, did you then meet Arturo Beltran?

10   A.   I had known him from some time before that.

11   Q.   Do you remember when it was you first met him?

12   A.   Approximately in '93.

13   Q.   And in 1993, what was Mr. Beltran doing or who was he

14   working with?

15   A.   Arturo Beltran was the person in charge for the Juarez

16   cartel in the city of Aqua Prieta, Sonora.

17   Q.   So he worked -- did he work under Amado Carrillo?

18   A.   That's correct, sir.

19   Q.   Did La Barbie work with that group, too?

20   A.   No, sir.

21   Q.   What about El Borrado?

22   A.   No, sir.

23   Q.   What about a person by the name of Luis Cardenas Palomino?

24   A.   No, sir, not during those years, not yet.

25   Q.   When you began to work with Beltran, you worked with

Barragan - cross by Lopez

43

1   Arturo; is that right?  He was the boss?

2   A.   That's correct, sir.

3   Q.   And I think you described to us that he had two brothers

4   by the name of Hector and Alfredo; is that right?

5   A.   He has two brothers.

6   Q.   Was Alfredo arrested at some point?

7   A.   That's correct, sir.

8   Q.   And was -- the arrest of Alfredo, did that cause the

9   breakup between El Chapo and Arturo Beltran?

10  A.   That's correct, sir.

11  Q.   And it was your understanding that El Chapo used some

12  federal police officers to arrest Alfredo Beltran; is that

13  right?

14  A.   Military, sir.

15  Q.   Was that the Marines?

16  A.   No, sir.  The Mexican Army.

17  Q.   There was also a general in charge of that operation; is

18  that right?

19  A.   That's correct, sir.

20  Q.   And can you tell us -- I don't remember.  I read it, but

21  what was the name of the general, if you know?

22  A.   Angel Dahguares.

23  Q.   Can we ask you to spell it for the court reporter, please,

24  the last name, if you can?

25           THE COURT:  See how close you got it.

Barragan - cross by Lopez

44

1     THE WITNESS:  D-a-h-g-u-a-r-e-s.

2  BY MR. LOPEZ:

3  Q.  And he was the person responsible for the arrest of Arturo

4  based on the information provided by El Chapo; am I correct

5  about that?

6  A.  Of Alfredo, Alfredo Beltran.

7  Q.  Now, when the Federation split, you stayed with Arturo; is

8  that correct?

9  A.  That's correct, sir.

10  Q.  And you rose -- you rose to a supervisor position, did you

11  not?

12  A.  That's correct, sir.

13  Q.  In fact, you had -- you had people working underneath you;

14  isn't that true?

15  A.  Under Arturo Beltran.

16  Q.  I understand, under Arturo, but Arturo Beltran was your

17  boss, right?

18  A.  That's correct.

19  Q.  And eventually, you became a plaza boss, did you not?

20  A.  I did not have a plaza.  I worked alongside Arturo

21  Beltran.

22  Q.  Okay.  Can you tell -- do you remember working at the

23  Plaza de La Guana, La Guana?

24  A.  La Guana, I do not know that name.

25  Q.  You would be responsible for making sure that the routes

Barragan - cross by Lopez

45

1   chosen were safe routes to smuggle the product into the United

2   States; isn't that true?

3   A.   That's correct, sir.

4   Q.   That was one of your jobs, correct?

5   A.   That's correct, sir.

6   Q.   And another one of your jobs was to provide security to

7   the organization; isn't that also correct?

8   A.   Not to provide security.  There was someone in charge in

9   the area of security for Arturo.

10  Q.   You would always be armed, though; isn't that true?

11  A.   That's correct, sir.

12  Q.   And Arturo was responsible for over 1,000 murders that he

13  ordered; isn't that true?

14  A.   Possibly, yes, sir.

15  Q.   And you knew that Arturo Beltran would kidnap and kill

16  people; is that right?

17  A.   In some cases, yes.

18  Q.   That didn't bother you.  You kept working for him.  Isn't

19  that right?

20  A.   I continued to work for him, sir.

21  Q.   You saw him kill people, didn't you?

22  A.   I never saw him kill someone.

23  Q.   Didn't you tell the DEA you saw him kill a Brazilian

24  actress and a Mexican singer one time because he got mad about

25  what they said?

Barragan - cross by Lopez

46

1   A.   Someone -- yes, yes, sir, that is so.

2   Q.   You were there when he killed both those women, weren't

3   you?

4   A.   That's correct, sir.

5   Q.   And you witnessed other murders, too, haven't you?

6   A.   That I can recall, I was a witness to that murder.

7   Q.   Okay.  And other murders, too, correct?

8   A.   That I can recall at this moment, that's the one that

9   comes to mind, sir.

10  Q.   Okay.  You saw Arturo's men torture people before, didn't

11  you?

12  A.   On occasion, yes, sir.

13  Q.   That didn't bother you, you continued to work for him; is

14  that right?

15  A.   It did bother me and, in fact, I did complain to Arturo

16  about it, and I also interceded for some people.  And Arturo

17  would only tell me not to get involved, that he knew what he

18  was doing.

19  Q.   You were arrested in Mexico, weren't you?

20  A.   That's correct.

21  Q.   You were charged with drug trafficking?

22  A.   That's correct.

23  Q.   And multiple murders?  Those were your charges?

24  A.   That's correct, sir.

25  Q.   And eventually, you were extradited to the United States;

Barragan - cross by Lopez

47

1    is that correct?

2    A.   That's correct, sir.

3    Q.   And you began to cooperate; is that right?

4    A.   That's correct, sir.

5    Q.   You knew when you got to the United States you'd be

6    looking at a significant sentence; is that right?

7    A.   That's correct, sir.

8    Q.   It was your understanding that you could be sentenced

9    anywhere from 30 years to life; is that right?

10   A.   Sent to life, yes, sir.

11   Q.   And you decided to cooperate so you wouldn't have to serve

12   that much time; isn't that right?

13   A.   That's correct, sir.

14   Q.   And eventually, you were sentenced to 120 months?

15   A.   That's correct, sir.

16   Q.   And as part of your sentence, you're cooperating, right?

17   A.   That's correct, sir.

18   Q.   And as part of your sentence, you have to -- let me

19   rephrase that.

20        You're here today because of your cooperation

21   agreement with the government; isn't that right?

22   A.   I didn't understand the question.  I'm sorry.

23   Q.   I'll rephrase it.  You're here today because your plea

24   agreement requires you to cooperate?

25   A.   With the truth, yes, sir.

Barragan - cross by Lopez

48

1    Q.   And testify; is that right?

2    A.   That's correct, sir.

3    Q.   Do you remember a person by the name of Juan Leyva?

4    A.   No, not Juan Leyva, sir.

5    Q.   Okay.  You -- you talked about El Borrado before; is that

6    right?  Do you remember him?

7    A.   That's correct.

8    Q.   And El Borrado was killed by Arturo Leyva and his men; is

9    that right?

10   A.   That's correct, sir.

11   Q.   And that was because Arturo felt he was betraying him

12   because he was receiving loads from El Chapo?

13   A.   That's correct.

14   Q.   And they had their throats slit, and they were burned in a

15   car; is that right?

16   A.   That's correct, sir.

17   Q.   Do you remember Mario Pineda?

18   A.   That's correct.

19   Q.   He also worked -- excuse me.  He also worked for Arturo,

20   did he not?

21   A.   That's correct.

22   Q.   And he was also receiving loads on the side from El Chapo;

23   is that right?

24   A.   That's correct, sir.

25   Q.   And Arturo had him killed, too; is that right?

Barragan - cross by Lopez

49

1    A.   That's correct, sir.

2    Q.   In fact, you drove Mario -- you drove Mario to a toll

3    plaza on a highway.   Do you remember that?

4    A.   That's correct, sir.

5    Q.   And you turned him over to Hector Beltran; is that right?

6    A.   That's correct, sir.

7    Q.   Who murdered him on the spot with an AK-47; is that

8    correct?

9    A.   Hector Beltran murdered him, that's correct.

10   Q.   After you brought him to him; is that right?

11   A.   That's correct, sir.

12   Q.   While you were -- while you were working for Beltran, it

13   would not be unusual for you or others to steal loads from

14   rival cartels; is that right?

15   A.   That's correct, sir.

16   Q.   One time, you took three to five tons from the Gulf cartel

17   and the Zetas.   Do you remember that?

18   A.   That's correct, sir.

19   Q.   And because of that, your brother was kidnapped; is that

20   right?

21   A.   No, sir.   My brother had already been kidnapped.

22   Q.   Okay.   Was he kidnapped by the Gulf cartel?

23   A.   That's correct, sir.

24   Q.   And did they kill him?

25   A.   No, sir.

Barragan - cross by Lopez

50

```
1          THE COURT:  Is that "gulf," like the Gulf of Mexico?

2          MR. LOPEZ:  Like Gulf of Mexico, Judge, g-u-l-f.

3          THE COURT:  Okay.

4   BY MR. LOPEZ:

5   Q.  Was he subsequently released after negotiations?

6   A.  That's correct, sir.

7   Q.  Did the federal police help in that or the military?

8   A.  The federal police.

9   Q.  You mentioned to the judge earlier today that it was not

10  unusual for cartels to give information to the federal police

11  about rival cartels?

12  A.  That it was common.

13  Q.  And that's kind of the way the business was structured

14  during the period of time that you were involved in it; is

15  that right?

16  A.  That's correct.

17  Q.  And Arturo would give information to the federal police;

18  is that right?

19  A.  That's correct.

20  Q.  And then the federal police would take that information

21  and go arrest somebody; is that right?

22  A.  That's correct.

23  Q.  You remember when La Barbie was arrested, right?

24  A.  That's correct.

25  Q.  La Barbie had worked with Arturo; is that right?
```

1   A.   That's correct.

2   Q.   And Arturo was killed in 2009?

3   A.   That's correct.

4   Q.   Were you with him at that time?

5   A.   No, sir.

6   Q.   I mean, you've been involved in paying off prosecutors in

7   Mexico, have you not?

8   A.   That's correct, sir.

9   Q.   I'm going to read into the record some letters, and please

10  tell the judge what they stand for and who they are:

11  S-E-I-D-O.

12  A.   "SIEDO"?  S-E-I-D-O?

13  Q.   Yes -- no, S-E-I-D-O.

14  A.   So at that time, it was S-I-E-D-O, and it was --

15  Q.   You might not -- you don't remember what it -- what it

16  stands for?

17  A.   That's correct, sir.

18  Q.   But what was it as a group?

19  A.   It was a branch of the federal prosecutors that were

20  specialized in organized crime.

21  Q.   And you would pay them off; is that right?

22  A.   In some parts, sir.

23  Q.   La Barbie would pay him, too; is that right?

24  A.   That's correct, sir.

25  Q.   Do you remember a group called AFI?

Barragan - cross by Lopez

1  A.  A-F-I, AFI, yes, sir.

2  Q.  Do you remember what AFI stands for?

3  A.  Federal agency of investigation.

4  Q.  Do you know a person by the name of Ramon Pequeno?

5  A.  That's correct, sir.

6  Q.  Who was Ramon Pequeno?

7  A.  A high-ranking official of the federal police.

8  Q.  He was a high-ranking official above Ivan Reyes; is that

9  right?

10  A.  That's correct, sir.

11  Q.  It was your understanding he was Mr. Reyes Azarte's boss;

12  is that right?

13  A.  That's correct, sir.

14  Q.  And when you talk about this meeting with this Colombian

15  informant, Mr. Paque no was the one that told Reyes to give

16  the information to him, and he gave that information to

17  Arturo; is that right?

18  A.  That's correct, sir.

19  Q.  Do you remember in February 19th of 2015 that you had an

20  interview at the Joe Corley detention center in Conroe, Texas?

21  A.  That's correct, sir.

22  Q.  And you remember that you had an attorney by the name of

23  Scott McCrum.  Do you remember that?

24  A.  That's correct, sir.

25  Q.  And do you remember speaking -- or do you remember the

Barragan - cross by Lopez

53

1    names of a couple of agents?  One of them was James Cain,

2    C-a-i-n.  Do you remember that name?

3    A.   That's correct, sir.

4    Q.   And do you remember another agent by the name of Darryl

5    Sobin, S-o-b-i-n?

6    A.   The truth is, I've spoken with a lot of AUSAs and a lot of

7    officers, and I don't remember all of them, you know.

8    Q.   You've been debriefed countless times; is that right?

9    A.   Many times.

10   Q.   In Texas and in other places?

11   A.   That's correct.

12   Q.   Are you expected to testify in the El Chapo trial in New

13   York City?

14   A.   I do not know, sir.

15   Q.   Let's talk about your meeting that you had on February

16   19th of 2015.

17   A.   That's correct, sir.

18   Q.   Do you remember a person by the name of Luis Cardenas

19   Palomino?

20   A.   That's correct, sir.

21   Q.   And who was he?

22   A.   A high-ranking official of the federal government.

23   Q.   Now, he wasn't a policeman; is that right?

24   A.   He worked at the federal secretary's office for home

25   security and before that, in the federal -- federal agency of

1    investigations.

2    Q.   While you worked for these various cartels, you've become

3    aware that these cartels had made payments all the way up to

4    the chain almost to the president of Mexico; is that right?

5    A.   That's correct, sir.

6    Q.   And that's how these cartels conducted business in Mexico,

7    correct?

8    A.   That is how they do it, sir.

9    Q.   Now, there came a point in time when Arturo was using

10   offshore power boats to move product; is that right?

11   A.   That's correct, sir.

12   Q.   Submarines as well; is that right?

13   A.   That's correct, sir.

14   Q.   And these boats would meet vessels in international

15   waters, and they would load up the cocaine and bring it to the

16   shore; is that right?

17   A.   That's correct, sir.

18   Q.   And within a period of six or seven months, a lot of these

19   vessels were being seized; is that right?

20   A.   Some, yes, but actually, I couldn't tell you for sure, sir.

21   Q.   Okay.  Well, do you remember on February 19th of 2015 that

22   you had a meeting with the people that I just talked about,

23   and you told them there was a period of six to seven months

24   where numerous go-fast boats as well as semi-submersibles were

25   seized by the U.S. government while en route to Mexico with

Barragan - cross by Lopez

55

1  cocaine loads.  Do you remember saying that?

2  A.  That's correct, sir.

3  Q.  And what I want to know is, these were seizures that were

4  by the United States, by the DEA, and not by any Mexican

5  police; isn't that true?

6  A.  That's correct, sir.  They were in international waters.

7  In Mexico, there were no seizures because of the corruption.

8  Q.  No, I understand that, and that's the point I'm trying to

9  make.

10        THE COURT:  He made it for you.

11        MR. LOPEZ:  Thank you.

12        THE COURT:  Move on.

13  BY MR. LOPEZ:

14  Q.  So Arturo was concerned that there was a leak in the

15  organization; is that right?

16  A.  That's correct, sir.

17  Q.  And he directed El Borrado to talk to Luis Cardenas

18  Palomino about that problem; isn't that right?

19  A.  That's correct, sir.

20  Q.  And there was a meeting that was called at the place you

21  previously described as Mi Ranchito.  Do you remember that?

22  A.  That's correct, sir.

23  Q.  And that was in Cuernavaca near Mexico City, correct?

24  A.  Yes, the second meeting, yes, sir.

25  Q.  And present at the meeting were Cardenas Palomino, Arturo,

Barragan - cross by Lopez

56

1   Borrado, Mario Pineda Villa -- you also would call him "MP,"

2   correct?

3   A.   Mario Pineda Villa was not at the second meeting, sir.

4   Q.   I'm talking about, after El Borrado asked Palomino for

5   assistance, there was a meeting.  That's what you told the

6   DEA, right?

7   A.   At the first meeting, yes, sir.

8   Q.   And at that meeting, there was another person, the

9   nickname Conejo, C-o-n-e-j-o.  Do you remember him?

10  A.   Yes, possibly he was there.  I don't remember right now

11  exactly.

12  Q.   Would you like to see a copy of the statement which you

13  gave to the DEA to help you refresh your recollection?

14  A.   Yes, sir.

15           MR. LOPEZ:  Judge, I'm going to mark this as Azarte

16  1.

17           Judge, I'm going to direct him and maybe --

18           THE COURT:  Yes, direct him.

19           MR. LOPEZ:  It's in English, so can the interpreter

20  interpret for him --

21           THE COURT:  If he needs help.

22  BY MR. LOPEZ:

23  Q.   Can you read English?

24  A.   No, sir.  I don't read or speak English, sir.

25  Q.   So would you need the interpreter to help you read -- to

Barragan - cross by Lopez

57

1    interpret it for you?

2    A.  Yes, please.

3           MR. LOPEZ:  Okay.  Judge, I'm going to -- I've

4    already talked to the government.

5           I'm going to direct the interpreter to, if you could

6    just -- if you could just interpret that box.

7           THE INTERPRETER:  Translate that for him right now?

8           MR. LOPEZ:  Not on the record.

9        (Translation off the record.)

10   BY MR. LOPEZ:

11   Q.  All right.  Is your memory refreshed?

12   A.  That's correct, sir.

13   Q.  So Conejo was at the meeting, correct?

14   A.  Possibly, sir, as I mentioned there.

15   Q.  Now, at that meeting, Cardenas Palomino told the group

16   that he had spoken to his compadre, Genaro Garcia Luna?

17   A.  That's correct, sir.

18   Q.  And he had been informed that there was a Colombian

19   informant working within the Beltran Leyva cartel?

20   A.  That's correct, sir.

21   Q.  And then Cardenas Palomino provided the informant's name

22   and nickname; is that right?

23   A.  That's correct, sir.

24   Q.  And this is the same Colombian informant that was later

25   murdered; is that right?

Barragan - cross by Lopez

58

1    A.   That's correct, sir.

2    Q.   And during your interview on February 19th, 2015, you told

3    the DEA that according to Cardenas Palomino that Garcia Luna

4    had obtained this information from Garza Palacios.  Do you

5    remember that?

6    A.   That's correct, sir.

7    Q.   Who you might -- who you think is Francisco Javier Garza

8    Palacios, correct?

9    A.   That's correct, sir.

10   Q.   Who was a Mexican federal police officer stationed in

11   Bogota?

12   A.   That's correct, sir.

13   Q.   And then after learning the identity of the informant,

14   Borrado ordered El Panchito to go get the informant and bring

15   him to him; is that right?

16   A.   That's correct, sir.

17   Q.   And the informant was taken from Cuernavaca by Borrado and

18   MP?

19   A.   They were in the city of Cuernavaca, the informant.

20   Q.   But they took him, right, and tortured him?

21   A.   That's correct, sir.

22   Q.   And you learned that the informant admitted he'd been

23   arrested in Miami and was cooperating?

24   A.   That's correct, sir.

25   Q.   And Arturo took all the informant's properties?

Barragan - cross by Lopez

1   A.   That's correct, sir.

2   Q.   And then he killed him or he had him killed?

3   A.   That's correct, sir.

4   Q.   You didn't know the informant, did you, or did you?

5   A.   No, sir.

6   Q.   You had never met him?

7   A.   No, sir, not that I remember, no.

8   Q.   You weren't present when the informant was killed, were

9   you?

10  A.   I was not present, sir.

11           THE COURT:   How much more do you have?

12           MR. LOPEZ:   A couple more minutes.

13           THE COURT:   A couple minutes?

14           MR. LOPEZ:   Yes.  Do you want to take a break?

15           THE COURT:   No.  If it's only a few minutes, let's

16  finish it.  Then we'll take a short break.

17  BY MR. LOPEZ:

18  Q.   Sir, after the informant was killed, no more boats were

19  stopped; is that right?

20  A.   No, sir, not that I know of, no.

21  Q.   Now, do you remember, you came -- that you had an

22  interview here in this building on August 20th, 2018?

23  A.   Yes, sir.

24  Q.   And you were shown a photograph.  Do you remember that?

25  A.   Yes, sir.

1  Q.  And at first you said it was -- at first you said that it

2  was La Reina; is that right?

3  A.  Yes, sir.

4  Q.  And then later, you changed your mind; is that right?

5  A.  Yes, sir.  Those days, I was feeling very bad physically.

6  Q.  But you identified a photograph of Ivan Reyes, La Reina,

7  and it was a photograph of somebody else; is that right?  You

8  remember that?

9      I'm just asking if you remember it, yes or no.  You

10  remember that, right?

11  A.  I was explaining to you --

12  Q.  I'm not asking for an explanation --

13      THE INTERPRETER:  Your Honor --

14      THE COURT:  Wait, wait.  You're talking over each

15  other.

16      THE INTERPRETER:  -- the interpreter cannot do two

17  voices.

18      MR. LOPEZ:  I'm not asking for an explanation.

19      THE COURT:  It's hard to do with the translation.

20  BY MR. LOPEZ:

21  Q.  Just yes or no.

22  A.  Yes.

23      MR. LOPEZ:  I have nothing further, Judge.

24      THE COURT:  All right.  We'll take a -- how much

25  redirect?

1    MS. SAWYER:  I think it will be brief, your Honor.

2    THE COURT:  Pardon?

3    MS. SAWYER:  I think it will be brief.

4    THE COURT:  All right.  Let's finish him and then

5    we'll --

6    MS. SAWYER:  Thank you.

7    THE COURT:  -- take a break.

8    Judy, are you okay?  All right.

9                    REDIRECT EXAMINATION

10   BY MS. SAWYER:

11   Q.  When -- Mr. Villarreal, when we first met with you back in

12   January of 2017, were you shown approximately 10 to 12

13   photographs of all different people?

14   A.  That's correct.

15   Q.  And Government's Exhibit 1 that you referred to previously

16   you saw as part of that group of photographs of 10 to 12

17   people; is that right?

18   A.  That's correct.

19   Q.  And you identified that individual as the person known to

20   you as "La Reina"?

21   A.  That's correct.

22   Q.  Okay.  And just generally speaking, during the course of

23   your cooperation, approximately how many different individuals

24   have you provided information about?

25   A.  Oh, so many.  I don't know if it's 50 to 70 or more

Barragan - redirect by Sawyer

1    people.

2    Q.   Okay.  And by the time you spoke to us for the first time

3    in this case in January 2017, had you already provided

4    information about other people who had a role in this drug

5    trafficking operation?

6    A.   I'm sorry?

7    Q.   By the time you spoke with us about La Reina in January

8    2017, had you already provided all that information about all

9    of those different people?

10   A.   No, it's just a lot of information.

11   Q.   Right.  And had you already provided that information

12   prior to 2017?

13   A.   Ah, yes.  That's correct.

14   Q.   So in your mind, did you know whether you would get any

15   additional benefit by talking about one more person?

16   A.   No, no, no.

17   Q.   Okay.  Now, when we talked to you for the first time in

18   January 2017 about the person you knew as La Reina, did anyone

19   tell you why we were asking you about him?

20   A.   No, no one.

21   Q.   Did anyone tell you what he was suspected of doing?

22   A.   No, no one.

23   Q.   Did anyone show you any evidence related to La Reina?

24   A.   No.  They just showed me the photograph, and I talked

25   about what I needed to talk about:  The truth of the facts.

1    Q.   And prior to January 2017, had any investigators ever come

2    to you to specifically ask about La Reina?

3    A.   No, no one.

4    Q.   And were those investigations either centered on senior

5    members of the Beltran Leyva organization or people senior to

6    La Reina within the Mexican law enforcement community?

7    A.   That's correct.

8    Q.   And at the time of the meeting about the Colombian

9    informant, where did La Reina rank --

10            MR. LOPEZ:  Objection.

11            MS. SAWYER:  -- in relation to --

12            THE COURT:  Overruled.  If he knows.

13   BY MS. SAWYER:

14   Q.   -- in relation to the other law enforcement

15   representatives present at that meeting?

16   A.   He had an intermediate rank in the police.

17   Q.   Okay.  So what does that mean about how it compared to the

18   other law enforcement representatives that were there?

19   A.   The others were very high in the federal police.

20            THE COURT:  I think he testified to that on your

21   direct.

22   BY MS. SAWYER:

23   Q.   And as a result, were those people more memorable to you

24   in the context of that meeting?

25   A.   Certainly, because with them, I had more contact.

Barragan - redirect by Sawyer

64

1   Q.   And Mr. Villarreal, it was no secret prior to Arturo

2   Beltran Leyva's death in 2009 that his organization was

3   violent; is that right?

4   A.   That's correct, yes.

5   Q.   Everyone knew that, right, in Mexican police, the DEA?

6   A.   That's correct.

7   Q.   And prior to his death in 2019, Arturo Beltran Leyva was,

8   in fact, one of the most wanted men in Mexico, right, by the

9   Mexican police as well as the DEA?

10  A.   That's correct.

11  Q.   Certainly, anyone who worked in law enforcement would have

12  known that, right?

13           MR. LOPEZ:  Objection.

14           THE COURT:  Yes, I'll sustain the objection.

15  BY MS. SAWYER:

16  Q.   All right.  And Mr. Lopez has referenced a couple of

17  previous interviews, specifically 2015 in the context of the

18  meeting with the Colombian -- actually, strike that.

19           Let's go back to some questions that Mr. Lopez asked

20  you about corruption generally and about the fact that you

21  used your status as a police officer to help the Juarez

22  cartel.  Do you remember those questions?

23  A.   Yes.

24  Q.   Did you have any belief that that was legal at the time?

25           MR. LOPEZ:  Objection.

Sandberg - direct by Su

65

1          THE COURT:  He can answer.

2    BY THE WITNESS:

3    A.  I knew that it was illegal, what I was doing.

4    BY MS. SAWYER:

5    Q.  And why -- why do it?

6          MR. LOPEZ:  Objection.

7    BY THE WITNESS:

8    A.  Ambition.

9          THE COURT:  Well, those are pretty -- let's move on

10   so we can get to the next witness.

11         Anything further?

12         MS. SAWYER:  I have no further questions, your Honor.

13         THE COURT:  Anything further?

14         MR. LOPEZ:  No, Judge.

15       (Witness excused.)

16         THE COURT:  We'll take a 10-minute recess.

17       (Recess from 11:44 a.m. to 11:56 a.m.)

18         THE COURT:  Please stand up and raise your right

19   hand.

20       (Witness sworn.)

21         THE WITNESS:  Yes.

22         THE COURT:  Please be seated.

23         MR. SU:  Thank you, your Honor.

24         THE COURT:  You may question the witness.

25         MATTHEW SANDBERG, GOVERNMENT'S WITNESS, SWORN

Sandberg - direct by Su

66

1                    DIRECT EXAMINATION

2    BY MR. SU:

3    Q.   Sir, can you please state and spell your name?

4    A.   My name is Matthew Sandberg.

5    Q.   Are you currently employed?

6    A.   Yes, I am, with the Drug Enforcement Administration.

7    Q.   And how long have you been with the DEA?

8    A.   Approximately 18 years.

9    Q.   Where are you currently stationed or assigned to?

10   A.   Salt Lake City, Utah.

11   Q.   What are your responsibilities in Salt Lake City?

12   A.   I'm a group supervisor there.

13   Q.   Prior to Salt Lake City, where were you assigned?

14   A.   I was assigned to Mexico City, Mexico.

15   Q.   For how long?

16   A.   For three years.

17   Q.   And before Mexico City?

18   A.   I was in Guatemala for three years.

19   Q.   And before Guatemala, where were you?

20   A.   I was in Texas for approximately 12 years.

21   Q.   And this was all while you're part of the DEA; is that

22   correct?

23   A.   Yes.

24   Q.   What kind of investigations did you do in Texas and in

25   Guatemala?

Sandberg - direct by Su

67

A.   Cartel investigations, primarily Mexican cartel

including -- my focus was on cartels out of Sinaloa with a

particular expertise in Sinaloa cartels, but also I worked on

the Juarez cartel and the Zetas and many other cartels but

with particular emphasis on, like I said, Sinaloa cartels,

Beltran Leyva and The Federation.

Q.   When you moved to Mexico City, were you also working on

cases relating to those same cartels?

A.   Yes.

Q.   You just mentioned the Beltran Leyva organization just

now.  Can you describe what that was?

A.   Yeah.  That was an organization that was headed by the

Beltran Leyva brothers.  Alfredo Beltran Leyva initially was

in charge, and he was arrested, and later Arturo was in charge

and eventually Hector.  They broke off from the Sinaloa cartel

headed by Chapo Guzman and Mayo Zambada when there was a

disagreement that arose between the Beltran Leyva brothers and

Chapo Guzman.

Q.   So Arturo Beltran Leyva was one of the brothers in charge

of the Beltran Leyva organization?

A.   Yes, and eventually became the most powerful of the

brothers.

Q.   Now, sir, as part of your investigation in Mexico, did you

partner with Mexican law enforcement officials?

A.   Yes.

Sandberg - direct by Su

1    Q.   Which agencies did you partner with in particular?

2    A.   The two agencies that we partnered with were the Mexican

3    Marines and the federal police but a specific unit within the

4    federal police known as the SIU.

5    Q.   Why did you need to partner with these agencies?

6    A.   Because like in any country that we work in, we have very

7    special or specific people that we work with who we have tried

8    to vet and make sure that we can trust them because of the

9    corruption that we know sometimes exists in those other

10   countries and around the world.

11   Q.   And, in fact, you have to partner with these agencies

12   because you're guests in their country; isn't that right?

13   A.   That's right.  We don't have any independent authority in

14   another country, another sovereign country, to be able to make

15   our own arrests and do things there without the participation

16   of the other country.  And usually, they act as the lead in

17   those enforcement operations, so we depend on them to be able

18   to do that with the information we provide them.

19   Q.   Now, you mentioned a unit within the federal police called

20   the SIU.  Can you describe what that is?

21   A.   Yes.  Sensitive investigation unit, and this is a unit

22   that we set up with foreign police agencies, usually with like

23   the federal police in that particular country.  And it's a

24   group of officers that we train at Quantico, Virginia, at the

25   DEA academy and whom we -- there's a process that we go

Sandberg - direct by Su

69

1    through to try to ensure that those officers are vetted and

2    their backgrounds are checked and, if possible, try to weed

3    out the people that may be corrupt.

4    Q.  Can you describe the nature of the relationship between

5    agents working cases in Mexico as part of the DEA and Mexican

6    SIU members?

7    A.  Yes.  It's very close because we depend on each other.

8    Our lives literally depend on each other because we're in it

9    against some of the most violent, powerful criminal

10   organizations in the world, and so we need to share

11   information back and forth about these targets.

12           And so we get to know them on a professional level

13   and sometimes even more than that, as friends because we get

14   together for lunch or other things like that.  So we get to

15   know each other and work together closely to investigate these

16   groups.

17   Q.  Do you have that same type of relationship with non-SIU

18   federal police officers?

19   A.  No.  We purposely avoid having -- building those closer

20   relationships in order to try to ensure that the cases don't

21   get compromised.

22   Q.  So directing your attention to 2015-2016, during that

23   timeframe, as part of your investigative duties in Mexico, did

24   you assist in related grand jury investigations conducted by

25   the U.S. Attorney's Office for the Northern District of

1    Illinois as well as for the Southern District of California?

2    A.   Yes, I did.

3    Q.   Can you summarize that investigation, who the targets of

4    that investigation were?

5    A.   Yes.  So I had my own informants in Mexico, and it was

6    discovered while I was working with them that they had

7    information about some targets.  One in particular to begin

8    with was Geronimo Gamez Garcia who was a high-level member of

9    the Beltran Leyva cartel back when it was at its peak of

10   power.  And so he had recently been released from prison in

11   Mexico, and he was out again and he was operational.

12        So we started to investigate him, and that led us to

13   a couple other powerful cartel figures:  Angel Dominguez who

14   ended up really being probably the big kingpin in that case,

15   and then another individual named Gerardo Vazquez, also known

16   as Pulpos.  So we were investigating those three guys and

17   those two targets and their relationships with the Colombians

18   who they were getting cocaine from and sending it to the

19   United States.

20        And, in fact, that cartel was in the process of

21   trying to take over the whole entire eastern side of Mexico

22   and to consolidate elements from the Beltran Leyvas, the Gulf

23   cartel, and the Zetas.  So it was a rapidly growing group with

24   a lot of power.

25   Q.   Based on your investigation into Gamez, did you learn what

Sandberg - direct by Su

71

1    specifically his role was in the former Beltran Leyva

2    organization?

3    A.   In the former Beltran Leyva organization, he was an

4    individual that was representing the Beltran Leyva cartel to

5    the Colombians, and he was very, very close to Arturo Beltran

6    Leyva.  And he would go down to the Colombians and negotiate

7    cocaine deals and also precursor chemicals for manufacturing

8    of other synthetic drugs.

9    Q.   And did you learn from this investigation what his role

10   was in this new Dominguez drug trafficking organization?

11   A.   Yes.  We learned quickly from the informants that we had

12   that he was now acting kind of in the same exact role but

13   doing it for this new group called the satellite elite group,

14   which was headed by Angel Dominguez and that had ties with the

15   Beltran Leyva's mole.

16   Q.   You discussed using informants.  Did you use other

17   investigative methods during this investigation?

18   A.   Yes.  We used surveillance, and we were doing Title III

19   investigations in the United States.  Initially, it was just I

20   was doing my investigation in Mexico, and I discovered as I

21   started looking at the phone numbers for these targets that,

22   in fact, Chicago was also investigating some of those numbers

23   and didn't realize who they were.

24        And so I spoke to the Chicago office, and we began to

25   team up as well as with San Diego to combine our efforts.  So

Sandberg - direct by Su

72

1    we were doing Title III investigations, surveillance,

2    informants, and all the normal techniques that we were using.

3    Q.   And when you say "Title III investigation," you mean Title

4    III wiretaps; is that correct?

5    A.   Wiretaps, yes.

6    Q.   And so who were these three targets who were intercepted

7    over these Title III wiretaps?

8    A.   So it was Geronimo Gamez and Angel Dominguez and Gerardo

9    Vazquez, also known as Pulpos.

10   Q.   And when you mentioned surveillance, who was principally

11   responsible for conducting surveillance in Mexico?

12   A.   Well, usually it will be the Mexican government because

13   it's their country, and so SIU would be our surveillance tool,

14   if you will, or the ones who would conduct the surveillance.

15   Occasionally, and not very often, we would assist if there's

16   some kind of emergency but typically, it's them that does the

17   surveillance at our request.

18   Q.   And with respect to informants, were you responsible for

19   controlling a confidential source?

20   A.   Yes.  As a DEA agent, we're the ones that control the

21   confidential sources.

22   Q.   Who did the confidential source that you controlled have

23   access to?

24   A.   He had access to Geronimo Gamez and eventually to Angel

25   Dominguez and also to Pulpos, or Vazquez, as I mentioned.

Sandberg - direct by Su

73

1    Q.   And can you describe the nature of the activities that the

2    confidential source was engaged in?

3    A.   His -- his job in the case was to provide us with

4    information about the Colombians and the Mexicans that were

5    meeting to negotiate these drug deals.  And so the informant

6    was the one that was acting to introduce them and to monitor

7    what was happening so that we knew about these meetings and

8    what deals they were trying to do to try to -- so that we

9    could try to intercept the loads and investigate the

10   organizations they were working with, the Colombian and the

11   Mexican organizations that were working together.

12   Q.   And did the confidential source, in fact, record some of

13   these meetings as well as calls he had placed with some of the

14   targets?

15   A.   Yes.

16   Q.   And did -- making those recordings and these other

17   activities, did they put the CS in some danger?

18   A.   Yes.  It's, of course, a very potentially dangerous

19   situation for the informants because of the level of

20   traffickers that they're dealing with.  So this one was

21   definitely in that position.

22   Q.   With respect to Geronimo Gamez, based on all these

23   investigative methods we talked about, did the investigation

24   learn that Gamez went by a particular nickname?

25   A.   Yes.  He had several, Jero and Jeremias, but those were

Sandberg - direct by Su

74

1    the main ones he was known as.

2    Q.   In the binder in front of you, you have several exhibits.

3    Do you see that?

4    A.   Yes.  Let me grab my glasses.

5    Q.   If you can, flip to Government Exhibit 12.

6         MR. LOPEZ:  Excuse me.  What number was that,

7    counsel?

8         MR. SU:  12.

9         THE WITNESS:  Okay.

10   BY MR. SU:

11   Q.   Do you recognize the photo in Government Exhibit 12?

12   A.   Yes.  That's Geronimo Gamez Garcia, or Jeremias.

13   Q.   Now, you also talked about the SIU's involvement in this

14   investigation.  Was there a primary point of contact at SIU?

15   A.   Yes.  It was our commander of the SIU, Ivan Reyes Azarte.

16   Q.   Do you see Mr. Reyes Azarte in court today?

17   A.   Yes.  He's seated at the table in his orange jumpsuit.

18        MR. SU:  Your Honor, may the record reflect the

19   witness has identified the defendant?

20        THE COURT:  I'm not sure it needs to, but it will.

21   BY MR. SU:

22   Q.   When you refer to him as the commander of the SIU, what

23   does that mean?

24   A.   That means he was the highest ranking person in the

25   Mexican federal police in charge of our sensitive

Sandberg - direct by Su

75

1    investigative unit who are select federal police units that we

2    were working with.

3    Q.   And did Mr. Reyes also undergo training at Quantico like

4    the rest of the SIU members?

5    A.   Yes.

6    Q.   During the investigation, did you learn of a meeting that

7    was supposed to take place between the targets of the

8    investigation on September 8th of 2016?

9    A.   Yes.

10   Q.   How did you learn about this meeting?

11   A.   I was contacted by the Chicago case agents, the DEA case

12   agents who told me that they were intercepting information on

13   the phones about a meeting that was going to occur in Polanco,

14   which is an exclusive area in Mexico City, and they were

15   requesting that we cover the meeting or try to have somebody

16   do surveillance of the meeting to verify which targets were

17   there at the meeting.

18   Q.   On that day, did you ask the defendant to assist in

19   surveillance of this meeting?

20   A.   Yes.   I reached out to Ivan to ask him to help out with

21   the surveillance.   Typically, when these things come up, we

22   don't have a lot of time to try to get a surveillance team

23   over there, so I was scrambling to try to get help and seeing

24   if they could cover the meeting in Polanco.   And with traffic

25   in Polanco and Mexico City, it's difficult to get people over

Sandberg - direct by Su

76

1  to areas quickly.

2  Q.  Can you please flip to Government Exhibit 2?  What's the

3  date of the conversation listed there?

4  A.  September 8th, 2016.

5  Q.  And who's participating in this conversation?

6  A.  I am, with Ivan.

7  Q.  Can you briefly describe what's going on in this

8  conversation?

9  A.  This is some text messages that I was sending to Ivan

10  informing him of where the meeting was going to take place.

11  And this is conversation I was trying to have with him while I

12  was -- you know, part of what I typed, and then I was also

13  driving, so part of it, I would call him on the phone.  But so

14  some of this was, this here is my reaching out to him in the

15  written form saying what I'm asking, if he can help us with.

16  Q.  So for example, that first highlighted sentence, you were

17  referring to the investigative targets meeting at

18  Sonora Grill?

19  A.  Yes.  The Sonora Grill was the restaurant.  It's a

20  high-end restaurant there in Polanco where the targets were --

21  said they were going to be meeting according to Chicago.

22  Q.  And towards the bottom of the page, you mention the

23  apartment for the targets.

24  A.  Yes.  And I did that because I wasn't sure if they were

25  going to be able to get there in time to cover the meeting, so

1    I wanted to increase the chances that we'd be able to pick up

2    the targets.  And so we believed they were living at that

3    apartment which was not far from the restaurant, and we had

4    that information.

5            So I was also sharing that information with Ivan so

6    that perhaps he could send some team members over to that

7    address either before or after and then other members to the

8    restaurant to see if, between the two locations, they could

9    observe the targets.

10   Q.  And if you flip to Page 2, you sent a photograph to the

11   defendant.  Do you recognize that photograph?

12   A.  Yeah.  That's a photograph of Geronimo Gamez and Vazquez

13   meeting in Cancun several months before this surveillance was

14   being requested.  But that was a photo that I had sent to Ivan

15   in order to try to direct him to who he was looking for, and I

16   was telling him to look for the guy in the middle who I

17   believed was going to be at the restaurant.

18           And so I wanted him to have a picture of the face so

19   that he could -- he could be able to look for that person at

20   the restaurant or his team could.

21   Q.  So this picture was originally taken in Cancun several

22   months ago.  Do you have a specific month?

23   A.  Yes.  I believe it was in April.  And so as I said, I had

24   been working this case for a while with Chicago, but I had not

25   been really working it with the SIU Mexico City at that time

1    yet until this night where I was asking for surveillance help.

2    But we had worked with another Mexican -- or SIU team that was

3    in Cancun, with our office in Cancun so they could try to

4    cover this meeting.  So I already had this picture, and so

5    then I reached out to Ivan to use it to see if he could help

6    us with this new surveillance that was occurring in Mexico

7    City.

8    Q.  And so did Ivan Reyes participate in the SIU Cancun

9    operation that resulted in this photo being taken?

10   A.  No.  He wasn't involved in that, in that one.  And that's

11   typical because with so much going on around the country,

12   sometimes SIU may work on other things or partner -- a smaller

13   group of SIU would be working on something, and he wouldn't be

14   necessarily involved with that.

15   Q.  And so after you received this photo from SIU in Cancun

16   but before you sent it to the defendant, did you modify this

17   photo in any way?

18   A.  Yeah.  I always try to be very careful if there's photos

19   that include the informant.  So I cropped out the photo where

20   the informant was sitting.  And so I zoomed it in or cut out

21   the outside of it so it's just focused on the targets and you

22   can't see the face of the informant.

23   Q.  And aside from sending the cropped photograph to the

24   defendant, did you send the photograph to anybody else?

25   A.  I did not send the cropped photograph to anybody else.  It

1    was only to Ivan.

2    Q.  Now, the very next day, did the DEA learn of a leak of

3    information to Geronimo Gamez?

4    A.  Yes.  I believe it was later on that night, and I didn't

5    find out about it until the morning when Chicago was

6    frantically trying to get ahold of me to tell me, "There's a

7    leak.  Somebody's leaking the information that you're passing,

8    and it's going right back to Geronimo, and he's finding out

9    that there's an investigation against him."

10   Q.  Can you flip to Government Exhibit 3?

11        What's the date of this conversation?

12   A.  September 9th, 2016.

13   Q.  And who is participating in this conversation?

14   A.  Geronimo Gamez and someone who's communicating from a

15   phone with the screen name of Ayalla.

16   Q.  Now, I referred to this conversation.  This is actually a

17   copy of a Title III interception of Geronimo Gamez; is that

18   correct?

19   A.  Yes.

20   Q.  What do you understand Gamez and this person Ayalla to be

21   saying in this conversation?

22   A.  Whoever this Ayalla is, is saying, "Watch out, Geronimo.

23   They're listening to you.  They're intercepting your phone,

24   and you'd better be careful because they -- they're watching

25   you, and they've got information on you and on your phones."

1          And then the photo that I had sent to Ivan is being

2     sent to Geronimo, the same cropped photo.

3     Q.   Is the photo on Government Exhibit 3 cropped in the same

4     way that you cropped the photo in Government Exhibit 2?

5     A.   It's, yeah, the cropped version of the photo.

6     Q.   If you go to Page 2, can you describe what's going on in

7     that first half of the page that's highlighted, the sentences

8     there?

9          MR. LOPEZ:  Judge, shouldn't we read that into the

10    record?

11         THE COURT:  Pardon?

12         MR. LOPEZ:  Shouldn't it be read into the record?

13         THE COURT:  No, we don't want to take the time

14    reading it.  I've read it.

15         MR. LOPEZ:  I understand that, but for purposes of a

16    complete record unless we just put the whole --

17         THE COURT:  Well, we'll put -- yes, these exhibits

18    will be in the record.  How is that?

19         MR. SU:  So, Judge, I guess at this time, I formally

20    move Government Exhibits 1 through 12 into the record.

21         THE COURT:  All right.

22         MR. LOPEZ:  Thank you.  No objection.

23         THE COURT:  They're admitted without objection.

24       (Government Exhibits 1 through 12 received in evidence.)

25         THE WITNESS:  Okay.  So in this second -- on the

Sandberg - direct by Su

81

1  second page here, Gamez and the screen name of Ayalla are

2  discussing more about the photo and when it was taken.  And

3  it's relayed by the screen Ayalla to Gamez that it's probably

4  around April when the photo was taken.

5      And then he's basically giving him more warning.

6  He's saying, "Be careful.  Don't talk to anybody.  They're

7  watching you and who you're hanging out with."  And so he's

8  telling him to get new phones.

9      And then also of interest in the middle where they're

10 speaking about the targets on the second level of the

11 restaurant, which is unusual because this particular

12 restaurant had two levels.

13 BY MR. SU:

14 Q.  And, in fact, Exhibit -- the previous exhibit, did you, in

15 fact, tell the defendant the targets were meeting on the

16 second floor of that restaurant?

17 A.  I did.  And I only told Ivan that.  And I knew that

18 because I didn't want others to know it.  I didn't even want

19 him to know it at the time, but I was there on the second

20 level by myself because in the interest of time and not

21 knowing if SIU would get there on time, I went, and I was

22 there on the second level.

23     And so -- but I was trying to -- I was kind of trying

24 to disguise that because I found it better that people not

25 know where I was.

1  Q.  So now that the law enforcement found out about this leak

2  to Gamez, what is the effect that this leak had on the U.S.

3  investigation?

4  A.  It was devastating.  We immediately had to worry about

5  protecting the informant.  That was our first concern because

6  he was in danger.  We also had to worry about, well, where is

7  this leak coming from?  Who is this?  How do we stop this?

8        And then, of course, now the targets knew they were

9  being listened to and watched, and so now they were going to

10 take measures to try to not get caught doing something they

11 shouldn't or to, you know, basically avoid being investigated.

12 Q.  And, in fact, had the CS -- was the CS scheduled to meet

13 with the targets of the investigation?

14 A.  Yeah.  This is -- I mean, to us, we were just really

15 grateful that we got this in time because the informant was

16 going to meet with him again and was scheduled and they were

17 hitting him up.  Especially after they found out this

18 information, they were trying to contact the informant saying,

19 "We need to meet with you."

20        And so the informant was telling us that, and we

21 said, "No, you can't meet with them.  You need to come right

22 now, and we need to find a way to protect you."  And so

23 everything switched over to protection of the source and

24 trying to stop the damage to the case and to protect lives.

25 Q.  Okay.  What kinds of steps, very briefly, did you do or

1    did the DEA do to ensure the safety of the informant?

2    A.   We told the informant to turn off their phone.  Don't

3    answer any calls.  Don't let anybody know where you -- they

4    were, where he was.  And then we brought that person to a

5    secure location, told him don't go outside.  And then we made

6    arrangements to move the informant to a place far away.

7    Q.   Is it safe to say that the informant no longer had access

8    to the targets he had access to prior to the leak?

9    A.   Yeah, that's right.  The informant was under a lot of

10   pressure because right before turning off the phones, they

11   were like insisting that he come meet with them.

12   Q.   And with respect to the wiretap angle of the

13   investigation, how did this leak affect that part of the

14   investigation?

15   A.   Well, the normal stuff that they were talking about, the

16   criminal activities that they were talking about, it was -- I

17   mean, they were more concerned about finding out about the

18   investigation now.  They weren't talking about the drugs and

19   the things that we were looking for them to discuss openly as

20   they had been earlier, and so it really ruined the normal part

21   of the wire investigation.

22            THE COURT:  Do you have any -- had the informant been

23   invited to this meeting?

24            THE WITNESS:  Yes.  The informant was being invited

25   to --

Sandberg - direct by Su

84

1    THE COURT:  I mean, so he was supposed to go to the

2    meeting and then when you found out they had had a -- there

3    was a leak, then you told him not to go to the meeting?

4    THE WITNESS:  Yeah, because, in fact, that was the

5    same informant that they're discussing in the leak.

6    THE COURT:  All right.

7    THE WITNESS:  And so we saw that, and we're like,

8    "Absolutely not.  Don't go to the meeting again."  And so the

9    informant obeyed us and did not go to any more meetings with

10   them.

11   BY MR. SU:

12   Q.  So in the days following the leak, did the defendant try

13   to find out more information about this investigation from

14   you?

15   A.  Yes, he did.

16   Q.  If you can go to Government Exhibit 4, it's conversation

17   between yourself and Ivan Reyes on December 13, 2016.  Is that

18   right?

19   A.  Yes.

20   Q.  What's going on, briefly, in this conversation?

21   A.  This is just a conversation between Ivan and I.  We're

22   writing back and forth.  And he's asking me, he reached out to

23   me to ask if we could meet and discuss some case matters.

24   Q.  Did you actually meet and discuss?

25   A.  We did.  We went over to the Starbucks next to the

1  embassy.

2  Q.  Going into this meeting, did you tell Ivan about the leak?

3  A.  No, I never told him that there was a leak because my

4  first thought was, well, what if it's Ivan?  What if Ivan is

5  the one leaking this?  So I have to be very, very careful what

6  I say to him from now on.  I don't want -- if he is the leak,

7  I don't want him to think that I think -- that I suspect him

8  but at the same time, I have to -- whatever I tell him from

9  here on out, I have to assume that it's possible that he's the

10  leak.

11        So that was how I approached this meeting.  And my

12  primary concern was for the safety of the informant.  So I

13  even went into the meeting thinking that if we started

14  discussing the possibility of the informant in this

15  investigation that I was going to try to mislead or throw out

16  some kind of misleading information about the informant so as

17  to confuse anybody that might get that information.

18  Q.  What, if anything, did Ivan bring to this meeting?

19  A.  When he showed up to the meeting, he had a little folder

20  with him, like a little dossier of papers.  It looked like he

21  had been doing a little bit of research himself.  And from

22  what I remember, it was documents -- because there was another

23  case that was going on with Seattle.  There's an investigative

24  unit that's with the Mexican government under the PGR, and

25  they investigate organized crime.  And their -- our Monterey

1    office had begun working with them on the target, Angel

2    Dominguez, separately.  And so they were up on phones relating

3    to him.

4          And so as I remember, that he had a folder with him

5    that was related to that wire intercept case with the other

6    office and with -- well, the other Mexican office.

7    Q.  So it's fair to say he came prepared to talk about

8    Dominguez?

9    A.  Yes.  And we spoke for a little while, mentioned Geronimo

10    Gamez.  And we were talking about Geronimo, and he was asking

11    me, "Well, isn't Geronimo locked up" because Geronimo had been

12    locked up.  And so I remember we were talking about Geronimo

13    and other aspects of the case and about -- the informant did

14    come up, and then I tried to mislead him on who the informant

15    might be, just in general like to try to protect the CS.

16    Q.  Now, did he ever ask about these topics relating to the

17    U.S. investigation of the Dominguez organization before?

18    A.  Before that date, no, no.  We had never discussed Angel

19    Dominguez in that -- before that date, but Geronimo Gamez, I

20    had -- we had discussed on the night when I was asking for

21    surveillance help.  And so to my recollection, we had not --

22    we didn't start discussing Dominguez until at the Starbucks.

23    Q.  And you didn't discuss Gamez with him until the night you

24    asked him for help on the surveillance; is that correct?

25    A.  Yeah.  Before the surveillance request, I had not spoken

1    to Ivan about Gamez or any of this.

2    Q.   Now, during the investigation, did the DEA also intercept

3    additional conversations where Ayalla was expressly outing the

4    CS to Gamez?

5    A.   Yes.

6    Q.   Can you go to Government Exhibit 5?

7            Is this an interception between Gamez and Ayalla on

8    September 12, 2016?

9    A.   Yes, it is.

10   Q.   Can you explain the highlighted portion of the bottom of

11   Page 1?

12   A.   Yes.  So this is the person that's holding the phone that

13   says Ayalla on the screen name telling Gamez, "Don't say

14   anything" because the information is coming from, like, a

15   source of information or a confidential source or an

16   informant.

17           And then he goes on to say that, "The source was

18   actually sitting next to you the day the picture was taken."

19   And so this is very specific information that is being relayed

20   about the source being there at that meeting in Cancun.

21   Q.   And so the reference to the day of the picture, is that

22   your understanding, it refers to the cropped-out photo that

23   you sent to Ivan Reyes?

24   A.   Yes.

25   Q.   Now, during the course of the investigation into the leak,

Sandberg - direct by Su

1  did you review additional intercepts that supported your

2  belief that the defendant was involved?

3  A.  Yes.

4  Q.  I want to ask you some questions about some of those, if

5  you can flip to Government Exhibit 6.

6  A.  Okay.

7  Q.  What is the date of this conversation and who's

8  participating?

9  A.  October 17th, 2016, a conversation between Gerardo Vazquez

10  and Angel Dominguez.

11  Q.  Now, why is this conversation significant in the leak

12  investigation?

13  A.  This is significant because these were the partners of

14  Geronimo Gamez from the other conversation we just looked at,

15  and Dominguez was really the big boss in all of this.  And so

16  they're discussing someone that they refer to as "the Jewish,"

17  in Spanish "Judio," and they're asking if -- or they're

18  discussing if the Jewish can help them out with this.  So

19  that's kind of the nature of this particular conversation.

20  Q.  Do you have an understanding of who the Jewish, or

21  El Judio, is?

22  A.  Yes.  That's the guy that we knew that worked closely with

23  the Beltran Leyvas.  His name is Ismael Coronel Sicairos.  And

24  it was also known as Judio or Jewish and Bufalo.  Those were

25  his nicknames.

Sandberg - direct by Su

1    And then you can see in the conversation before me

2    that they're discussing going to this person to get help to

3    see if that person can help them in conversations and

4    negotiations with Ivan.

5    Q.   And based on prior investigations into the Beltran Leyva

6    organization, do you have an understanding of Mr. Sicairos,

7    what his role was within that organization?

8    A.   Yeah.  His role within the organization was, after the

9    Bravo brothers or the Pineda Villa brothers were killed

10   because of betraying Chapo, betraying Beltran to Chapo, the

11   replacement was Ismael Coronel Sicairos.  And so his job was

12   to coordinate with corrupt Mexican police officers and public

13   officials and the Beltran Leyvas and try to recruit them or be

14   like an intermediary with them.

15   Q.   And the last --

16        THE COURT:  Remind me who Palamo, Paloma was.

17        THE WITNESS:  So this is help out with Paloma.  So

18   Paloma specifically is someone that's going to -- we don't

19   know exactly who Paloma is, but it's presumably someone within

20   the federal police.

21   BY MR. SU:

22   Q.   So the last four lines of Government Exhibit 6, Vazquez

23   says -- asks Ivan for a meeting, calls him the boss.  Do you

24   have an understanding of who they're referring to there?

25   A.   Yes.  So the last part of the conversation is that they're

1  focusing on Ivan who is the boss of the SIU, and so they're

2  talking about -- Paloma, your Honor, would have been somebody

3  that Ivan's chain above him, is presumably is what this

4  conversation is saying.

5  Q.  And with respect to the specific references to "Ivan" and

6  "the boss," you understand that to be a reference to the

7  defendant, Ivan Reyes?

8  A.  Yeah.  When they're talking about Ivan and the fact that

9  he's the boss, it's because they understand he's the boss over

10  the DEA vetted unit, or the Mexican unit that interfaces or

11  coordinates with DEA.

12  Q.  Now, can you flip to Government Exhibit 7?  What's the

13  date of this conversation and who's participating?

14  A.  October 20th, 2016.  It's a conversation with Gerardo

15  Vazquez, also known as Pulpos, and Angel Dominguez.

16  Q.  Now, why is this conversation significant in the leak

17  investigation?

18  A.  It's significant because again, they're talking about Ivan

19  and talking about him attending a class which would have been

20  common during this time for Ivan to be receiving training

21  in -- as a federal police officer, they regularly go to

22  training courses.  And then further, they go on to speak about

23  how they can blackmail Ivan in case he doesn't want to work

24  with them.

25         And then they bring up what they say is "the Bel

1   files" which to me, that's the Beltran files, Beltran Leyva

2   files.  And they're discussing a history that they know about

3   Ivan having worked with the Beltrans and how they can

4   basically use that to their advantage to get him to work with

5   them, too.

6   Q.  So is it your understanding that talking about Ivan coming

7   up in the Bel files with a code, that that references that he

8   is associated with Beltran Leyva documents under a code name?

9   A.  Yes.  So usually, you know, when they're talking about it

10   this way, they'll be talking about some kind of police files

11   or records where they would have had information on the

12   Beltran Leyvas, and then the code name would have been a

13   nickname for Ivan that would have been known, that would have

14   been documented in those police files.

15   Q.  Now, during the course of your investigation, did you

16   learn that defendant did go by a particular nickname?

17   A.  Yes.  I learned in the investigation as we started looking

18   into this more closely that he was known, Ivan was known as a

19   nickname "La Reina."

20   Q.  And where did you learn that?

21   A.  I learned that from studying the reports and also from

22   later on, we had interviews with Ivan which --

23           MR. LOPEZ:  Objection.

24           THE COURT:  Overruled.

25   BY THE WITNESS:

1   A.   We had interviews with Ivan in which he admitted that he

2   was known as La Reina.

3            MR. LOPEZ:  Objection.  He's talking about a proffer.

4            THE COURT:  What?

5            THE WITNESS:  No, that was not a proffer.  That was

6   an interview that we had with Ruben Garcia, Special Agent

7   Ruben Garcia.  It occurred.  I was standing outside the door.

8   I had spoken to Ruben about this.  Ruben is a very close

9   friend with Ivan.  And during that meeting with Ruben and

10  Ivan, Ivan -- I can talk more about that, but specifically to

11  this right now, he said that he was La Reina.

12  BY MR. SU:

13  Q.   And we'll get more into depth in that meeting in a little

14  bit.  But going back to Government Exhibit 7, the highlighted

15  reference to somebody named Bufalin, do you have an

16  understanding of who that's referring to?

17  A.   So that's another -- like a derivative of the word Bufalo,

18  which was the nickname of Ismael Coronel Sicairos, who had

19  that -- as I described earlier, had a long-time relationship

20  with the Beltrans and as being a liaison between the Beltrans'

21  group and the corrupt police officers.

22  Q.   At the bottom of Page 1 when Dominguez references "the

23  dirtbag," what's your understanding of that?

24  A.   When they're talking about the dirtbag on this page, I

25  believe they're talking about the actual informant.

1  Q.  Now, if you can go to Government Exhibit 8, which is

2  interceptions of Vazquez on October 20th, 2016.

3  A.  Yes.

4  Q.  What is your understanding of the references to "Pato"?

5  A.  Pato is going to be another nickname that they decide they

6  want to call the Jewish instead of calling him "the Jewish."

7  And this makes sense because Coronel Sicairos had been

8  arrested, and it was very public that he was known as the Jew

9  or Judio.

10      And so this conversation or this part of this

11  conversation indicates to me that they were aware that that

12  might not be a good nickname to continue calling Coronel

13  because that was something that law enforcement or other

14  people might know who they're talking about, so they decided

15  to call him Pato instead.

16  Q.  And before when we were talking about Bufalin, Buffalo, is

17  that also your understanding that that's a reference to

18  Coronel Sicairos?

19  A.  Yes.

20  Q.  So please turn to Government Exhibit 9.  And this is an

21  October 26th, 2016, conversation between Dominguez and

22  Vazquez; is that right?

23  A.  Yes.

24  Q.  And what do you understand them to be saying in this

25  highlighted portion?

Sandberg - direct by Su

1  A.  So it's -- to me, they're saying can Pato finally see Ivan

2  this week.  So they were trying to put together this meeting

3  with Coronel Sicairos and Ivan.

4  Q.  Ivan Reyes?

5  A.  Yes, Ivan Reyes.

6  Q.  And if you can, go to Government Exhibit 10.  Is this a

7  conversation between Dominguez and Vazquez on October 26th,

8  2016?

9  A.  Yes.

10  Q.  Can you describe why this conversation is significant in

11  the leak investigation?

12  A.  Well, they're again strategizing on how they can get out

13  of this mess that they're in or fix the problem.  And so

14  they're saying that Ivan could have a lot more information

15  about them and what the case is that the government has

16  against them, so it's important for them to try to have more

17  contact with Ivan and get with him to find out what that

18  information is.  So they're arranging to see if they can have

19  more contact with Ivan.

20       And then they assume -- it says in here that if they

21  can get his help that they might be able to figure out a plan

22  against the informant to try to smear him or to pin some fake

23  dope loads on him or something to ruin him as a witness -- as

24  a government witness.

25       And then they mention specifically in here that Ivan

1  should be coming over with the gueros.  "Gueros" is the white

2  guys.  That's the word they use to describe DEA.  And so they

3  have an understanding that Ivan is going to be involved with

4  us in that process and that he may be able to assist them in

5  smearing the informant or ruining the case that we have.

6  Q.  Now, sir, in January of 2017, did you participate in an

7  interview of Sergio Villarreal Barragan?

8  A.  Yes.

9  Q.  Does he go by the nickname "Grande"?

10  A.  Yes.

11  Q.  Who is that person?

12  A.  He was a high-ranking official or cartel member who worked

13  very, very closely with the Beltrans, was in charge of a lot

14  of different things for them including coordinating with

15  corrupt Mexican officials on behalf of the cartel.

16  Q.  Why was law enforcement interested in interviewing

17  Mr. Villarreal?

18  A.  We were interested in interviewing him because he had made

19  prior statements about some of those meetings that occurred

20  with Ivan and with the Beltrans.

21  Q.  Now, at any point during that interview with him, did

22  anyone show him the Title III interceptions that you conducted

23  in this case of Gamez, Vazquez, Dominguez, and others?

24  A.  No.

25  Q.  Did anyone tell him why they were interested in hearing

Sandberg - direct by Su

96

1    more about Ivan Reyes?

2    A.   No.

3    Q.   Did they tell him what they suspected Ivan Reyes of doing?

4    A.   No.

5    Q.   Did anyone promise him a reduction in his sentence in

6    exchange for information?

7    A.   No.

8    Q.   Now, during the interview, did they show Villarreal

9    various photos of individuals?

10   A.   Yes.

11   Q.   Did he identify Ivan Reyes, the defendant, in any of those

12   photographs?

13   A.   Yes, he did.

14   Q.   If you can, go to Government Exhibit 1.

15   A.   Yes.

16   Q.   Do you recognize this photograph?

17   A.   Yes.  That's Ivan Reyes.

18   Q.   And is that the photo of the defendant that Mr. Villarreal

19   identified in this meeting with you?

20   A.   Yes.  And it has his initials signed on the bottom.

21   Q.   In identifying the defendant, did Mr. Villarreal use any

22   particular nicknames?

23   A.   Yes.  He knew him as La Reina.

24   Q.   Now, during this interview, did Mr. Villarreal discuss

25   Ivan Reyes' involvement in providing information that led to

Sandberg - direct by Su

97

1   the kidnapping, torture, and murder of a Colombian individual?

2   A.   Yes.

3   Q.   From speaking to DEA agents familiar with that particular

4   Colombian, was that individual actually a DEA confidential

5   source?

6   A.   Yes.

7   Q.   And from speaking to those same agents, do you know what

8   kind of information that this confidential source was

9   previously providing?

10  A.   Yes.   The source was providing information about loads of

11  cocaine that were coming on boats up through international

12  waters from Colombia into Mexico.

13  Q.   And from those same conversations, do you know if the CS

14  was, in fact, murdered?

15  A.   Yes.   The source was murdered.

16  Q.   Now, the following month, in February of 2017, did you

17  participate in an interview of the defendant?

18  A.   I did.

19  Q.   Where did this interview take place?

20  A.   At the U.S. embassy in Mexico City.

21  Q.   Did the defendant participate in this interview

22  voluntarily?

23  A.   Yes.

24  Q.   What did he say at the beginning of the interview?

25  A.   Well, when he arrived, he said, "I knew this day was going

1  to come.  I don't know what took you so long to come speak

2  with me."

3  Q.  Who did the defendant identify in this interview as the

4  sole point of contact between the DEA and SIU?

5  A.  Himself.

6  Q.  During this interview, did he admit that he had met with

7  Angel Dominguez in person?

8  A.  Yes, he did.  And he said he had met with him around the

9  Dia de los Muertos, which would have been right around

10  Halloween.

11  Q.  Of 2016?

12  A.  Of 2016, yes.

13  Q.  What else did he say about this meeting?

14  A.  He said that when he met with Angel Dominguez in Polanco,

15  it was an area by Antara, which is an exclusive shopping area

16  there in Polanco, and that they had -- he had gone over there

17  and that he had gotten into a car with Angel Dominguez and

18  with another individual and that they had driven around in

19  circles talking for a while.

20       And they were talking in the car about the Tamaulipas

21  Plaza which at the time and even now and for a long time has

22  been one of the most violent plazas in all of Mexico, that

23  fighting between different groups has occurred.

24       And so Angel Dominguez was talking about basically

25  all the problems in that plaza, was asking Ivan for help in

Sandberg - direct by Su

1    arresting some of his rivals that were violent and said that

2    if we can put my own people in place of the drug trafficking

3    affairs there in Tamaulipas that there would be a lot less

4    violence and everybody would be better off.

5    Q.   In the interview, did the defendant say that Dominguez

6    showed him anything in that car?

7    A.   Yes.  He said that he showed him the picture of that photo

8    in Cancun of the surveillance photo of Geronimo Gamez and

9    Pulpos.

10   Q.   And this is the cropped photograph that you had sent to

11   Ivan Reyes?

12   A.   Yes.

13   Q.   In the interview, did the defendant admit that he knew

14   that Dominguez was a target of the DEA investigation?

15   A.   Yes.

16   Q.   Did he also admit that he knew about the existence of the

17   U.S. investigation into Gamez and to others?

18   A.   Yes.

19   Q.   To your knowledge, did defendant report this meeting with

20   Dominguez to anybody at DEA?

21   A.   No.

22   Q.   Did defendant report to anyone at DEA that he knew

23   Dominguez had this surveillance photograph?

24   A.   What was that again?

25   Q.   Did he report to anyone at DEA that he knew that Dominguez

Sandberg - direct by Su

100

1  had the cropped photograph that you had sent?

2  A.  No, he didn't tell anybody that.

3  Q.  And as the commander of the SIU, should he have reported

4  these things?

5  A.  Absolutely.

6  Q.  Now, during this interview, did law enforcement ask him

7  about information that defendant had previously been corrupt

8  to members of the Beltran Leyva organization?

9  A.  Yes.  We asked him about that, said, "Isn't it true that

10  you used to work with the Beltran Leyvas?"  And his response

11  was pretty much a nonresponse and acting like he didn't know

12  what was -- why we were asking that.

13  Q.  Now, during your investigation of the leak, did you review

14  interceptions corroborating that the defendant had, in fact,

15  met with Dominguez?

16  A.  Yes.

17  Q.  If you can, go to Government Exhibit 11.

18  A.  Okay.

19  Q.  Can you -- this is a conversation from October 31st of

20  2016.  Who were the participants?

21  A.  Angel Dominguez and Gerardo Vazquez.

22  Q.  And then later on, Angel Dominguez and an individual

23  nicknamed Martin de la Vega?

24  A.  Yes.

25  Q.  Now, how does this conversation corroborate the statements

Case: 1:17-cr-00084 Document #: 74 Filed: 09/11/19 Page 101 of 184 PageID #:437
Sandberg - direct by Su
101

1  made by the defendant?

2  A.  This is a conversation where Dominguez is telling Vazquez

3  basically that he just met with the individual that he was

4  getting information from, and they met in Polanco.  And this

5  conversation is on October 31st, Halloween, around the same

6  time that Ivan told me that he had met with Angel Dominguez.

7  And so this is corroborating the statements that Ivan made

8  about meeting with Angel Dominguez.

9  Q.  So when Dominguez said "now with the person" and

10 "finishing up the friend," what's your understanding of who

11 the references to "person" and "friend" are?

12 A.  To Ivan.

13 Q.  Ivan Reyes?

14 A.  Yes, Ivan Reyes.

15 Q.  Dominguez later tells Martin de la Vega, "I'm going to

16 need two iPhone 7s, one for me, other for the friend."  What's

17 your understanding of that?

18 A.  Well, my understanding is that he's providing a phone to

19 Ivan and one for himself that they're going to speak

20 exclusively on knowing that the government is trying to

21 intercept their communications.  This is a method for them

22 to -- a way for them to try to avoid being -- their

23 conversations being intercepted by the government.

24 Q.  And if you can go to Page 2, what's your understanding of

25 the highlighted portions there?

1   A.   On the top, it's saying that -- Dominguez is saying that,

2   telling this Martin de la Vega that he's going to give that

3   person $290,000.  He says 290 dollars, but that's typical for

4   traffickers in their conversation to abbreviate the money

5   amounts, the drug amounts.  So that would be $290,000 that

6   he's going to give him.

7   Q.   And what's your understanding of who's going to be getting

8   the $290,000?

9   A.   The person that he just met with in this conversation,

10  that he's told him that he's going to give it to Ivan Reyes or

11  to Ivan.

12  Q.   Now, did DEA agents meet again with the defendant in March

13  of 2017?

14  A.   Yes.

15  Q.   Now, I think we -- you had started to describe this

16  meeting, so I'm going to ask you some more specific questions

17  about it.  So who specifically from the DEA met with the

18  defendant on that day?

19  A.   Special Agent Ruben Garcia.

20  Q.   And who is Special Agent Ruben Garcia, and what's the

21  relationship with the defendant?

22  A.   Ruben Garcia had worked in Mexico City, and his job in

23  Mexico City as special agent was to work very, very closely

24  with the SIU.  And he was close friends with Ivan and worked

25  closely with Ivan on many cases, and so we knew that he had

1    that relationship of trust with Ivan.

2            And since we had already started speaking with Ivan

3    and trying to ask him to do the right thing and come and

4    cooperate, we figured Ruben would be a good person to go speak

5    with him because they had trust.  And so I actually went with

6    Ruben over to the hotel, and I waited outside the room.  And

7    he had a conversation with Ivan and then relayed to us all the

8    details of the conversation.

9    Q.  Now, was Ivan there voluntarily?

10   A.  Yes.

11   Q.  Now, speaking to Special Agent Garcia, are you aware that

12   the defendant made admissions about corruption of cartel

13   members in that interview?

14   A.  I am, yes.

15   Q.  Can you describe the individuals that the defendant

16   discussed?

17   A.  Well, it was a very emotional conversation, according to

18   Ruben.  It was difficult for both of them.  He said that Ivan

19   was suicidal and was crying and that Ivan admitted that he had

20   met with Arturo Beltran Leyva in the past.

21           In fact, he went on and asked Ruben, "Are you going

22   to have to tell anybody that I met with Arturo Beltran?"  And

23   Ruben told him yes.

24           Ruben described to me that when he heard that with

25   his own ears that Ivan had been meeting with Beltran

1  personally that it was like getting punched in the stomach and

2  that it was -- it was very, very difficult to hear that, to

3  know that one of the most wanted men in the world and most

4  violent, notorious criminals in the history of drug

5  trafficking was talking to our SIU commander and that there

6  was a relationship that they had.

7  Q.  So I want to focus a little bit on that.  So because of

8  Arturo Beltran Leyva's status as being violent and one of the

9  most powerful narco traffickers, how would you have expected a

10  non-corrupt Mexican police officer -- official to have acted

11  if he was able to have met with Arturo Beltran Leyva?

12  A.  Well, if the person was honest, they would be reporting

13  that to their chain of command, signing all the bells and

14  whistles to make it known that that was occurring because

15  that's such an important thing.  That would be like any agent

16  meeting with Chapo Guzman.

17  Q.  And based on your training and experience, would these

18  cartel leaders have met with a police officer they did not

19  trust?

20  A.  There's no way they would have done that, and there's no

21  way an officer that didn't trust that he was going to be okay

22  would go alone and not tell anybody beforehand because, I

23  mean, if there was any kind of undercover operation or

24  informant relationship thing going on, you would certainly

25  want your team to know what you were doing so they could

1    protect you if something went wrong.

2           And so on both sides, that meeting never would have

3    occurred unless there was trust.  Very, very few people would

4    have had an audience with Arturo Beltran Leyva.

5    Q.   And so did the reason that Special Agent Garcia viewed

6    this admission as a punch to the stomach, is that because he

7    viewed it basically as an admission that the defendant had

8    been corrupt to Arturo Beltran Leyva?

9    A.   Yes, and a betrayal to all the things that they had worked

10   together for.  They had been in gun battles together under

11   attack, Ruben and Ivan, and it was a very close relationship.

12   People had died together.  And so to hear that he had been

13   meeting with Arturo Beltran Leyva was just unconscionable.

14   Q.   In this interview, did the defendant also admit to meeting

15   with other cartel members?

16   A.   Yes.

17   Q.   And who were those?

18   A.   He admitted to meeting with Judio, or Ismael Coronel

19   Sicairos, and the Borrados, or Mario and Alberto Villa Pineda.

20   Q.   So who exactly are Borrado and Mario Pineda Villa?

21   A.   They were in charge of working for the Beltran Leyvas and

22   recruiting and paying and acting as intermediaries with the

23   Mexican law enforcement and corrupt officials.

24   Q.   Can you -- I'm sorry.  In this interview, did the

25   defendant also admit to using a particular nickname?

Case: 1:17-cr-00084 Document #: 74 Filed: 09/11/19 Page 106 of 184 PageID #:437
Sandberg - direct by Su
106

1    A.   Yes.  He and Ruben talked about -- Ruben told him, "They

2    know that your nickname is La Reina."  And Ivan admitted, yes,

3    he conceded, yes, that was true.

4    Q.   And just to clarify, in this interview, he talked about

5    meeting with Arturo Beltran Leyva, Alberto Pineda, and Mario

6    Pineda.  He did not actually talk about meeting with Sicairos,

7    is that correct, in this particular interview?

8    A.   In this particular one, just with the Borrados and with

9    Arturo.

10   Q.   Now, I want to ask you about the defendant's interactions

11   with other cartel members including with Angel Dominguez.

12   First, are you aware that the defendant has participated

13   previously in an operation concerning an individual nicknamed

14   Macho Prieto?

15   A.   Yes.

16   Q.   Who was or who is Macho Prieto?

17   A.   Macho Prieto is a high-level lieutenant for the Sinaloa

18   Federation, specifically working with Mayo Zambada -- I'm

19   sorry?  Ismael Zambada Garcia, also known as Mayo Zambada.  So

20   he was one of the heads of -- he was partners with Chapo

21   Guzman.  The two of them were the co-heads of the Sinaloa

22   cartel for probably the longest stretch of time, still is the

23   head of the Sinaloa cartel.

24        So anyway, Macho Prieto worked for Mayo and was his

25   head of security, was in charge of basically fighting wars or

1    battles with any other cartels such as the Beltrans who were

2    their archenemies at a certain point.

3    Q.   And so from speaking to agents who participated in a

4    capture operation of Macho Prieto, do you know what happened

5    to him?

6    A.   Yes.  Macho Prieto -- actually, Ivan was in charge of that

7    operation with SIU working with Ruben Garcia.  And in that

8    attempt to capture Macho Prieto, it was a huge gun battle, and

9    Macho Prieto was killed during the capture attempt.

10   Q.   Are you also aware that the defendant has participated in

11   a capture operation of Edgar Valdez Villareal, a/k/a La

12   Barbie?

13   A.   Yes.  Ivan was also one of the bosses over the Barbie

14   capture.

15   Q.   And who was Barbie?

16   A.   La Barbie was also a high-ranking Beltran figure, a

17   member, lieutenant.  And at the end, before he was captured,

18   he betrayed the Beltrans and tried to kind of break off and

19   form his own group and with intentions to actually take over

20   the Beltran Leyva cartel.  And when Hector Beltran figured out

21   that that was going on, he wanted to get rid of La Barbie

22   because he betrayed them.

23   Q.   And from speaking to DEA agents who participated in that

24   investigation or that operation, do you know what happened

25   with Barbie?

1   A.   Yes.   So Barbie was captured by the SIU and by Ivan's

2   group --

3   Q.   And specifically --

4   A.   -- the capture operation.

5   Q.   Specifically, from speaking to those agents, do you know

6   what happened during that operation?

7   A.   Yes.   So in speaking with agents that were close to the

8   operation, in charge of the operation, they said that some of

9   the SIU members recalled that when they found Barbie, that

10  Ivan had actually fired shots at him, tried to shoot him, but

11  that Ivan wasn't a very good shot and so he didn't hit him.

12  But then eventually, everybody was there, and Barbie wasn't

13  resisting and didn't try to retaliate, and so they just took

14  him into custody.

15  Q.   With respect to Dominguez, based on your training and

16  experience working in DEA Mexico City with Mexican

17  counterparts, do you believe that meeting with a high-level

18  cartel target like Dominguez, providing information, getting

19  paid for that information, is commonplace?

20  A.   No.   It may be commonplace with corrupt officials, but

21  it's not common for someone that is trying to do the right

22  thing to meet with him.

23  Q.   And what would DEA do if it knew that an SIU member was

24  meeting with cartel leaders, members, and giving them

25  information?

Sandberg - direct by Su

109

A.  Well, we'd -- we would fire them.  We'd try to vet that information out, see if it's true because there's accusations made all the time.  But if we knew beyond doubt and certainty, had very good reason to believe that that was true, we would, number one, get that person removed from our SIU, and then we would try to prosecute that individual if possible.

Q.  And as an agent working on the investigation of Dominguez and his drug trafficking organization, would you have wanted to know that the defendant had met with Dominguez in person?

A.  Yes.  That would have been critical because we were trying to capture him.

Q.  Was there any legitimate law enforcement purpose for the defendant to have possibly met with Dominguez?

A.  Not that I can think of under the circumstances.

Q.  And why is that?

A.  Because at this time, Angel Dominguez was one of the most powerful drug traffickers in Mexico.  He was conspiring to take over half of the country and working with several other groups that had lost their leadership.  He was a threat to the national security of Mexico and the United States.  And so I wouldn't expect anybody would have met with him directly and not informed others about that.

Q.  And also, specifically with respect to how Mexican law enforcement officers operated, was there any legitimate reason for the defendant to have met with Mr. Dominguez?

1   A.  No.  Typically, it's a little different in Mexico from

2   what I understand because their officers don't typically run

3   sources and don't do undercover like we do in the United

4   States.  So we have relationships with informants, and we run

5   them, so to speak, or direct them, but that same type of

6   activity doesn't really occur with the Mexican police in the

7   same way, so that would be very unusual.  It's very normal in

8   the U.S. but not normal or commonplace for that to be

9   happening in Mexico in the same way.

10  Q.  And so even if it were the case that he was meeting with

11  Dominguez for some conceivable legitimate reason, what would

12  the defendant have done before actually taking that meeting?

13  A.  Well, to protect himself, he would have informed his

14  superiors or his SIU team members so they could try to protect

15  him if something went wrong, or if it was a surprise meeting,

16  he certainly would tell someone afterward immediately to see

17  if he could take the next step to, number one, to clear

18  yourself of any future accusations that you might have been

19  doing something you shouldn't and also to further the

20  investigation and try to capture that individual, which in

21  this case he was a fugitive.

22  Q.  And to your knowledge, did he take any of those steps?

23  A.  No.

24  Q.  I just want to take a step back and ask you some -- a few

25  questions.  So first of all, with respect to Dominguez, are

1  you aware that there was, in fact, a provisional arrest

2  warrant out for him at the time of --

3  A.  Yes.

4  Q.  -- the meeting?

5       Now, with respect to the overall investigation into

6  the leak, can you describe the extent of the resources that

7  were spent in investigating this leak and defendant's role in

8  that?

9  A.  Yeah.  This was -- this was really devastating to DEA

10  Mexico because we have all worked very, very hard to establish

11  relationships with the Mexican government.  We had many, many

12  good things happening with them.  And so when this -- this

13  happened, it really damaged everything we were working for and

14  had worked together for so long to accomplish and put a haze

15  over a lot of the successes that we had had and caused us to

16  have to ask questions about, is there anybody else, what else

17  is going on.  And so all of these things led to -- it

18  interfered with investigations going forward.

19       I know for my own part, I just completely stopped

20  coordinating with him on any of the cases, and yet at the same

21  time, there were many good officers over there.  And we had to

22  remove many of them just because at this point, we didn't know

23  exactly how deep the leaks ran and so we had to, you know,

24  remove a lot of people.  Some may not have been even, you

25  know, guilty, but we just had to remove them from those

Sandberg - direct by Su

112

1   positions and find new people.

2       This set us back incredibly because all the casework

3   stopped, and we were focused on damage control and on safety.

4   Who -- I mean, our family's in danger now.  I mean, these

5   individuals could easily find out where my family was.  And

6   they knew what car I drove.  And so it was a very, very

7   difficult time for all of us.

8   Q.  And how did this leak affect the specific investigation

9   into the Dominguez drug trafficking organization?

10  A.  Well, it basically ended the collection of any new

11  evidence of drug trafficking and just focused on, how can we

12  get him into custody as quickly as possible.  And it set us

13  back because now people knew we were coming after them.

14      And so the chances of trying to capture diminished,

15  although we were successful, but it made it so we had a really

16  hard time capturing Gamez and Pulpos who were on the run.  So

17  it was really, really difficult.

18  Q.  Is it fair to say that law enforcement had to shift their

19  resources away from investigating this drug trafficking

20  organization into finding out, you know, the extent of the

21  leak?

22  A.  Yeah, that's absolutely true, and not to mention the

23  political repercussions and the damaged relationships and

24  trying to preserve what we had built with our Mexican

25  counterparts, many of whom are heroes and good people.  And so

Sandberg - direct by Su

113

1   it was just a real tragedy.

2   Q.  And with respect to investigating the defendant's role in

3   the leak, is it fair to say that significant resources were

4   expended in that investigation?

5   A.  Oh, yes.

6   Q.  And in fact, people, law enforcement officials flew down

7   to Mexico several times to interview the defendant; is that

8   right?

9   A.  Yes.  I mean, flying people back and forth, putting

10  informants into protection, all of these things cost a lot of

11  money.

12  Q.  And I think you touched on this regarding how defendant's

13  conduct affected the safety of agents in DEA Mexico City.  Did

14  it also affect your safety personally?

15  A.  It did.  And one of the most sobering things about this

16  for me is that on the night that I was trying to get Ivan's

17  help to go and do the surveillance -- I normally don't do

18  surveillance in Mexico because we usually just ask other

19  people to do it.  It's not recommended that we do it, and we

20  try to abide by that.  But given the circumstances and not

21  knowing if they were going to get over there in time, I went

22  personally over there.

23          And I was in the restaurant.  And I rode up the

24  elevator.  And by chance, I rode up in the same elevator with

25  Geronimo and Pulpos.  It was a very small elevator.  I can

1   remember looking at them and thinking, they're probably

2   looking right through me and wondering who I am.

3        Fortunately, we got up to the second level, and they

4   went and seated themselves.  I was on the other side of the

5   restaurant.  And while this is all occurring, little did I

6   know that within hours, those same people that I was trying to

7   observe by myself in Mexico who have a history of all sorts of

8   violence, that they were being told by my trusted counterpart

9   that we were investigating them.

10       And so thank goodness, I didn't -- you know, that

11  didn't come out faster than that, than it did, but I

12  personally was in danger.  And from that moment on until I

13  lived the rest of the time in Mexico, even today, I wonder,

14  you know.  There's people that know all about me and know what

15  I was doing, you know.

16       They know -- you know, it was coming from someone

17  that I was trying to protect myself with, someone that I

18  trusted who in some ways had done many good things but after

19  we look back at it, it makes me wonder what was the real

20  reason for that.  Was it to just take out rivals?

21       And so it's very, very difficult for me personally

22  and for our agency and -- because agents have been killed.

23  Mexicans have been killed.  His own officers have been killed

24  in the line of this work as have Sonorans by the Beltrans.

25  The ones that went there and risked their lives to try to

1    capture Arturo Beltran Leyva, one of the Marines died in that

2    operation.

3            To add insult to injury, within a couple of days,

4    they killed his family, too.  They went after his family.

5    That stuff can't happen unless there's corrupt officials that

6    are passing on information.  They're leaking what we're trying

7    to do, people standing beside us.  And it only takes one or

8    two to put everyone in jeopardy.  And this is a real thing.

9    And it happened and played out over and over and over again in

10   Mexico and still does.

11   Q.   In your experience -- you know, you've spent many years

12   working with foreign counterparts on cases involving

13   international drug trafficking.  Can you just talk about why

14   the trust between law enforcement officers on those types of

15   cases is so important and also why corruption is so damaging

16   to that trust?

17           THE COURT:  I think he's explained this already.  I

18   mean, it's pretty obvious what the problem is, so maybe we can

19   move on.

20           MR. SU:  Your Honor, may I have a moment?

21           THE COURT:  Yes.

22           MR. SU:  Judge, I have no other questions.

23           THE COURT:  How long will the cross be?

24           MR. LOPEZ:  Half hour.

25           THE COURT:  All right.  We'll take a recess until

Case: 1:17-cr-00084 Document #: 74 Filed: 09/11/19 Page 116 of 184 PageID #:437
Sandberg - cross by Lopez
116

1    1:30.  Then we'll have the cross.

2         (Recess from 1:07 p.m. to 1:34 p.m.)

3              THE COURT:  Mr. Lopez, it's your turn.

4              MR. LOPEZ:  Yes, Judge.  I'm waiting for my client to

5    get audioed up, Judge.

6              THE COURT:  That's right.

7                          CROSS-EXAMINATION

8    BY MR. LOPEZ:

9    Q.  Good afternoon, sir.

10   A.  Good afternoon.

11   Q.  Sir, when we looked at -- in the government's exhibits --

12   do you have the government exhibit book before you?

13   A.  Yes.

14   Q.  And we had the -- when we looked at Exhibit 2, that was a

15   conversation between you and Ivan Reyes who you knew; is that

16   right?

17   A.  Yes.

18   Q.  You told us on direct examination you had worked with him

19   before; is that right?

20   A.  Yes.

21   Q.  Do you know what year it was that he joined SIU?

22   A.  I don't know exactly the year, no.

23   Q.  Do you remember what year you met him?

24   A.  Yeah.  Probably when I first arrived in Mexico City in,

25   like, 2015.

1  Q.  And at that time, he was SIU at that time?

2  A.  Yeah.  He was the commander of SIU.

3  Q.  So he was the commander for SIU for the entire time that

4  you knew him; is that right?

5  A.  Yes.

6  Q.  When you -- when you were talking to him on September 8th,

7  you told us that you wanted his group to surveil the Sonora

8  Grill; is that right?

9  A.  Yes.

10  Q.  And you were at the Sonora Grill or near the Sonora Grill

11  at that time; is that correct?

12  A.  I was on my way to it, and then eventually I got there,

13  but I didn't let him know that I was there.

14  Q.  Okay.  When -- if you can look at Exhibit 2 when Ivan

15  says, "I've already sent people.  We're going to do everything

16  we can to get there.  When these things come up, please tell

17  me."  What did he mean by that?

18  A.  He meant -- because as I mentioned, when I was driving

19  over there, I was also having a phone conversation with him.

20  So in our phone conversation, I mentioned that, weren't you

21  hearing about any of this case from the analyst with --

22  there's an analyst with SIU that -- well, they're a little bit

23  separate, but they work closely together.  And so I had

24  coordinated with the analyst and had been coordinated with the

25  analyst for a little -- for some time on this case.

1          So I was telling him, "Hey, aren't you speaking to

2     the analyst that knows about this case?"

3          And he was like, "No, I'm not speaking to that

4     analyst about this case.  I didn't know about this case."

5     Q.   Okay.  But he says, "when these things come up, please

6     tell me," correct?

7     A.   Right.  And so he was trying to tell me, "Hey, don't talk

8     with them about this stuff.  Talk to me."  But, in fact, we do

9     both, and he knows that we talk to both of them.

10    Q.   Okay.  So you talked to the analyst, and then you talked

11    to Ivan, and Ivan indicated that his people were on the way;

12    is that right?

13    A.   Yeah.  He was -- my understanding at that time was that he

14    was trying to send people over to the location.

15    Q.   Now, you indicated to the Court that the area in which

16    this grill is located, there's a lot of traffic there; is that

17    right?

18    A.   Yeah.  Well, Mexico City in general, there always is,

19    especially around that time.  And so, I mean, it would have

20    been true or at least it would have seemed true at the time

21    that it would have been difficult for them to get over there

22    in a timely manner.

23    Q.   Okay.  And he told you they were going to try to get

24    there; is that right?

25    A.   That's what he said, yes.

1   Q.   Okay.  You didn't see any of the people there from the SIU

2   that day; is that right?

3   A.   I didn't see any of them when I was there, no.  And my

4   understanding is that they weren't able to make it there when

5   I was there, but if I recall correctly, I think he may have

6   told me later that they -- eventually, they may have gotten

7   there, but it might have been after I was there.

8   Q.   And they had -- the people had already left, correct?

9   A.   Yeah.  And so if I remember correctly, he said, yes, when

10  they got there, they couldn't see them at all.

11  Q.   Now, I want to ask you about this photograph that's --

12  that you sent to him.

13  A.   Yes.

14  Q.   That photograph, you said that you cropped it out so the

15  informant wasn't pictured; is that right?

16  A.   That's correct, yes.

17  Q.   And Ivan told you during your conversation that, "Yes, my

18  people in Cancun took that photo;" is that correct?

19  A.   Yes, but because I think I had told him on the phone --

20  because he didn't know about the investigation, so I had told

21  him in the phone part of the conversation that, you know,

22  "This is -- the photo that I'm going to send you, this is one

23  that your guys did in Cancun."

24  Q.   And Ivan had -- when you say one of the -- that his guys,

25  the photo that Ivan's people took had the picture of the

Sandberg - cross by Lopez

120

1    informant in it which is not the same photo that you sent;

2    isn't that true?

3    A.   Yeah.   The one that his people originally took had the

4    informant in there.

5    Q.   So he would have access to that photograph with that

6    informant; isn't that also true?

7    A.   Not necessarily.   And the reason -- would you like me to

8    explain that?

9    Q.   No.   I'm just asking if he would have access to it.   If he

10   took the photograph, what would he do with it, if his people

11   took the photograph?

12   A.   Well, a lot of times if it happens in another part of the

13   country, he may never know about it until a later time or may

14   never know about it because he's a boss and doesn't

15   necessarily know everything that the SIU is doing around

16   Mexico.

17   Q.   Well, he was familiar with the photo because he said,

18   "Yes, my people in Cancun took that photo," right?

19   A.   Right, because I told him in the phone conversation before

20   I sent it that, "I'm going to send you a photo that SIU took

21   months before."

22   Q.   And that's what he told you:   "My people took the photo,"

23   correct?

24   A.   He was reaffirming what I had told him, yes.

25   Q.   And the photo that was sent to Dominguez -- or excuse me,

1 to Gamez, that photo looks different than the photo that you

2 sent, doesn't it?

3 A.  Yes.  The colors are different.

4 Q.  And during the conversation --

5 A.  The background colors, I should say.

6 Q.  During the conversation, it was stated that the photo was

7 taken from a computer, right?

8 A.  In which conversation?  But yes, I do recall --

9 Q.  The September 9th conversation.

10 A.  Okay.  Yeah.  Later, the one between Ayalla and Gamez,

11 they're saying it was taken -- the one that he's sending is

12 taken from a computer, yes.

13 Q.  This Ayalla/Gamez transcript from September 9th, 2016,

14 this was a Blackberry Messenger intercept, was it not?

15 A.  Yes, I believe so, yes.

16 Q.  Do you know when it was that DEA became aware of this

17 conversation on September 9th?

18 A.  Well, DEA was the one that intercepted it, so they knew

19 right away.  On the 9th?

20 Q.  So they would know on the 9th then; is that right?

21 A.  Yes.  That's why DEA Chicago was trying to get ahold of

22 me.

23 Q.  Was it -- were they -- this was a Title III, you said,

24 right?

25 A.  In Chicago, yes.

Sandberg - cross by Lopez

122

1   Q.   Okay.  So the Title III would be monitored here in

2   Chicago; is that correct?

3   A.   Yes.

4   Q.   That was your understanding, right?

5   A.   Uh-huh, yeah.

6   Q.   On September 9th, DEA had information that it was a person

7   by the name of Ayalla; is that right?

8   A.   They saw this new phone Ayalla pop up --

9   Q.   Okay.

10  A.   -- on the intercepts.

11  Q.   This was a new name, though, for this investigation,

12  wasn't it?

13  A.   As I recall, yeah.  That was -- but it's very common to

14  have a new screen name pop up on intercepts.  So the screen

15  name Ayalla is not necessarily the person's name.  It's just

16  the screen name that is on the phone.

17  Q.   No, I understand that.

18  A.   Okay.

19  Q.   I understand that.  But my point is, that this was a new

20  name that popped up?

21  A.   Oh, yes.

22  Q.   Whether it was a false name or a true name?

23  A.   Yes.  That's true, yes.

24  Q.   It was someone else that DEA would have interest in or DEA

25  would try to target and try to figure out who it was, right?

1  A.  Oh, absolutely, yes.

2  Q.  That would be important to your investigation, would it

3  not?

4  A.  Certainly, yes.

5  Q.  So on September 13th, you had a meeting that you said with

6  Ivan at the Starbucks that was near the -- I think you said

7  near the SIU or near the consulate or the embassy?

8  A.  Near the embassy, yes.

9  Q.  DEA works out of the embassy?

10  A.  Yes.

11  Q.  And then on September 12th -- and they're out of order.  I

12  should have asked you this.  But if you can look at Exhibit 5

13  of September 12th, there's a couple of things that I want to

14  ask you about.

15  A.  Exhibit 5.  Okay.  Yes.

16  Q.  Exhibit 5.

17  A.  Got it.

18  Q.  If you look at the bottom where it's highlighted, "Ayalla,

19  don't say anything because he says the information is coming

20  from a source."  Do you remember that?

21  A.  Yes.

22  Q.  We don't know who Ayalla is referring to at this point, do

23  we?

24  A.  To the source?

25  Q.  When he says "because he."

1    A.   Okay.   "Don't say anything because he says" --

2    Q.   Yes.   Who is the "he"?   We don't know who "he" is; is that

3    right?

4    A.   By this, no, we don't know what that means.

5    Q.   And he says again, "he tells me that the source was

6    sitting with you the day of the picture."   You see that, right?

7    A.   Yeah, but -- so that source would be the -- our source,

8    the one --

9    Q.   Your source?

10   A.   Yeah.

11   Q.   Okay.   And the source that you were talking -- that

12   they're talking about would be the confidential informant that

13   was depicted in the original photo.   Is that how I read that?

14   A.   Yeah, the one that I cropped out.

15   Q.   Okay.   So there's a mention to this person that was

16   sitting there; is that correct?   And -- yes or no?

17   A.   I didn't understand that.   Can you repeat it?

18   Q.   Let me rephrase it.   So in this particular passage,

19   there's a reference to the person that's in the picture that

20   was cropped out by you.

21   A.   Yeah, right.   The "he" you were talking about.

22   Q.   Right, the "he."

23   A.   Okay.

24   Q.   Now, you haven't been able to identify who Ayalla is; is

25   that right?

1   A.  No.  With certainty, we don't know, yeah.

2   Q.  And it's certainly possible that Gamez would have

3   alternate sources within SIU or other law enforcement

4   divisions.  Isn't that also true?

5   A.  Oh, yeah, sure.

6   Q.  That wouldn't be uncommon, would it?

7   A.  I mean, to a -- I mean, it could happen.

8   Q.  Okay.

9   A.  Yeah.

10   Q.  And then you were talking about the Jewish, the Jewish

11   guy, El Judio.  Do you remember El Judio?

12   A.  Yes.

13   Q.  And they talk about Palomo?

14   A.  Uh-huh.

15   Q.  I think it was your testimony you think that Palomo was

16   someone else within the SIU unit.  Was that my understanding

17   of what the answer to the question was?

18   A.  Yes.  From what I was reading it, possibly -- not within

19   SIU but somebody maybe within SIU would have answered to in

20   the federal police, possibly in the federal police, somebody

21   higher up the chain.

22   Q.  Someone who had a contact because --

23   A.  Yeah, possibly someone that Ivan worked for, one of the

24   bosses.

25   Q.  And then --

Sandberg - cross by Lopez

126

1   A.   Or maybe with PGR, but someone higher up.

2   Q.   And then it goes on to say, "Ivan is Palomo's people,"

3   right?

4   A.   Yes.

5   Q.   "And that's why we thought of him."  Now, the "we," is it

6   your understanding from the passage here that "we" means

7   Vazquez and Dominguez thought about reaching out to Ivan for a

8   meeting?

9   A.   Yeah, yeah.

10  Q.   In fact, that's what they said?  "The man we saw already

11  asked Ivan for a meeting," correct?

12  A.   Uh-huh.

13  Q.   So from this passage, it looks like Vazquez or others went

14  to see somebody and asked that person to set up this meeting

15  with the boss; isn't that true?

16  A.   Yes.

17  Q.   Okay.  And then in Exhibit 7, on October 20th, the

18  conversation between Vazquez and Dominguez, they basically are

19  discussing the fact that they can control Ivan because they

20  have information on him; is that right?

21  A.   Right, about the Beltran files.

22  Q.   So they're saying that they have enough information where

23  he would be fucked if they provided it to somebody, correct?

24  A.   Yes.

25  Q.   And this information was discussed between Vazquez and

Case: 1:17-cr-00084 Document #: 74 Filed: 09/11/19 Page 127 of 184 PageID #:437
Sandberg - cross by Lopez
127

1  Dominguez, right?

2  A.  Yes.

3  Q.  Both targets of your investigation, correct?

4  A.  Uh-huh, yes.

5  Q.  So it was your understanding, in case Ivan said he didn't

6  want to work with them that they could tell Ivan that, we can

7  provide information?

8  A.  Yeah.  Like if he wanted to back out or something like

9  that, that they could use this information to force him to

10  continue cooperating.

11  Q.  And that's what they're talking about.  They're talking

12  about the fact that they have this information, and if he

13  wants to go in a different direction, they're going to

14  threaten him with this information.  That's kind of a summary

15  of what they're saying; isn't that true?

16  A.  Yeah, uh-huh.

17  Q.  When these intercepts are occurring, are you being briefed

18  by DEA in Chicago that these things are occurring on this

19  investigation?

20  A.  Yes.

21  Q.  And did anybody at any time decide to put Ivan Reyes under

22  surveillance to see if he was meeting with anybody?

23  A.  Well, yes, we discussed this numerous times to see how

24  might we be able to figure out what he's doing.  And so -- but

25  it was super tricky because how do we surveil a guy whose team

1    is usually the one that we use for surveillance.  And so it

2    was really tricky to figure out how are we going to do this.

3    Q.   So nobody ever followed Ivan to see if he was meeting with

4    anybody.  That's the bottom line, right?

5    A.   Followed physically?

6    Q.   Physically, yes.

7    A.   No.

8    Q.   Did you have an electronic tracker on him?

9    A.   No, because that would have required his team to be

10   putting in the tracker on his car.

11   Q.   DEA works in Mexico, really doesn't have any jurisdiction;

12   isn't that correct?

13   A.   To act unilaterally, no.

14   Q.   You have to -- I mean, you are -- you can't arrest people

15   on your own down in Mexico, can you?

16   A.   Yeah, that -- unilaterally, we couldn't.  We just have to

17   work with them to make the arrest.

18   Q.   So you're kind of working there in Mexico with their

19   permission, so to speak --

20   A.   Yes.

21   Q.   -- would that be accurate?

22   A.   Yes.

23   Q.   An accurate summary?

24   A.   Oh, yes.

25   Q.   I'm not trying to downplay it, but it's with their grace

Sandberg - cross by Lopez

1   that they're allowing you to work in their country --

2   A.   Oh, absolutely, yeah.   We depend on them and their

3   cooperation.

4   Q.   And in order to work down in Mexico then, you're kind of

5   forced to work with different organizations of the Mexican

6   government; is that true?

7   A.   Right.   And that's why we try to have, like, SIU and

8   certain units that we can maybe control the flow of

9   information.

10  Q.   Okay.   And you were working, you said, you mentioned some

11  operations that Ivan was on, right?

12  A.   Yes.

13  Q.   He worked with DEA for a number of years down there; is

14  that correct?

15  A.   Yes.

16  Q.   In SIU; is that right?

17  A.   Yes.

18  Q.   He was able to bring forth evidence and other things to

19  DEA about suspected targets; is that correct?

20  A.   Yes.

21  Q.   He was able -- you said that he participated in the arrest

22  of La Barbie and others, is that also correct?

23  A.   Correct.

24  Q.   He shared a lot of information with DEA about things that

25  he found out about certain targets in Mexico; is that right?

1    A.   Yes.

2    Q.   The only thing that you've been able to really trace back

3    to Ivan now is this Beltran connection and this Vazquez

4    connection -- this Dominguez connection; is that correct?

5    A.   That's the only thing I've been able to trace?

6    Q.   Right.  These are the two things you've been able to

7    trace, that you have this Beltran issue and this Dominguez

8    issue; is that right?

9    A.   Those are the main issues that I've been able to trace.

10   Q.   And again, these --

11   A.   At the moment, but there are possibly many, many other

12   things that didn't rise yet to the level where...

13   Q.   No, I understand that.  I mean, it could be any -- it

14   could be many different things or nothing; is that right?

15   A.   Yeah.  From -- basically, what I've done in my research of

16   Ivan, I now think that there's a lot more, but that's what

17   we're concerned with today.

18   Q.   Ivan came to the United States voluntarily, didn't he?

19   A.   Yes, he did.

20   Q.   And that was after meeting with -- I forget the name of

21   the agent that you mentioned.

22   A.   Ruben Garcia.

23   Q.   Ruben Garcia, right?  He had some meetings with Ruben

24   Garcia.  I think that you said that one of the meetings,

25   either you were present or you could overhear what they were

1   discussing.  Am I correct about that?

2   A.   I was present at the first meeting, and then the meeting

3   with Ruben, I was just nearby.

4   Q.   And during the first meeting that you had with Ivan, he

5   wasn't under any obligation to even speak or answer any

6   questions to DEA at that point, was he?

7   A.   No.

8   Q.   He did it voluntarily; is that right?

9   A.   Yes.

10  Q.   He came to the meeting; is that right?

11  A.   Yes.

12  Q.   He didn't ask for a lawyer; is that right?

13  A.   Yes.  After we contacted him, he came.

14  Q.   During these discussions you had with Ivan, in this first

15  conversation, you made it clear to Ivan that there was an

16  investigation in the United States; is that right?

17  A.   Yes.

18  Q.   And that he was a target of the investigation for

19  obstruction of justice; is that correct?

20  A.   Yes.

21  Q.   You kind of outlined and laid out, maybe not all of the

22  case, but some of the things just so that he knew that you

23  knew; is that right?

24  A.   Yes.

25  Q.   And that's a proper investigative technique you use with

1    many targets; isn't that true?

2    A.   Correct.

3    Q.   And after you laid all of this out, Ivan had agreed to a

4    second meeting; is that right?

5    A.   Yes.

6    Q.   The second meeting with the other agent.

7    A.   I don't know if at the moment he said, "I'll come back

8    later" or if it was just, you know, we -- but he did, yeah.

9    He came in a couple times, yes.

10   Q.   He came in a couple -- he didn't try to become a fugitive

11   or to run away from the issue; is that right?

12   A.   No.

13   Q.   In fact, when he was confronted about coming to the United

14   States, he actually flew up in an airplane with the DEA agent

15   to turn himself in, right?

16   A.   Yeah, after some convincing, yes.  It took some

17   convincing.

18   Q.   He wasn't under any obligation to do that, was he?

19   A.   No.

20   Q.   You didn't have an arrest warrant out of Mexico to grab

21   him and put him in custody, did you?

22   A.   No.   That was part of what we spoke to him about, is that

23   this would be easier for everyone.

24   Q.   And he did it voluntarily then; is that correct?

25   A.   After taking time to think about it and after we spoke to

Sandberg - cross by Lopez

133

1   him and used -- and had Ruben go speak to him about it, yes.

2   Q.   Okay.  And, in fact, Ruben brought him here; is that right?

3   A.   Ruben escorted him, yes.

4   Q.   He escorted him here to the DEA, and he was placed into

5   custody here in the United States; is that right?

6   A.   Yeah.  That part of it, the whole thing started off great,

7   in a sense.

8   Q.   You said you did at one point seek his cooperation; is

9   that right?

10  A.   Yes.

11  Q.   And he did not want to cooperate out of fear; is that

12  right?

13  A.   He started to a little bit but then backed off.

14  Q.   He was going to be charged whether he cooperated or not,

15  don't you think?

16  A.   Yes, possibly charged more initially if he wasn't going to

17  cooperate.  If he stayed in Mexico, he may have been charged

18  with more.  I don't know.  I definitely know we were thinking

19  about that.

20  Q.   During one of the conversations, the initial conversation

21  that you had with Ivan on March 8th, was that the one that --

22  A.   That was Ruben's conversation.

23  Q.   With Ruben, right.  That's the one where Ruben told you

24  that Ivan was very upset; is that right?

25  A.   Yeah.  That is when I was sitting outside in the lobby of

Sandberg - cross by Lopez

134

1   the hotel, and they were in there talking.  And he told me

2   that he was suicidal and he was crying and everything about

3   the Beltrans and all that stuff.

4   Q.  And he was emotional about it; is that correct?

5   A.  Yeah.  I think they both were, but my understanding was he

6   was crying.

7   Q.  During this conversation, too, Ivan told Ruben that

8   Dominguez showed him the photograph; is that right?

9   A.  Yes.

10  Q.  And that was the -- that was the photograph that came off

11  the computer; is that right?

12  A.  Yes.

13  Q.  That wasn't the photograph that you sent to Ivan?

14  A.  Yes -- I mean, it's the cropped photo.  To clarify --

15  Q.  Whether --

16  A.  It's the cropped version, but anybody can look at it and

17  say that there's different colors on it but --

18  Q.  Right.

19  A.  -- there's only one cropped version that I sent to Ivan.

20  Q.  That was a bad question.

21  A.  Okay.

22  Q.  The question is:  One photograph, the source was from a

23  cell phone which is a picture from the cell phone, right, that

24  we saw on --

25  A.  Yes.

Sandberg - cross by Lopez

135

Q.   -- and the other photograph, there was an explanation that the source of that photograph came from a computer of some sort; is that right?

A.   The second -- yes.  In fact, the reality is they probably both were taken from screenshots but --

Q.   Different sources?

A.   Different computers.

Q.   Right.  One from a phone and one maybe from a computer, correct?

A.   Well, they're both sent by phone, so they had to get on a phone and -- so but they both appear to have been Photoshopped of a computer screen.

Q.   But it wasn't the original photo with the informant; is that right?

A.   Only in the sense that it's the cropped photo, that only there was one copy sent to Ivan.

Q.   But there wasn't -- in the cropped photograph, you can't see the informant, right?

A.   Yes.

Q.   And wouldn't it be of much more value to send a photo with the informant in it to a drug trafficker?

A.   Oh, absolutely, if they had that, but if you're operating with what you have just gotten and moving it quickly over to them, then the other photo might be harder to get at, and they kind of monitor -- when you're trying to get to the other full

Sandberg - cross by Lopez

1  photographs, it might be harder to do at SIU, and there might

2  be ways for them to discover that you are trying to look up

3  that photo.  So --

4  Q.   The bottom line is, you don't know if Ivan had access to

5  the original photo or not; is that true?

6  A.   I don't know if he had -- to the one that was uncropped?

7  Q.   To the one that was uncropped, the one that has the

8  informant in it.  You don't know if he had access to it or

9  not; is that your testimony?

10 A.   Yeah, I don't know.  I don't know if he had access to it.

11 Q.   But he could have or he could not have, nobody knows; is

12 that right?

13 A.   Right.  I don't know.

14 Q.   And presumably, Dominguez would want the photo with the

15 informant in it, is that right, to see who it was in case he

16 didn't remember that he was in that -- where he was at during

17 that photograph?

18 A.   That's true, but in the timely manner to get the

19 information quickly to the crooks, I would imagine they would

20 go with what they had at the time, the version they had.

21 Maybe later on, he gave him the one that was discussed in the

22 meeting.

23       The one that he -- the one that was shown at the

24 meeting, I don't know if that was the uncropped one or the

25 cropped one, but I don't know that anybody knows except for --

1   Q.  Okay.  We don't know how Ayalla got the photo; is that

2   right?

3   A.  We don't know how Ayalla got the cropped photo.  I think

4   that's -- that's the question for us as the government.  We

5   don't know how the cropped photo got because I only gave the

6   cropped photo to Ivan.

7   Q.  But we do know again that there's screenshots from

8   different sources?

9   A.  Yeah, different screenshots, but they're all of the

10  cropped photo.

11  Q.  Okay.  Not the original photo?

12  A.  They -- well, the original with the informant uncropped,

13  no.

14          THE COURT:  The pictures that you had -- excuse me.

15  The pictures that you cropped, I take it they were clearer

16  than the ones that are in the record here; is that correct?

17          THE WITNESS:  Yeah.  If you were to see the original,

18  it would be clearer, yes.

19          THE COURT:  These are, you couldn't tell anybody, I

20  don't think, if you look at --

21          THE WITNESS:  Yeah, no.  If you see it early on the

22  phone screen, it was clear enough to see who the --

23          THE COURT:  Okay.  But this is just a -- this was

24  a -- this is not the condition that the picture was that they

25  got?

1    THE WITNESS:  No.  The only thing that's the same is

2  that it's cropped in the same exact way that I cropped it.

3    THE COURT:  Yeah.  You can't -- I mean, this one guy

4  is fairly clear but these two --

5    THE WITNESS:  So I -- yes.

6    THE COURT:  Okay.  So the ones they were working with

7  were much clearer than those?

8    THE WITNESS:  Than what appears in the book, yes.

9    THE COURT:  Yes.  Thank you.

10  BY MR. LOPEZ:

11  Q.  So between -- between September and October, did anybody

12  ever attempt to talk to Ivan about what the DEA was

13  discovering?

14  A.  No, because at this point, he was under investigation, and

15  we were trying to figure out -- because there were still

16  conversations occurring with Ayalla and Gamez, so we're trying

17  to figure out, is there a way that it's going to become

18  evident that it's Ivan or whoever.

19    And so we were waiting and trying to figure out what

20  to do and see before because we didn't want to accuse him

21  prematurely if it wasn't him.  So we were trying to figure out

22  exactly who it was.  And that's why later on when they're

23  talking about Ivan on the text by name and as the boss and all

24  that, so then all of that came together later.

25  Q.  That's when you brought him in?

1  A.  After -- well, actually, by then, we had arrested Angel

2  Dominguez.  And so the case was coming to a head with some --

3  the main guy getting arrested, Angel Dominguez.  And so we

4  were satisfied with everything that had happened with the

5  later communications, and it took us a while to interpret

6  everything that was in there and the other intercepts that we

7  had.

8          So yes, that was when we decided that we can't wait

9  any longer, we have to move.  We were satisfied that he,

10  possibly more people with him, but at least him, that he's

11  involved.

12  Q.  So Dominguez was arrested.  Was he extradited to the

13  United States?

14  A.  Not yet.

15  Q.  He's in the extradition process?

16  A.  Yes.

17  Q.  In Mexico, it takes at least a year or two before you get

18  extradited, is that right, if you don't have --

19  A.  Yes, typically.

20  Q.  And is Dominguez's case out of the Northern District or a

21  different district?

22  A.  It's actually out of San Diego.

23  Q.  And once he clears whatever he's doing in Mexico, then he

24  will go face prosecution in San Diego?

25  A.  Yes.

Sandberg - cross by Lopez

140

1    Q.   How many people were indicted in his case?

2    A.   In Dominguez's case?

3    Q.   Dominguez.

4    A.   I don't know the total number, but I think several.

5    Q.   Was Gamez named in that?

6    A.   Gamez is indicted in the Chicago case, indicted in the

7    Chicago case.

8    Q.   A different case?

9    A.   And so, yeah, we're -- as we try to, started to figure out

10   it was the same group, we work closely with San Diego;

11   Chicago, San Diego, and Mexico.

12   Q.   Okay.  So these individuals were supplying Chicago and San

13   Diego, right?

14   A.   That's where the -- that's where the cases were based out

15   of in the investigations.

16          MR. LOPEZ:  One second, Judge.

17        (Pause.)

18   BY MR. LOPEZ:

19   Q.   So at the time that this photograph was passed, who was

20   Ivan's supervisor, do you know?

21   A.   The one underneath him?

22   Q.   It was above him?

23   A.   Oh, the one above him.  Well, there's -- I mean, several

24   police officers above him in the hierarchy but not necessarily

25   over the SIU as the commander.

1  Q.  He was the commander of SIU?

2  A.  He was the commander so --

3  Q.  He was the boss?

4  A.  He was the boss.

5  Q.  And he had -- how many people did he have underneath him?

6  A.  Well, it ranged from, like, 30 to 70, up to 100 on paper

7  but really at any given time, it's somewhere between 30 and 70.

8  Q.  Okay.  Actively working?

9  A.  Around the country of Mexico, yes.

10  Q.  Okay.  So as the boss of SIU then, he would have access to

11  all of the SIU files; is that right?

12  A.  In theory.  Maybe in time, he could get access to them,

13  but just like in the U.S., I mean, just because there's access

14  to something in Chicago, you may or may not know that it

15  exists, you know.  So --

16  Q.  No, I --

17  A.  But in theory --

18  Q.  I understand that, but my point is, as commander of SIU,

19  he would have custody or control of all of the information

20  that his investigators have put together at any given time; is

21  that right?

22  A.  Yes.  Eventually, yes, if he wanted to, he could probably

23  have access to any of it.

24          MR. LOPEZ:  Okay.  I have nothing further, Judge.

25          THE COURT:  Anything further?

Case: 1:17-cr-00084 Document #: 74 Filed: 09/11/19 Page 142 of 184 PageID #:437
Sandberg - redirect by Su
142

1        MR. SU:  Yes, your Honor.

2        THE COURT:  Very briefly.

3                    REDIRECT EXAMINATION

4    BY MR. SU:

5    Q.  During the investigation of the leak, the DEA wasn't

6    allowed to just go and slap a tracker on Ivan's car; is that

7    right?

8    A.  No, we can't do that unilaterally.  And that's what made

9    this whole thing so complicated, was that the people that we

10   would normally ask to do something like that were the people

11   that -- the boss of that group.

12   Q.  You were asked some questions about operations that Ivan

13   participated in including presumably Barbie and Macho Prieto.

14   A.  Yes.

15   Q.  Do you remember those questions?

16   A.  Yes.

17   Q.  At the time Barbie was arrested, was he considered to be a

18   friend or an enemy of the Beltran Leyva organization?

19   A.  He was an enemy and one of the threats to take over the

20   cartel, and so he was one of their main concerns to get rid of

21   him.

22   Q.  And at the time Macho Prieto was killed, was he considered

23   to be a friend or an enemy of the Beltran Leyva organization?

24   A.  He was an enemy, a very, very powerful person with

25   assassins working for him fighting against the Beltrans.

1   Q.  And with respect to the photographs that are discussed in

2   Government -- or reproduced in Government Exhibits 2 and 3,

3   you know, regardless of whether these -- where these

4   photographs were taken, are these two photographs cropped in

5   exactly the same way that you personally cropped the

6   photographs?

7   A.  Yes.  They're cropped in exactly the same way:  Keeping

8   out the informant.

9   Q.  And did you send this cropped photograph to anybody other

10  than Ivan Reyes?

11  A.  No.

12          MR. SU:  Nothing further.

13          THE COURT:  All right.  You can step down.  Any

14  further --

15          MR. LOPEZ:  I just have one question, Judge.

16                          RECROSS-EXAMINATION

17  BY MR. LOPEZ:

18  Q.  Do you know if Ivan shared that photograph with any of the

19  other members of the SIU on the day that you asked him to do

20  the surveillance?  Do you know if he sent them to other agents

21  out there so they could see who these people were?

22  A.  I don't know.

23          THE COURT:  All right.  You can step down.

24      (Witness excused.)

25          THE COURT:  No further witnesses; is that right?  Now

1    we go into the sentencing now?

2           MS. SAWYER:  Yes, your Honor.

3           THE COURT:  All right.  The first order of business

4    is to determine the guidelines.  And the base offense level

5    for violation of 18 USC Section 371 is USSG Section 2X1.1, and

6    that calls for a base offense level of 14.

7           Is there any objection to that?

8           MR. LOPEZ:  No, Judge.

9           THE COURT:  All right.  Now, the specific offense

10   characteristic, result of substantial interference with the

11   administration of justice because the government was forced to

12   relocate CS1 for his or her safety.  It was substantial

13   government resources to relocate CS1 and eliminated CS1's

14   ability to provide proactive cooperation against the Dominguez

15   DTO.

16          There was an objection to that.  Do you want to argue

17   that some more?

18          MR. LOPEZ:  Judge, I think I pretty much laid it out.

19   There was also -- there was a provisional warrant already in

20   effect for Mr. Dominguez according to the agent's testimony at

21   the time this occurred, so I don't see how it could affect it

22   that much.

23          I understand there was a safety issue, but they

24   certainly had their case built against these individuals and a

25   provisional warrant at least for one of them coming out.  And

1    I would ask that it not be applied.

2              THE COURT:  Counsel?

3              MS. SAWYER:  Yes, your Honor.  Section 2J1.2(b)(2),

4    and specifically with reference to application note 4 makes

5    clear that it includes -- that it applies in cases involving,

6    A, a premature or improper termination of a felony

7    investigation, which certainly happened here.  As Agent

8    Sandberg testified, we were no longer able to actively pursue

9    our investigation -- forgetting about Dominguez -- against

10   Gamez, against any of his coconspirators.

11             And then you have the unnecessary expenditure of

12   substantial government resources.  And any way you look at it,

13   whether it's the underlying narcotics investigation or then

14   what arose was the obstruction investigation, and under either

15   scenario, we expended hours and months of work with

16   prosecutors and agents traveling back and forth to Mexico to

17   interview Mr. Reyes, to pursue leads, to obtain additional

18   evidence.

19             And so I think under any of those scenarios, the

20   Court has evidence upon which it can find substantial

21   interference.

22             THE COURT:  I agree.  Whether or not the defendant is

23   Ayalla, nevertheless, his actions, admitted actions in this

24   case caused certainly disruption in the operation of the

25   investigations into Gamez and many other investigations as

1   testified to by the previous witness.  So the Court will

2   enhance by the three levels by USSG Section 2J1.2(b)(2).

3           Adjustment for role in the offense, it's my

4   understanding there's no objection to that.

5           MR. LOPEZ:  No, Judge.

6           THE COURT:  All right.  So that's 19.  And what about

7   acceptance of responsibility?  Does the government -- does the

8   government agree to acceptance of responsibility?

9           MS. SAWYER:  No, your Honor.  We reserved our

10  position on that and today argue that the defendant should not

11  be afforded credit for acceptance of responsibility.

12          We've laid out, and as the PSR acknowledges, the

13  defendant pled under a nolo contest -- a no contest plea in

14  order to accept responsibility for a very narrow set of

15  circumstances which the government believes at this point has

16  proven is not the complete scope of the charged conduct or the

17  complete history of defendant's conduct.

18          We've provided some authority in our pleading.

19  That's *U.S. v. Miller* at Page 803.  There's -- the sentencing

20  guidelines provide for the departure.  The burden is on the

21  defendant to demonstrate that he's accepted responsibility for

22  his conduct, and he must -- in order to do so, he has to

23  truthfully admit the conduct comprising the offense of

24  conviction and any relevant conduct as it relates to the

25  offense of conviction.

1          The Court, the sentencing court today has discretion

2    to decide whether or not the defendant has in all other

3    respects, and the quote is, forthrightly avowed responsibility

4    for his crime.

5          I don't know that there's Seventh Circuit authority

6    on -- and the case that we cited in our sentencing brief, the

7    defendant entered a no contest plea, and the court found that

8    above and beyond simply the nature of the plea itself, there

9    were facts surrounding that conduct that the defendant

10   continued to deny responsibility for.

11         In this case, that is what we have.  I think this

12   Court can find, obviously, there was a no contest plea, but

13   there is conduct that the defendant continues to deny; that

14   is, any knowledge or any involvement in the transmission of

15   the information from the Ayalla pin to Gamez.  In his

16   sentencing memo, he has essentially denied any involvement

17   with Dominguez beyond the scope of the very -- the one meeting

18   that took place on October 21st.

19         And the government's position with respect to all of

20   that is that the defendant's position here fails to comport

21   with the letter and the spirit of the acceptance provision,

22   that this Court would be well within its province to deny

23   credit for acceptance of responsibility.

24         THE COURT:  Mr. Lopez?

25         MR. LOPEZ:  Judge, the letter and the spirit of the

1   acceptance of responsibility is to avoid trial, and that's

2   what we did.  We avoided trial.  That's acceptance of

3   responsibility by avoiding trial.  And for purposes of this

4   proceeding, we believe that that adjustment should apply

5   because we did avoid trial.  We did make certain admissions.

6   We didn't obstruct justice.

7          Mr. Reyes had his own personal reasons as to why he

8   wanted to do a nolo contendere.  He has to return to his

9   country, and it would create problems.  But accordingly,

10  Judge, he has demonstrated acceptance of responsibility.  He

11  pled guilty, and he hasn't affected any administration of

12  justice.

13         The government decided they were going to call the

14  witnesses.  We didn't ask them.  He does admit with meeting up

15  with Dominguez at that particular time and talking to him

16  about -- Mr. Dominguez about things that were occurring.  And

17  we ask the Court to apply this acceptance of responsibility

18  adjustment under 3E1.1(a).

19         THE COURT:  The nolo contendere is exactly what it

20  says.  You're not contesting but you're not admitting, right?

21         MR. LOPEZ:  Correct.  You're not contesting it.

22         THE COURT:  But you're not admitting it.

23         MR. LOPEZ:  No, you're not admitting.  You're

24  admitting that the government can convict you, basically.

25  That's what acceptance of responsibility is.

1        THE COURT:  What's the difference between that and an

2    Alford plea, anything?

3        MR. LOPEZ:  I don't think there is a difference.  I

4    think it's the same thing.

5        THE COURT:  You don't have a right to do an Alford

6    plea unless the government agrees, is my memory.

7        Does the government have any right to reject the

8    nolo contendere?

9        MS. SAWYER:  No, your Honor, we do not have to agree

10   to that.  That's something that the defendant can offer and

11   the Court can accept in its discretion.

12       THE COURT:  What exactly in the indictment -- what

13   were there?  Were there two counts?

14       MR. LOPEZ:  Yes.

15       THE COURT:  What exactly would you say in the

16   indictment that he has not -- assuming he has said that they

17   can prove it, I'm not going to admit it but they can prove it,

18   is there anything that -- in the indictment that he's

19   rejecting?

20       MS. SAWYER:  Your Honor, I don't have it in front of

21   me right now, but if memory serves, I do believe that there

22   were allegations in the indictment, and they go to how the

23   government intended to prove identity.  And that was through

24   the links to Beltran Leyva organization.

25       So I do think that there were allegations on the face

1   of the indictment that the defendant is not --

2           THE COURT:  I'm sure that I had an extensive colloquy

3   with him at the time he entered the plea.  Was that ever

4   written up, do you know?

5           MS. SAWYER:  I don't have a transcript of it, your

6   Honor.

7           THE COURT:  I'm trying to remember what -- I mean, I

8   would assume I asked him.

9           MS. SAWYER:  Your Honor, Judge St. Eve took it in

10  your absence.

11          MR. LOPEZ:  Judge St. Eve --

12          THE COURT:  Pardon?

13          MS. SAWYER:  Judge St. Eve took the plea in your

14  absence.

15          THE COURT:  Oh, okay.  I was wondering.  I thought

16  I'd -- I'm getting old, but I know I'm not that old.  Do you

17  recall what was said or what she asked him?

18          MS. SAWYER:  Your Honor, my recollection -- and I

19  apologize for not having a transcript here.  But my

20  recollection is that it was a limited admission on the basis

21  that he met with Dominguez and that there were conversations

22  that were had regarding -- well, and I can't even recall how

23  specific it got, but it was limited to the interaction with

24  Dominguez at the beginning of November or end of October.

25          THE COURT:  All right.  Well, it's a close question.

1   And we're supposed to err on the safe side, so I'll give him

2   credit for acceptance of responsibility based upon the fact

3   that he did not contest in any way, shape, or form the two

4   counts of the indictment, which then gives us a total offense

5   level of 16 and a criminal history category I, which is what

6   the probation officer suggested.  So the Court adopts the

7   presentence investigative report without change.

8        No count carries a mandatory minimum.  The offense

9   level is 16, criminal history category I.  Guideline range is

10  21 to 27.  Supervised release, I believe it was one to three

11  years.  And the fine range is 10,000 to 95,000.

12       The government, I know you've made extensive

13  recommendation of 120 months.  Do you want to speak to that?

14       MS. SAWYER:  Yes.  Thank you, your Honor.  So

15  understanding, obviously, your Honor, that that is a

16  significant request given, in particular, the guidelines,

17  Section 5K2.0 governs upward departures and provides that the

18  sentencing court can depart from the applicable guideline

19  range if in the case of offenses, when there exists an

20  aggravating circumstance of a kind or to a degree not

21  adequately taken into consideration by the sentencing

22  commission.

23       The application note essentially instructs that if

24  the offense guideline in Chapter 2 or Chapter 3 -- none of

25  which applied here because those were other enhancements --

1    does not adequately take that circumstance into consideration

2    in setting the offense level for the offense; and only to the

3    extent not adequately taken into consideration, a departure

4    based on that circumstance might be warranted.

5          Section 5K2 goes on to list a number of bases for

6    that departure.  And specifically, 5K2.21 states that the

7    Court can upward depart to reflect the actual seriousness of

8    the offense based on conduct, one, underlying a potential

9    charge not pursued in the case as part of a plea agreement or

10   for any other reason and, two, that did not enter into the

11   determination of the applicable guideline range.

12         And it's our position, your Honor, that there's ample

13   evidence in this case of aggravating circumstances of a kind

14   and to a degree that has been completely unaccounted for by

15   the guidelines in this case, and so as such, we ask that this

16   Court consider that under 5K and also under 3553 as a factor

17   going to the defendant's history and characteristics in

18   requesting an above-guideline sentence.

19         So under the unique circumstances of this case, it's

20   our position that the guidelines don't take into account that

21   history and that the 3553(a) factors, most notably, obviously,

22   the seriousness of this offense, the history and

23   characteristics of this defendant, displays as evidence

24   through the testimony today, the objective of general

25   deterrence, and to avoid unwarranted sentencing disparities

1   all support a sentence significantly in excess of the

2   guideline range here.

3           Addressing first the seriousness of the offense

4   conduct, and I guess you can parse this in two ways between

5   the offense conduct and then the additional conduct that the

6   Court has heard about, and that will lend itself to history

7   and characteristics of the defendant.

8           This case, your Honor, obviously, I think it almost

9   goes without saying, but it involves corruption at the highest

10  level of law enforcement by the most senior echelons, first of

11  the Beltran Leyva organization and later by a vestige of that

12  organization led by Angel Dominguez and Gamez.  Within the

13  universe of these kinds of investigations, there may well be

14  no more serious offense that a law enforcement officer could

15  commit.

16          Starting first with the conduct that the defendant

17  has admitted by way of his plea, simply meeting with Angel

18  Dominguez is an extremely serious and troubling offense:  The

19  highest ranking member of the SIU entrusted, as Agent Sandberg

20  testified, with the safety, with information, with lives of

21  both agents and cooperators, meeting with the head of a cartel

22  who is looking to assume responsibility for significant

23  portions of Mexico's drug trafficking.

24          And in doing so, he wasn't worried about his safety

25  because he didn't tell anyone.  He wasn't interested in

1   arresting him which notably, there was a provisional arrest

2   warrant already in place for Angel Dominguez at the time that

3   Mr. Reyes met with him.  I mean, that's akin to a DEA agent in

4   the United States meeting with Chapo in Chicago and not

5   putting the cuffs on him.  It's unimaginable until you put

6   that conduct into the context that this Court now has.

7          And more than that, those text messages on October

8   31st indicate that not only is he meeting with Angel

9   Dominguez, he's taking a cell phone and $290,000 in cash for

10  him so that he can communicate with Angel Dominguez going

11  forward.

12         This conduct alone constitutes an egregious betrayal

13  of trust at the highest level of law enforcement, and then you

14  add to that the evidence that Mr. Reyes either was Ayalla or

15  conspired and participated with the person using the screen

16  name Ayalla to provide information to Geronimo Gamez.  And

17  there is a mountain of circumstantial evidence that that is,

18  in fact, the case.

19         There's the preexisting relationship that you've

20  heard about between on the one hand Mr. Reyes and the Beltran

21  organization and on the other hand, Geronimo Gamez and the

22  Beltran organization.  Both of these people, Geronimo Gamez

23  and the defendant, are providing the exact same service in

24  this case that they both were ten years ago to the Beltran

25  Leyvas.

1    Geronimo Gamez is the link between Dominguez and the

2    Colombian cocaine suppliers.  The defendant is the link

3    between the cartel and the police and the intelligence that

4    helps the cartel do what it does.

5    The other link between those two is El Judio, is

6    Ismael Coronel Sicairos.  He played the same role for the

7    Beltran Leyvas that he is for the Dominguez organization and

8    for Mr. Reyes.  Second, the circumstantial evidence,

9    obviously, that Mr. Reyes is connected to the Ayalla leak is

10   also overwhelming.

11   And keeping in mind, obviously, it's a preponderance

12   standard at this stage, the defendant somehow wants you to

13   believe that it's a huge coincidence that he did this for the

14   Beltran Leyvas and now Geronimo Gamez, the same person, is

15   getting information that the defendant received barely 24

16   hours earlier in the form of a photograph, in the form of very

17   specific information about the meeting that Agent Sandberg

18   transferred to the defendant.

19   Mr. Reyes admitted he was the sole point of contact

20   for that information.  The photo was taken in April of 2016.

21   So if someone else were interested in leaking it, it's very

22   interesting that it doesn't actually get leaked until about

23   four months later, 24 hours after the defendant got it.

24   Similarly, in the days following the leak, the

25   defendant just happens to start fishing for information from

1    Agent Sandberg, comes to a meeting with Agent Sandberg days

2    after that armed with additional information about Dominguez.

3    And the fact that he had never asked for this kind of

4    information before certainly fits with that pattern.

5         Mr. Lopez's argument that somehow the photos are

6    different, they're cropped exactly the same, but if you

7    actually look closely at the one that's in the government

8    exhibit embedded in the message to Ayalla, the top of it looks

9    like the top of an iPhone.  It does actually look like it came

10   from a cell phone but, obviously, the Court can draw its own

11   conclusion about that.

12        And keeping in mind, this was a conspiracy charge.

13   So to the extent that it doesn't have to be him that hits

14   "send," I think all of the evidence and certainly by a

15   preponderant standard supports the conclusion that this

16   defendant participated in the provision of that information to

17   Gamez.

18        The identity of Mr. Reyes as a source to the

19   Dominguez operation is obviously then corroborated more.  And

20   I'll note this, that Mr. Lopez was asking about the wire

21   intercepts.  And just for this Court's information, all of

22   those October messages from Dominguez's phone were intercepted

23   on San Diego's wire.

24        So Chicago wasn't getting those messages in realtime

25   as they were coming in in October.  Those came in later and

1    helped put the pieces of the puzzle together.  And if you look

2    at those, starting on October 17th, the connection is The

3    Jewish, Ismael Sicairos, about a meeting with Ivan.  Ivan is

4    the boss.  I think there can be very little doubt that we're

5    talking about Ivan Reyes.

6         Then again on the 20th, they talk about Ivan, how

7    they can keep him, they can keep him on board, they've got

8    leverage over him because he worked for the Beltrans.  Well,

9    lo and behold, there's evidence that this defendant worked for

10   the Beltrans.  Again, we've got the link between El Judio,

11   Coronel Sicairos.

12        And then interestingly, in the same conversation on

13   October 26th that they discuss the fact that Ivan has more

14   information than what's with the Mexican prosecutors, they

15   talk about the source.  And those two things happen in the

16   same context, that Ivan is coming with the white guys.  And so

17   that's yet another piece that fits into the puzzle of the fact

18   that Ivan was involved in providing information about the

19   source to this -- to this group.

20        Then obviously, we have October 31st when Reyes

21   admits -- meets with Dominguez, admits meeting with Dominguez.

22   And the test messages that Dominguez sent just after that

23   meeting indicate that he provided Reyes with $290,000 and a

24   cell phone.

25        So the notion that this is some kind of narrow

1    aberration that, "Oh, oops, I found myself in his car and I

2    just -- I don't know, I just couldn't help it," there was a

3    plan.  There was a plan.  It was a piece of the cartel's plan

4    to continue to provide information.  He was taking money, and

5    he had a cell phone, a clean cell phone now to do that.

6                THE COURT:  Can I ask you one question?

7                MS. SAWYER:  Of course.

8                THE COURT:  I'm looking for a copy of the indictment.

9    What were the three overt acts which were -- the defendant was

10   charged with engaging in in furtherance of the conspiracy?

11               MS. SAWYER:  Your Honor, I would hate to speak

12   definitively without having it in front of me.  I can pull it

13   up or we can bring it up on the docket.  I just don't have it.

14   I'm sorry.

15               THE COURT:  Mr. Su, do you know?

16               MR. SU:  Judge, I also don't have a copy of it in

17   front of me.  I can try to find one.

18               THE COURT:  I don't know.  I should have one here

19   somewhere, but I don't -- let me just -- do you have a copy of

20   the indictment, Mr. Lopez, or --

21               MS. SAWYER:  Probation might have it, your Honor.

22          (Pause.)

23               MS. SAWYER:  Your Honor, the "at times material"

24   paragraphs refer to the history that he was the head of the

25   SIU, provides a background into the information.  The overt

1  acts in furtherance of the conspiracy and to accomplish the

2  objectives between on or about September 9th and on or about

3  September 14th, 2016, Reyes in his official SIU capacity

4  solicited information from U.S. law enforcement personnel

5  including Agent A regarding the U.S. investigation.  Agent A

6  is Agent Sandberg.

7          Between on or about September 9th, 2016, and on or

8  about September 14th, 2016, Reyes transmitted and caused to be

9  transmitted to Gamez information regarding the U.S.

10  investigation including a surveillance photograph and

11  information relating to the identity of a confidential source.

12          And finally, on or about November 1st, 2016, Reyes

13  met in person with Angel Dominguez and discussed the U.S.

14  investigation of Dominguez, Rodriguez, and his coconspirators

15  within the Dominguez DTO.

16          THE COURT:  Okay.  Thank you.

17          MS. SAWYER:  And I think, finally, with respect to

18  that meeting, the other significant piece of Agent Sandberg's

19  testimony that should be taken into consideration with respect

20  to any preexisting relationship at the time that that meeting

21  occurred is that in context, in real life, a Mexican police

22  officer who has no level of comfort or trust, it just makes no

23  sense that either Dominguez would meet with him for safety

24  reasons.  And obviously, there's a provisional arrest warrant.

25  How is Angel Dominguez going to meet with a federal police

1   officer when he's a fugitive unless there is an understanding.

2          And then on Mr. Reyes' side, what police officer is

3   going to meet with a known head of a violent drug organization

4   without some level of comfort and safety that he wouldn't come

5   to harm?  He didn't tell anyone he was meeting with him.  And

6   you've heard that he knew who that was.  He knew who Dominguez

7   was and he knew who he was meeting, and yet he tells no one.

8   He doesn't ask for surveillance.  He doesn't ask for backup.

9   And his target was a big deal.  It wasn't just anyone.

10          And then after the meeting, he doesn't call anyone.

11  He doesn't say, "Agent Sandberg, you'll never believe who I

12  got in this car with.  You'll never believe.  I can find him

13  now.  He gave me a phone.  We can track him."

14          Nothing.  Nothing.  And that doesn't happen without

15  trust, and it doesn't happen without a background.  And that

16  doesn't exist on one day, on one meeting.  And so I think that

17  the totality of this evidence, certainly by a preponderance of

18  the evidence standard, provides this Court with the evidence

19  it needs to make a finding and to consider in context the

20  extreme seriousness of the offense defendant committed.

21          Agent Sandberg's testimony was moving in many

22  respects, and so he said it better than I ever could have.

23  The ripple effects of the conduct were felt for months.  The

24  safety issues, the relationships, it affected not only this

25  case but general business that Mexico -- that the DEA conducts

1   in Mexico with the SIU on countless cases; and not the least

2   of which, Agent Sandberg testified compellingly about his own

3   feelings about his personal safety and the safety of the

4   agents who put their lives at risk on a daily basis.

5       And people, people die as a result of these kinds of

6   things.  And this kind of corruption strikes at the core of

7   the DEA's mission and puts in jeopardy the trust with foreign

8   law enforcement partners, the mission of the DEA, and puts in

9   grave danger the lives of U.S. and Mexican law enforcement,

10  not to mention cooperators.  And the Court has heard extensive

11  testimony about the effects on the cooperator in this case.

12      And so I think with respect to the seriousness of

13  this offense, the sentence should reflect the severity.  And I

14  do not believe that the guidelines effectively do that.

15      With respect to the history and characteristics of

16  the defendant, most significant to this Court's consideration

17  of that issue is his longstanding history of corruption to the

18  Beltran Leyva organization.

19      The Court heard evidence of those historical

20  connections in sort of four forms:  First, the testimony of

21  Mr. Villarreal; second, the defendant's own admissions that

22  corroborate that testimony; the wire evidence that

23  corroborates that; and then Agent Sandberg's testimony.

24      And this is -- it's a complicated matter, and it's a

25  little hard to put it all together, but when taken as a whole

1    and as a complete picture, each piece of evidence corroborates

2    in some way the other pieces and proves certainly by a

3    preponderance of the evidence that the conduct that the

4    defendant pled guilty to was not an isolated incident or an

5    aberration but part of an ongoing, decades-long history of

6    corruption to one of the most notorious and violent cartels in

7    Mexican history.

8             Now, obviously -- and Mr. Lopez will get to this, I

9    have no doubt, and he's already raised it -- Mr. Villarreal

10   was a cooperator.  And along with that comes a certain amount

11   of baggage.  And so this Court should -- the government

12   understands, this Court should and will evaluate that

13   testimony as you would any cooperator's.

14            And so while this Court can obviously accord his

15   testimony any weight it sees fit, the government believes that

16   that testimony was important because without it, you're

17   missing an enormously significant part of this defendant's

18   history and this defendant's characteristics.  And there are,

19   in our view, multiple hallmarks of veracity in

20   Mr. Villarreal's testimony that should lead this Court to

21   credit it.

22            Given the time left on his sentence, frankly, he

23   stands to gain probably nothing from his testimony here today.

24   He had no idea whether the testimony is going to affect his

25   sentence.  His explanation for not naming La Reina, the code

1     name, in the interviews relating to the Colombian informant

2     makes total sense in context when you realize that the people

3     he was being asked about far outranked Mr. Reyes in those

4     meetings, that he was actually never even asked specifically

5     about Mr. Reyes.  He was being asked about those other more

6     prominent individuals, and so he -- he didn't think to even

7     include him.

8             But I would also submit that even if you put aside

9     the meeting with the Colombian informant, there is so much

10    evidence of his other corruption and involvement in the

11    Beltran Leyva organization to justify the sentence the

12    government has asked for.

13            He accepted a payment along with another officer for

14    a strike on the Familia Michoacana.  He accepted money for

15    arresting Edgar Valdez, Barbie.  Additionally, Agent Sandberg

16    told you that when we first went to talk to Mr. Villarreal in

17    2017, he saw a photo and said, "That's La Reina."

18            He was never told -- we never told him we're

19    interested in corruption.  We never told him we think La Reina

20    provided information to a cartel.  We never told him any of

21    that, yet somehow the information he provided was 100 percent

22    consistent with the defendant's role in this case.  We didn't

23    talk to him about the name Judio.  We didn't talk to him about

24    Geronimo Gamez.  Those were all things that Mr. Villarreal

25    provided because he knew them because they happened.

1      He talked specifically about the fact that Reina had

2  mentioned training in Virginia in Quantico unprompted.  He

3  gave the version notably -- and I need to bring these two

4  pieces together.  He talked about how the assignment from the

5  Beltrans was to kill Barbie and how Reyes, when he was paid

6  and asked about that, his explanation was, "I shot at him but

7  he didn't fight back, so I couldn't kill him."

8      Well, agents have heard from their sources in Mexico,

9  and Agent Sandberg testified completely independently of

10 Mr. Villarreal, that that is, in fact, the story that resulted

11 from that arrest that Mr. Reyes shot at Barbie.  He didn't

12 fight back.  And other support arrived, and so he was placed

13 under arrest.  These are all reasons to believe that

14 Mr. Villarreal's testimony is credible.

15     The idea that -- and I'm sure this will come up in

16 Mr. Lopez's argument, also, but the idea that somehow because

17 Mr. Villarreal was present for violence or worked for an

18 individual who is known for his brutality, no one disputed

19 that.  And, in fact, it makes Mr. Reyes' conduct all that much

20 more reprehensible because there's no dispute, this is a

21 horrible, violent, awful world that these people operate in,

22 and Mr. Villarreal didn't run from that.  He didn't hide from

23 that.  It just puts into more sharp, stark, and shocking

24 context the nature of the organization that this defendant

25 decided to align himself with.

1          Also notably, he admitted himself meeting with

2     Beltran Leyva and meeting with Mario Pineda and meeting with

3     Alberto Pineda, El Borrado.  And I'll come back to the

4     significance of that in a moment.  But Mr. Villarreal's

5     testimony is also then corroborated by some of Mr. Reyes' own

6     admissions.  His nickname, La Reina.  Mr. Villarreal knew that

7     and provided that nickname to investigators as far back as

8     2013.  He never knew Mr. Reyes by his first name or by his

9     last name.  He knew La Reina, and that's the information he

10    provided.

11         Sure enough, defendant admits that's -- that on the

12    street, he is known as La Reina.  He admitted that he took

13    those meetings.  Notably, in the initial meeting with us, he

14    denied or could not explain why anyone would suggest that he

15    had met with Arturo Beltran Leyva and then sure enough, later

16    in a meeting with Agent Garcia, he says, "Yes.  Okay.  I met

17    with Arturo Beltran Leyva, and I met with Borrado, and I met

18    with MP."

19         That is a hugely significant admission.  And I don't

20    know if the defendant thought about that when he was making

21    it, but the significant -- the significance of the admission

22    that he simply met with Arturo Beltran Leyva, your Honor,

23    cannot possibly be understated for the reasons that both

24    Mr. Villarreal and Agent Sandberg testified to.  To a

25    layperson, maybe it wouldn't mean much, but this is the

1   defendant meeting with Mexico's quite literally public enemy

2   number one at the time.  He was wanted by everyone.  He was

3   wanted by Mexico.  He was wanted by the DEA.  And any police

4   officer doing his job would now have information about where

5   this person could be found, how he could be arrested, how the

6   police could locate him.  And what did this defendant do?

7   Nothing.  Nothing.

8           And moreover, and potentially more critically,

9   there's no way Arturo Beltran Leyva -- Mr. Villarreal said

10  this, Agent Sandberg said this.  He's not meeting with some

11  police officer just because.  The police want to arrest him,

12  and every cartel in Mexico wants to murder him.  So he's not

13  going to sit down with someone unless there is an incredible

14  degree of trust.  Same with Borrado.  Same with MP, Mario

15  Pineda.  The only reason you would do that is because you know

16  this officer can be trusted, and the reason you know this

17  officer can be trusted is because he's on the payroll.

18          I've already alluded to this piece of it, but

19  Mr. Villarreal's testimony is also corroborated by the wire

20  intercepts here.  He never saw those wire intercepts, yet he

21  told us that Mr. Reyes' connection with the Beltran Leyva

22  organization, first with Borrado.  After he was killed, it was

23  El Judio, Ismael Coronel Sicairos.

24          The defendant's admissions about his meetings with

25  Dominguez match up with those wire intercepts.  I've already

1    alluded to the fact that Mr. Villarreal's testimony about the

2    circumstances of the Barbie arrest are corroborated by agent

3    testimony by way of Agent Sandberg.

4         So your Honor, when taken altogether, the evidence

5    overlaps in significant ways, and each corroborates another.

6    And when you look at it that way, it -- it's essentially a

7    tapestry, your Honor, that makes clear that not only did the

8    defendant obstruct this investigation but that he's been

9    involved in similar conduct for years.  And the remarkable

10   history and characteristics under those circumstances -- a

11   decade of corruption, of deceit, of betrayal of his country

12   and of this one -- certainly warrant a sentence above the

13   guidelines.

14        With respect to deterrence, your Honor, general

15   deterrence, I think, in a lot of drug cases doesn't go all

16   that far, but in this case, I think it's incredibly compelling

17   because in this case, this Court has a rare and important

18   opportunity to communicate to our law enforcement partners

19   that corruption will not be countenanced in the United States

20   investigation or by a United States court.

21        I don't think that message arrives in many cases to

22   ordinary narcotics traffickers on a corner in Chicago, but in

23   this case, general deterrence is directed at a very narrow,

24   very specific population and is incredibly important in light

25   of defense counsel's arguments about the fact that this is

1    business as usual.

2            A significant sentence would send a strong message to

3    others in law enforcement that when corruption affects the

4    United States investigation and places at risk the lives of

5    U.S. agents and cooperators that that corruption will be met

6    with the most serious of consequences in this country.

7            This -- Agent Sandberg's testimony, and again, he

8    said it far better than I ever could, it just really makes

9    clear that this kind of conduct places at risk the lives of

10   civilians and law enforcement, and it also just erodes any

11   sense of public trust and perpetuates this "corruption as

12   business as usual" narrative that Mr. Lopez urges on this

13   court.

14           In order to combat the international narcotics

15   trafficking that's resulted in an untold loss of life on both

16   sides of the border, the United States needs responsible law

17   enforcement partners who take seriously their obligation to

18   that mission.

19           The government asks that this Court's sentence

20   reflect the obligation of the United States government to

21   speak with one voice in sending an unequivocal message that

22   this is not business as usual, not in Mexico and not in the

23   United States.

24           And finally, with respect to sentencing disparities,

25   I've referenced in our filings a case that was before Judge

1     Zagel in which a Chicago Police Department officer was

2     sentenced to a prison term of five years.  In that case, it

3     was one police officer on one occasion who passed information

4     about one search warrant to the friend of a target.  The

5     amount of heroin implicated in that case was less than

6     one-half of one kilogram as opposed to the ongoing shipment of

7     tens of thousands of kilograms of cocaine here, to say nothing

8     of the risk to the lives of cooperators and agents.

9          And in that case, the guidelines were higher because

10    there was a way to concretely tether that offense to a drug

11    amount, and so they applied the "accessory after the fact"

12    guideline, 2X3.1.  That wasn't the case here, but I provide

13    that case just for a context for this court that if one police

14    officer is going to get five years for providing information

15    on one search warrant, then certainly a similar -- a similarly

16    significant sentence is more than warranted in this case.

17         And very briefly, because I don't know whether or not

18    the Court will want to hear from me again, I just want to

19    address a few things that Mr. Lopez raised in his filing.  A

20    lot of it was alluded to in the context of his

21    cross-examination of Mr. Villarreal, but he specifically says

22    in his memo, "The DEA has known for years that the SIU has a

23    record of leaking investigation."  He cites some articles.

24         And he says, "The point is that in Mexico,

25    investigations led by SIU often involve meeting targets of the

1    investigation as one cartel snitches on another.  The DEA

2    knows this and has accepted this practice in the past which is

3    the cost of running joint operations and many times involves

4    the payments to SIU officers for the opposite of what -- which

5    is the opposite of what occurs Stateside."

6           There have been frustrating and tragic leaks in the

7    past and they have had tragic consequences, but how on earth

8    Mr. Lopez can say that because there have been examples of

9    corruption in the past that somehow Mr. Reyes is less culpable

10   in this case?

11          If we accept that argument, your Honor, we're doomed

12   to continue to suffer the same failures.  It actually means

13   the opposite.  It means that on days like today, we should be

14   resolute in sending the message that this is not how the SIU

15   will operate, that SIU members who engage in this kind of

16   conduct will be prosecuted.

17          And none of those arguments attempt to distinguish

18   between rumors and actual proof.  The reality of the matter

19   is, we can't always prove corruption.  We can't always prove

20   rumors to the point where they're actionable.

21          Essentially, what Mr. Lopez wants this Court to

22   accept is that this defendant is less culpable because this is

23   how things happen in Mexico and this defendant didn't believe

24   he was doing anything wrong because "that's what we do."  Your

25   Honor, it's flat-out wrong, and it's a complete abdication of

1    responsibility conduct in this case and his oath as a police

2    officer.

3          It diminishes and it belittles the Mexican citizenry

4    as if they're not entitled to expect more of their law

5    enforcement officers and leaders, and it's the kind of

6    corrosive narrative that defense counsel urges on this court

7    that further undermines the partnership that Agent Sandberg

8    testified so movingly about.

9          The notion that defendant did good work, and that was

10   also addressed at length in the defendant's sentencing memo,

11   and we've attempted to put that into context for this Court

12   because it would be easy to read that in a vacuum and say,

13   well, that's true, he did.  Well, why?  Why did he do such

14   good work on Sinaloa cases?  Well, because it helped the

15   Beltran Leyvas and because he was taking money for it.  He was

16   taking money for the arrest of Barbie, Edgar Valdez.

17         THE COURT:  Counsel, bring your remarks to a close.

18         MS. SAWYER:  I will, your Honor.  Thank you.

19         THE COURT:  All right.

20         MS. SAWYER:  In any event, at the end of the day,

21   what we have here, your Honor, is we're no longer talking in

22   rumors and whispers about speculation.  At this point, we

23   stand before the Court following the discovery in an

24   investigation of a high-level law enforcement officer, of the

25   corruption of a high-level law enforcement officer to one of

1    the most violent, destructive drug cartels ever to plague

2    Mexico, and defense counsel has asked this Court to impose

3    what essentially amounts to a slap on the wrist for what --

4    doing what police in Mexico do.

5            That corrosive narrative, that request is insulting

6    to anyone who dedicates their lives in any country to the

7    pursuit of legitimate law enforcement goals.  And this Court

8    today has a unique opportunity to reject that narrative, to

9    demand more of our law enforcement partners, and to send a

10   resounding message that corruption will not be tolerated on

11   either side of the border, and certainly not when it places at

12   risk American lives.

13           For all of those reasons and the reasons that you've

14   heard in the government's filing, the government requests a

15   sentence, an above-guideline sentence of approximately 120

16   months.  Thank you.

17           THE COURT:  Thank you.

18           Mr. Lopez?

19           MR. LOPEZ:  One thing I can guarantee you today,

20   Judge, whatever your sentence is, is not going to stop the

21   corruption in Mexico.  It's been going on for centuries, as we

22   know.  And I cited that article in my sentencing memo because

23   there's -- that's just how it's done there.  My client grew up

24   in a culture of corruption.  This is how they do law

25   enforcement in Mexico.  We heard that from the informant, that

1   groups turn on one another and turn each other in.

2        And when they do that and the DEA bags a guy like La

3   Barbie, they're hugging and kissing Ivan instead of kicking

4   him in the butt.  That is the cost of doing business, and it's

5   not going to change no matter what we do here today.  That's

6   just how it is.  You can't change it.  I can't change it.

7   Nobody can change it.  And it's not going to change or would

8   change.

9        The guidelines have already taken into consideration

10  all the conduct that my client's been involved in.  He

11  received three points for substantial interference, which is

12  what the government has just argued, and they want an

13  above-guideline sentence because he interfered with their

14  investigation.  He already got three points for that, and he

15  already got the other set of points for his abuse of trust.

16       And there is no basis to give him an above-guideline

17  sentence.  It would be unreasonable to exceed the applicable

18  guidelines in this case.  The probation officer took a look at

19  this case.  Probation recommended 21 months in light of

20  everything that the government has thrown in their memo, in

21  their attachments, and everything else.

22       What we're saying, Judge, is we know what happened.

23  We know that he knew Beltran Leyva, and he knew that Beltran

24  Leyva gave him information to go arrest other people, and

25  that's just what they were doing.  We do know one thing.  At

1   the time in 2008, he wasn't a member of SIU.  And we do know

2   that he did arrest La Barbie for whatever reason.  He did

3   arrest him.

4       We do know that Barragan, when he was asked about --

5   when he was asked about the murder of the informant, he told

6   the DEA what happened, and he mentioned the folks that were

7   involved in it.  He mentioned who did it.  He didn't say

8   anything about Ivan.  That was his statement in 2015.  And we

9   went through it line after line.  I'm not going to keep

10  kicking a dead horse.  You heard what he said.

11      He mentioned how they had Palacios was involved and

12  Borrado was involved.  He didn't mention anything about any

13  corrupt police officers.  And don't you think DEA would want

14  to know that at that time?  Of course, they would, and I'm

15  sure they asked him about that.  I don't know why he changed

16  his story or how he changed his story, but it really doesn't

17  matter because his first statement that he gave didn't mention

18  anything about my client being present, named all the actors,

19  named all the players and said exactly what happened.

20      But regardless, Judge, again, we're looking here at a

21  guideline sentence.  There is no reason to exceed the

22  applicable guideline.  We're not talking about a Chicago

23  police officer who's grown up in a different culture.  It's

24  hard for us to assess how people live in other countries.

25      The DEA doesn't have any jurisdiction down there.

1  They're in there only by the grace of God that the government

2  even lets them in there.  And I understand that.  And I

3  understand their frustration.  And I can understand how they

4  feel about having to work with these Mexican police officers

5  and not trusting you.  That's just how it is.  You go to any

6  other country, it's going to be the same thing.  We're

7  outsiders.

8      But regardless, Judge, my client has done a lot of

9  good things.  You read all the letters about him.  You've seen

10  his history.  You've seen his characteristics.  He has already

11  suffered enough.  Here's a person that voluntarily got on an

12  airplane knowing that he was not coming back.  Now, that takes

13  a lot of courage.  That's acceptance of responsibility plus

14  ten right there, getting on a plane.  He could have easily hid

15  in Mexico.

16      It took forever to find Chapo.  He could have

17  disappeared.  He came, and he faced the music.  And I think

18  that shows to the Court that he's not only accepted

19  responsibility but he feels sorry and he feels bad, and this

20  is his way to apologize for his conduct:  By voluntarily

21  appearing here in this district knowing he was going to be

22  locked up and knowing that he had to face a federal

23  indictment, and that's what he did.

24      So I would like the Court to take that into

25  consideration because you don't see that too often.  Most of

1    the time, if not every single time --

2         THE COURT:  I gave him acceptance of responsibility,

3    remember?

4         MR. LOPEZ:  I understand, but it's just a little

5    bit just so you can think of where his head is at.  I mean,

6    we're not going to deter anybody in Mexico from doing anything

7    here in the United States.  I don't think that that argument

8    of an upward departure is going to deter anything in Mexico.

9         And this Court's been around long enough.  This

10   Court's been involved in law and politics for long enough to

11   understand that this is an unusual situation and doesn't

12   scream out for a ten-year sentence.  It certainly doesn't.

13   That's 120 months for this conduct, is way above the

14   guidelines.  He's already got five points for the conduct

15   above the obstruction.  So you add the other five points in,

16   he's already -- it's already been taken into consideration.

17        So we'd ask the Court to take a look again at not

18   only what the government has stressed are the bad things but

19   also the good things and what other people have to say about

20   Ivan.  Ivan is going to go back to Mexico at some point.  He's

21   not going to be a police officer anymore.  He's going to be

22   embarrassed.  And he's going to have to live the rest of his

23   life knowing that he lost his job and knowing that the things

24   he did, he got punished for.  And he's sure going to tell all

25   his friends in Mexico that, "I came to the United States.

1   They prosecuted me.  Don't do anything wrong when you work

2   with DEA because if you get caught, you're going to be

3   prosecuted."

4           And that's the most important thing.  It doesn't

5   matter how much time you give him.  It's the fact that he's

6   being prosecuted in the United States.  He can't reenter the

7   United States.  He can't work as a police officer in Mexico.

8   These are things that the Court should take into

9   consideration.

10          We've raised a lot of points in our memo that we

11  don't need to keep raising to the Court.  We'd ask the Court

12  to take a look at all of those letters that were presented on

13  Ivan's behalf so the Court can get a snapshot of the things

14  other than what the government has claimed.  He voluntarily

15  met with these agents.  He admitted his conduct.

16          Judge, we ask that you give him the 21 months as

17  recommended by Probation who made that recommendation after

18  reading all the parties' moving papers.  And the government's

19  moving papers basically include the same things that they've

20  said here today, and they still make a recommendation at the

21  lower end of the guideline.

22          THE COURT:  Mr. Azarte, do you wish to make a

23  statement in your own behalf before I impose sentence?

24          THE DEFENDANT (through the interpreter):  I would

25  just like to speak a few words.

1          THE COURT:  Yes.  Proceed.

2          THE DEFENDANT:  Your Honor, during 16 years, I worked

3    as a public official in Mexico.  During that time, I made an

4    effort to do my work in the best way possible motivated by the

5    love and the commitment that I feel for my country.  I think

6    it would be a useless exercise to try to show that it is a

7    lie, the version that the government themselves know to be so

8    and which is very -- which is very far removed from reality.

9    Their version is full of contradictions based on assumptions

10   and false statements whose only goal is to make me appear to

11   be a person that I am not.

12          As part of my -- as part of my development, I had the

13   opportunity to work with several American agencies such as

14   DEA, ICE, the marshals, among others.  And I only want to

15   mention that in that regard, during the years that I worked

16   with those agencies, the goals that were entrusted to me were

17   always met or I always met them in a successful manner at a

18   level of 1 OO percent.  There is not a single case where I did

19   not meet my obligations.

20          And this demonstrates the person who --

21          THE COURT:  Let me interrupt right here.  Is it your

22   position you did absolutely nothing wrong?

23          THE DEFENDANT:  No, no.

24          THE COURT:  What did you do wrong?

25          THE DEFENDANT:  I did my job, part of my job.  What I

1   did wrong perhaps was not telling the DEA agents about the

2   work that I was doing, but the relationship --

3            THE INTERPRETER:  Re-rendering by the interpreter.

4            THE DEFENDANT:  The working relationship with the DEA

5   is a relationship of cooperation and it is not the

6   relationship to a boss.  And that's what I feel was wrong.

7            THE COURT:  In other words, you were taking -- you

8   acknowledge that you shared -- you solicited information from

9   U.S. law enforcement personnel regarding U.S. investigations

10  and you transmitted that to the drug agents, the drug groups;

11  is that right?

12           THE DEFENDANT:  I do acknowledge that, your Honor,

13  but not under the circumstances that have been stated.  I do

14  acknowledge it --

15           THE INTERPRETER:  By interpreter --

16      (Pause.)

17           THE COURT:  All right.

18           THE INTERPRETER:  The interpreter requested for a

19  repeat.

20           THE DEFENDANT:  The circumstances have changed --

21           THE INTERPRETER:  Re-rendered by interpreter.

22           THE DEFENDANT:  The circumstances evolved.  That's

23  all.

24           THE COURT:  All right.  Thank you.  It is now my

25  obligation to impose a sentence that's reasonable under all

1  the facts and circumstances of the case.  And I found this

2  last statement a little bit troubling by Mr. Reyes Azarte

3  because he seems to be backing away from the general -- at

4  least what he admitted to when he entered the nolo contendere

5  pleading in response to the indictment which specifically

6  charges him with soliciting information from the U.S. law

7  enforcement personnel regarding the U.S. investigations and

8  sharing that with the investigating -- investigated groups,

9  which is clearly a violation of the law, violation of U.S.

10  law, and I'm sure it's a violation of Mexican law.

11          Now, the defense basically is, and it sounded like

12  that was what Mr. Reyes Azarte was just alluding to, that he

13  was -- that he is a Mexican citizen, that he works for Mexican

14  law enforcement agencies, and this is the way they do it.  We

15  might not like it, but this is the way we do it.  Therefore,

16  there's really nothing wrong with it.

17          That's clearly not true.  This undercutting

18  investigations in the way that have been described by

19  Mr. Sandberg clearly shows the trouble that is created by this

20  particular conduct.  And there -- I'm sure that the amount of

21  information and so forth and alluded to that various

22  individuals were outed, and it led to perhaps the death of

23  one.

24          Now, whether you can put that in -- it's not part of

25  the indictment itself, so it's hard to say that he admitted to

1   that.  However, there's clearly evidence that this has been

2   going on a long time.  And basically, the defense is that it's

3   been going on forever and it will probably go on forever and,

4   therefore, that's the defense.

5        A culture of corruption is a culture of corruption,

6   and unfortunately, he's probably right.  I mean, we have

7   problems here in this country, drug culture, and we can arrest

8   a lot of people for violating our drug laws.  And whether that

9   deters anybody else is anybody's guess.  It certainly

10  doesn't -- is not noticeable as far as deterrence is

11  concerned.

12       On the one side, we have Mr. Reyes Azarte who

13  apparently is thought of quite well by friends and relatives

14  based on the great number of letters that have been submitted.

15  He did give himself up.  He didn't fight the charges.  He came

16  to the United States voluntarily and submitted to the

17  jurisdiction of the Court so that he could be prosecuted.

18  This is a good point in his behalf.  And about the only other

19  good point that I can think of is the fact that -- it's not

20  really a good point but maybe -- it might be worse if he was a

21  United States law enforcement official.

22       But the basic problem here is that he not only was a

23  law enforcement official, he was the top law enforcement

24  official in a particular sensitive job in Mexico.  And his

25  work, contrary to what he was supposed to do, created many --

1    has created and will continue to create many problems in

2    apparently an unending war on drugs, which leads to massive

3    transfer of funds, people dying of drugs, people who get

4    involved in -- do undercover work and they're in danger and so

5    on and so forth.

6            So it's a real problem which I think, therefore, in

7    trying to fashion a sentence, I think the government is way

8    too high with 120 months, but I'm -- I think that the 21 to 27

9    months under all the circumstances of this particular case,

10   bearing in mind that the defendant was, in fact, the head of

11   the major criminal justice organization in Mexico, it puts him

12   way above what the normal person would be who is a -- would be

13   under this particular indictment.

14           So I'm going to sentence him to a term of 40 months'

15   custody.  I am going to waive a fine because of inability to

16   pay.  There is a $200 special assessment.  I will not impose

17   supervised release at the recommendation on the basis that he

18   will, in fact, be deported.  So the 40 months will be on each

19   count concurrent to one another, to be served concurrently.

20           Now, Mr. Reyes Azarte, you're entitled to appeal the

21   sentence I have just imposed.  Do you understand that, sir?

22           THE DEFENDANT:  Yes.

23           THE COURT:  In order to do so, you must file a

24   written notice of appeal within 14 days.  Do you understand

25   that, sir?

1          THE DEFENDANT:  Yes.

2          THE COURT:  I will ask your lawyer, Mr. Lopez, to

3    discuss with you whether you wish to appeal and to file a

4    notice of appeal on your behalf.

5          Mr. Lopez, will you do that?

6          MR. LOPEZ:  I have discussed it with him.

7          THE COURT:  Pardon?

8          MR. LOPEZ:  I have discussed the appeal with him.

9          THE COURT:  All right.  And will you file a notice

10   of -- if he wishes to appeal, will you file a notice of

11   appeal?

12         MR. LOPEZ:  I will do that, Judge.

13         THE COURT:  Okay.  Thank you.

14         Is there anything further?

15         MS. SAWYER:  No, your Honor.

16         MR. LOPEZ:  Nothing further.

17         THE COURT:  Okay.  We'll stand adjourned.

18      (Proceedings adjourned at 3:07 p.m.)

19

20

21

22

23

24

25

C E R T I F I C A T E

     I, Judith A. Walsh, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable HARRY D. LEINENWEBER, one of the judges of said court, at Chicago, Illinois, on November 8, 2018.

*/s/ Judith A. Walsh, CSR, RDR, F/CRR*_____ September 10, 2019

Official Court Reporter

United States District Court

Northern District of Illinois

Eastern Division